## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**SHANTEL PARRIA**                                    **CIVIL ACTION**

**VERSUS**                                            **NO. 23-3663**

**GERALD CVITANOVICH, ET AL.**                        **SECTION "O"**

## <u>ORDER AND REASONS</u>

Jefferson Parish Sheriff's Office Sergeant Troy Smith died one week after sustaining a single gunshot wound to his head, inflicted during a domestic dispute with Shantel Parria, his wife. The Jefferson Parish Sheriff's Office arrested Parria, who was charged with his murder. After four years in custody pending her state criminal trial, Parria was acquitted and released. This civil rights lawsuit followed against certain police officers, coroner's office officials, and a prosecutor involved in the death investigation and her prosecution. Defendants include various officials in the Jefferson Parish Sheriff's Office, Coroner's Office, and District Attorney's Office. Before the Court is the Rule 12(b)(6) motion[1] to dismiss for failure to state a claim by Jefferson Parish District Attorney Paul Connick ("DA Connick") and Jefferson Parish Assistant District Attorney Kellie Rish ("ADA Rish") (collectively, "JPDA Defendants"). Plaintiff Shantel Parria opposes[2] the motion, and JPDA Defendants filed a reply.[3] For the following reasons, JPDA Defendants' motion to dismiss is **GRANTED.**

---

[1] ECF No. 24.
[2] ECF No. 38.
[3] ECF No. 45.

## I.    BACKGROUND

Plaintiff Shantel Parria filed suit under 42 U.S.C. § 1983 and Louisiana law against 11 named defendants and six unknown defendants whom Parria alleges were complicit in a scheme to wrongfully accuse, arrest, and prosecute her for her husband's murder.[4] Parria's complaint consists of a narrative recitation of facts followed by a series of legal claims. At this, the pleadings stage, the Court "accept[s] all well-pleaded facts as true and view[s] those facts in the light most favorable to" Parria. *Anderson v. Valdez*, 845 F.3d 580, 589 (5th Cir. 2016) (internal quotation marks omitted).

*Troy Smith Is Shot in the Head with His Own Glock 19*

At 11:24 p.m. on June 17, 2018, Parria called 9-1-1 seeking emergency medical services for her husband, Jefferson Parish Sheriff's Office ("JPSO") Sergeant Troy Smith, whom Parria frantically reported, "sho[]t himself in the head" in the bedroom of their home in Waggaman, Louisiana.[5] Within six minutes, JPSO Deputies (and partners) Jeffrey Truong and Matthew Veazey arrived to respond to the shooting of one of their own.[6] The scene was "chaotic."[7]

Deputy Truong observed "a firearm located on the far side of the bed from the entry door of the room with the barrel facing the headboard."[8] Deputy Truong, wearing gloves, retrieved the firearm, cleared it, and placed it back on the bed in the

---

[4] ECF No. 1.
[5] *Id.* ¶¶ 1, 59.
[6] *Id.* ¶ 2, 61.
[7] *Id.* ¶ 76.
[8] *Id.* ¶ 62. The firearm was Smith's Glock 19. *Id.* ¶¶ 302, 305 at Fig. 16.

same general area.[9] JPSO Deputies Truong and Veazey found Troy Smith—with blood streaming from the right side of his head—lying on the floor next to the bed, against the wall; he was still breathing.[10] Smith was JPSO Deputy Veazey's police academy instructor—Veazey immediately recognized Smith and was distraught by his condition.[11] JPSO Deputy Truong became physically ill.[12] The deputies rendered aid to Smith until Emergency Medical Services arrived.[13] Smith, critically injured but clinging to life, was transported to the hospital.[14]

Just 15 minutes after the shooting, Deputy Veazey escorted Parria outside and took her initial statement in the driveway.[15] Deputy Veazey's report recounts that Parria advised that her husband, Sergeant Smith, had been drinking and had taken a muscle relaxer on that day—he was upset because neither of his children had called to wish him a happy Father's Day.[16] That evening, Parria and Smith argued. When the argument resumed hours later, Parria attempted to pack a bag so she could leave for the night, and she told Smith she was leaving him.[17] Smith took the bag from her and walked towards the bedroom and stated "I am just going to kill myself then!"[18] Parria followed him into the room—the report states—but before Parria crossed the

---

[9] *Id.* ¶ 63.
[10] *Id.* ¶ 64-65.
[11] *Id.* ¶ 75.
[12] *Id.* ¶ 76.
[13] *Id.* ¶ 66.
[14] *Id.* ¶¶ 5, 61, 88.
[15] *Id.* ¶¶ 68-69.
[16] *Id.* ¶ 70.
[17] *Id.*
[18] *Id.*

threshold to the bedroom, she heard a loud noise then saw Smith laying on the ground, bleeding from his head, at which time she called 9-1-1.[19]

According to Parria's complaint, Deputy Veazey "sadly misunderstood" Parria's description of the events leading up to the shooting such that his report was flawed.[20] There is no audio, video, or body cam recording of her alleged statements to Deputy Veazey—accordingly, there is no corroboration that Parria ever indicated that she was outside the bedroom when Smith shot himself.[21] In later statements to JPSO, Parria unequivocally told JPSO Homicide Division Commander Donald Meunier and Detective Kurt Zeagler that she never told Veazey that she was outside of the bedroom when the shooting occurred.[22] Yet, "JPSO used [Veazey's] misunderstanding as the catalyst to mount a baseless and malicious crusade to punish [] Parria for a 'murder' that simply never happened."[23]

Shortly after the shooting, Smith's supervisor, Director of JPSO's Municipal Training Academy James Arey—at the direction of Jefferson Parish Sheriff Joseph Lopinto—arrived at the hospital before Smith and declared to West Jefferson ER personnel that "this is a murder."[24] Parria alleges that this declaration "revealed JPSO's intention to manufacture a case against Shantel Parria for murder, regardless of the facts and evidence."[25] According to Parria, JPSO was motivated to

---

[19] *Id.*
[20] *Id.* ¶ 77.
[21] *Id.* ¶¶ 71-72.
[22] *Id.* ¶ 73.
[23] *Id.* ¶ 78.
[24] *Id.* ¶91.
[25] *Id.* ¶ 96.

determine that its own Sergeant Smith was murdered. If Parria was responsible for Smith's murder, JPSO could avoid the scandal and reputational harm that would ensue if it became known that one of JPSO's own (Smith, a highly trained firearms expert) was unstable and shot himself intentionally and/or shot himself accidentally.[26]

Thirty minutes after his deputies arrived on scene, Sheriff Lopinto arrived to the scene.[27] Sheriff Lopinto and Parria spent hours alone together, driving to the emergency room and then to the other hospital to which Smith ultimately was transported.[28] Though Parria claims that she described to Sheriff Lopinto the events leading up to Smith's shooting, Sheriff Lopinto later denied that he discussed the incident with her.[29]

Twelve hours after the shooting, while holding vigil at Smith's bedside in the hospital's Intensive Care Unit, JPSO Detective William Roniger took Parria's statement, which he audio-recorded.[30] During the five-minute statement, Parria described the day of the shooting: Parria and Smith woke up late morning, ran errands, and argued over Smith being jealous.[31] Smith began drinking around 4:00 p.m. when his children failed to call him to wish him a happy Father's Day.[32] Smith was "upset" and "depressed" about not celebrating Father's Day, both because his

---

[26] *Id.* ¶¶ 97-99, 104-05, 108-09.
[27] *Id.* ¶ 80.
[28] *Id.* ¶¶ 81-82.
[29] *Id.* ¶¶ 82-86.
[30] *Id.* ¶ ¶ 111-12.
[31] *Id.* ¶ 113.
[32] *Id.*

children did not call him and because Smith's own father was deceased.[33] After dinner, Smith continued to drink before they went to bed at 9:00 p.m., when they argued more.[34] Parria fell asleep, but Smith woke her up at 11:00 p.m. to continue arguing.[35] To deescalate the argument, Parria left the house, but she returned minutes later to retrieve clothes.[36] Once inside, Smith resumed the argument.[37] He prevented her from getting into her car when she tried to leave.[38] Then Smith "stormed back into the house with [Parria's] phone and keys so that she could not leave."[39] As he walked back through the front door, Smith said, "f*ck it, I'll just kill myself."[40] Parria followed Smith into the bedroom, where he was on his side of the bed and "before [Parria] could stop him he picked up his gun, took it out of the holster, and shot himself."[41]

Exactly one week after he sustained a gunshot wound to his head, Smith died at the hospital.[42]

### JPSO Investigates the Shooting

The day after Smith died, on June 25, 2018, Sheriff Lopinto directed Arey to take Parria to JPSO's Human Resources Office to discuss financial arrangements for Smith's funeral.[43] Once there, Arey called Commander Meunier to advise that Parria

---

[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.* ¶ 121.
[43] *Id.* ¶¶ 123-24.

was in the "insurance department," which prompted Commander Meunier to later allege that, just 24 hours after Sergeant Smith died, Parria presented herself at JPSO "for the purposes of assessing departmental life insurance payout to her as the beneficiary."[44] Though Parria learned for the first time at the Human Resources meeting that the JPSO departmental life insurance policy was for $130,000, JPSO Commander Meunier and Detective Zeagler (six weeks later in the Preliminary Examination hearing) "use[d] this orchestrated incident to accuse [Parria] of murdering her husband to obtain his insurance benefits."[45]

That same day following Smith's death, Pathologist Dana Troxclair of the Jefferson Parish Coroner's Office ("JPCO") conducted Smith's autopsy.[46] It was also in late June 2018 that JPSO met with JPCO to convey "[t]he general investigative findings of the Homicide Division . . . to provide context for the medical findings."[47] Parria alleges that JPSO (including Lopinto, Meunier, Zeagler, and Scanlan) "leaned heavily on JPCO [through Jefferson Parish Coroner Gerald Cvitanovich and JPCO Forensic Pathologist Dana Troxclair] to ignore the evidence and to classify [Smith's] death as anything other than a 'suicide' or 'accident.'"[48] According to Parria, JPSO withheld from JPCO the DNA evidence, which reflected that Smith's DNA was the sole DNA present on the Glock that shot him and on the Glock's holster, and the fact that no blood product was present on Parria's clothing at the time of the shooting.[49]

---

[44] *Id.* ¶¶ 125-27.
[45] *Id.* ¶¶ 128-35.
[46] *Id.* ¶¶ 127, 337.
[47] *Id.* ¶¶ 174, 293-95.
[48] *Id.* ¶ 296.
[49] *Id.* ¶¶ 297-300, 311-12, 314.

Despite this information being withheld, a July 2, 2018 draft JPCO case report, which was shared with JPSO and which was generated after two in-person meetings with JPSO's Homicide Division and a call between Sheriff Lopinto and Coroner Cvitanovich, reflected JPCO's preliminary finding of suicide or self-inflicted wound (with "manner of death" as "pending").[50]

The investigation continued. Informed by, among other things, crime scene photographs and interviews, JPSO Chief Deputy Timothy Scanlan conducted the forensic reconstruction of the scene, and formulated JPSO's bullet trajectory theory: the bullet entered the right side of Smith's head, exited the top of his head, and penetrated the ceiling above Smith's bed.[51] This bullet trajectory theory, which was based on the belief that Smith had an exit wound on top of his head and the discovery of a nick in the popcorn ceiling of the bedroom where the shooting occurred, was "inconsistent with a self-inflicted gunshot wound."[52]

According to Parria, the medical evidence and evidence from the scene undermined JPSO's bullet trajectory theory.[53] For example, one responding Emergency Medical Technician ("EMT"), Alton Guillot, claimed to have observed the single spent "shell casing" on the bed; he conveyed this to JPSO in a July 13, 2018 statement.[54] JPSO did not recover the single spent shell casing on the bed, but instead recovered the single spent shell casing on the floor against the wall at the foot

---

[50] *Id.* ¶¶ 335-40.
[51] *Id.* ¶¶ 203-08.
[52] *Id.* ¶¶ 203-04, 208 and Fig. 8, 397, 411, 415.
[53] *Id.* ¶¶ 202-208, 255, 278-85.
[54] *Id.* ¶¶ 67, 728-29.

of the bed, as depicted by crime scene photographs.[55] According to Parria, "[t]he location of th[e] shell casing was consistent with [her] account that [Smith] was facing her across the bed with his back to the window when he pulled the trigger."[56] Though Scanlan downplayed the significance of the location of the shell casing, regardless of whether it was discharged onto the bed (as Guillot suggested) or on the floor (as JPSO crime scene photographs depict), either location undermined JPSO's bullet trajectory theory as each was consistent with Parria's account that Smith "shot himself with his back to the window while facing her on the opposite side of the bed."[57]

### *Parria Is Arrested, Charged with Murder, and Detained*

On July 11, 2018, Parria was arrested for second degree murder.[58] The arrest warrant was issued by a commissioner of the 24th Judicial District Court upon JPSO Commander Meunier's Affidavit for Arrest Warrant.[59] Meunier's Affidavit recounted: Parria's alleged "deception" and "divergent accounts"; that Parria's assertions concerning Smith's depression and intoxication "were disproved"; entry and exit wounds on Smith's head were "inconsistent" with a self-inflicted gunshot wound; the "wound pattern, the crouched position [Smith would have had to assume], the scene reconstruction and the video surveillance collectively refute each and all of [Parria's] versions of the shooting[.]"[60]

---

[55] *Id.* ¶¶ 724 and Figs. 42-44.
[56] *Id.* ¶ 725.
[57] *Id.* ¶¶ 728-33, 724-26.
[58] *Id.* ¶¶ 137, 826.
[59] *Id.* ¶¶ 137, 826.
[60] *Id.* ¶¶ 139, 253.

Parria alleges that Commander Meunier submitted his affidavit *before* obtaining Smith's medical records[61] and *before* receiving the first DNA report,[62] and that he intentionally omitted from his Affidavit any evidence of Smith's depression and his positive test for opiates and amphetamines upon hospital admission.[63] Parria also alleges that Meunier knew as early as two days after the shooting that there was no exit wound on top of Smith's head, a finding later confirmed by Smith's medical records.[64] The hole in Smith's head was instead caused by a craniectomy performed by surgeons, who drilled several small holes and placed a drain in Smith's skull during interventions to stabilize him.[65]

After being arrested by JPSO in the middle of the night on July 11, Parria underwent a three-hour interrogation by JPSO Commander Meunier and Captain Dennis Thornton during which she provided a much more detailed statement than her prior five-minute recorded statement.[66] Parria was then booked on a charge of second degree murder.[67] Her bail was set at $500,000 but she lacked the resources to post it.[68]

On July 16, 2018, WDSU News Channel 6 aired an 11-minute segment during which a panel discussed Parria's arrest on the second-degree murder charge.[69] Panelist Mike Kahn suggested he was "intimately" familiar with the case. Kahn

---

[61] *Id.* ¶¶ 275, 447.
[62] *Id.* ¶ 448.
[63] *Id.* ¶¶ 163-67.
[64] *Id.* ¶¶ 164, 167, 226-29, 283.
[65] *Id.* ¶¶ 278-84.
[66] *Id.* ¶¶ 450-54.
[67] *Id.* ¶ 478.
[68] *Id.* ¶ 479.
[69] *Id.* ¶ 745.

dismissed the idea that Smith died by suicide (and dismissed Smith's suicidal Facebook posts), lauded Jefferson Parish's "state of the art crime lab," observed that Parria's credibility is "a huge issue" if her stories have changed, and foreshadowed the possibility of snitch testimony against Parria because "when people do these crimes, they have this deep-seated need to tell someone what really happened[.]"[70]

Just two weeks after the segment aired, on or about July 31, 2018, Parria (while in pretrial custody following her arrest on the warrant) allegedly confessed to a jailhouse snitch, Serrita Lambert, that she (Parria) murdered Smith.[71] In reality, Parria alleges, Commander Meunier orchestrated the "confession."[72]

*Parria Remains Detained After Probable Cause and Bond Reduction Hearing*

A week after the "confession," on August 6 and 7, 2018, a Preliminary Examination court hearing was held, contemporaneously with Parria's motion for bond reduction.[73] During the two-day hearing, a state court commissioner considered testimony and evidence to determine whether there was probable cause to hold Parria on the murder charge.[74] Smith and Parria's friend, Laura Vignoe, testified that the day before the shooting, Smith texted her that he was having suicidal thoughts.[75] JPCO Forensic Pathologist Dana Troxclair testified that it was *not* possible that the purported "exit wound" then-identified on the top of Smith's skull could have been

---

[70] *Id.* ¶¶ 746-51.
[71] *Id.* ¶ 598
[72] *Id.* ¶ 613.
[73] *Id.* ¶¶ 372-73; 485.
[74] *Id.* ¶¶ 372-73; 485.
[75] *Id.* ¶¶ 485-93.

related to Smith's medical treatment.[76] Commander Meunier testified, among other things, that Parria "confessed" to a jailhouse snitch, Serrita Lambert, who was housed with Parria.[77] According to Lambert's alleged statement to Commander Meunier and Detective Zeagler, Lambert asked Parria why she killed her husband to which Parria allegedly responded that they were having financial problems and "one day she just woke up and snapped."[78] In her complaint, Parria alleges that Lambert had snitched for Commander Meunier in other prior cases, and that he coerced Lambert to provide this fabricated testimony to supply probable cause where there was none.[79]

The state court commissioner determined there was probable cause to continue to hold Parria. Though Parria's bail was decreased to $300,000, she lacked the resources to post it.[80]

### *JPCO's Autopsy Reports Reflect "Undetermined" Manner of Death*

On September 17, 2018, days after conducting an internal in-depth Case Review involving its forthcoming Autopsy and Case Report, JPCO released its original Autopsy Report and Case Report, which listed Smith's manner of death as "undetermined."[81] This September Report differed from JPCO's July 2 draft report in which JPCO Troxclair had then indicated "preliminary findings: gunshot wound to the head. Suicide" and "manner of death: pending[;] describe how injury occurred:

---

[76] *Id.* ¶¶ 372-74.
[77] *Id.* ¶ 622.
[78] *Id.* ¶ 602-07.
[79] *Id.* ¶ 622.
[80] *Id.* ¶ 480.
[81] *Id.* ¶ 330-35.

decedent shot self."[82] Though JPCO "would not go so far as to rule [Smith's] death a 'homicide,'" Parria alleges, "[JPCO] served up medical findings that were inconsistent with the evidence but consistent with Defendants' murder narrative."[83]

On October 23, 2018, JPCO amended its Autopsy Report to reflect that the wound "previously designated as the Exit Gunshot Wound was a drainage tube insertion site[.]"[84] But JPCO did not change its assessment of Smith's manner of death—it remained "undetermined."[85] Nor did JPSO Chief Deputy Scanlan change his forensic theory of the case.[86]

### Parria Is Indicted, Tried, and Acquitted of Second-Degree Murder

On November 8, 2018, a grand jury returned an indictment against Parria for one count of second-degree murder.[87] For another three years and nine months, Parria remained in custody pending trial.

On August 15, 2022, Parria's jury trial began.[88] On August 26, 2022, after two hours of deliberation, Parria was acquitted.[89]

### Parria Files the Instant Civil Rights Lawsuit

On August 18, 2023, Parria filed in this Court[90] a 147-page, 907-paragraph Complaint in which she advances 16 federal and state claims and names as

---

[82] *Id.* ¶ 340.
[83] *Id.* ¶ 343.
[84] *Id.* ¶ 376.
[85] *Id.* ¶ 382.
[86] *Id.* ¶¶ 411, 442-45.
[87] *Id.* ¶ 827.
[88] *Id.* ¶ 756.
[89] *Id.* ¶ 776.
[90] This matter was initially allotted to another section of Court. The case was transferred to this section of Court on December 28, 2023.

defendants individuals from JPSO (Sheriff Lopinto, JPSO Deputy/Homicide Division Commander Donald Meunier, JPSO Detective Kurt Zeagler, JPSO Detective William Roniger, JPSO Director of Municipal Training Academy James Arey, JPSO Chief Deputy Timothy Scanlan, JPSO John Doe 1, JPSO John Doe 2, and JPSO John Doe 3); JPCO (Jefferson Parish Coroner Gerald Cvitanovich, JPCO Forensic Pathologist Dana Troxclair, and JPCO Investigator Julia Powers); and JPDA (DA Paul Connick, ADA Kellie Rish, JPDA John Doe 4, JPDA John Doe 5, and JPDA John Doe 6), as well as certain insurers. Parria purports to sue all defendants in their individual and official capacities, except for DA Connick, who is sued in his official capacity only as "vicariously . . . liable" for ADA Rish's alleged conduct.

Parria advances nine federal claims under 42 U.S.C. § 1983: **Count 1** (deprivation of liberty without due process under the Fifth and Fourteenth Amendments) against all defendants; **Count 2** (unlawful seizure/detention without probable cause under the Fourth and Fourteenth Amendment) against all defendants; **Count 3** (manufacturing false evidence in violation of the Fifth and Fourteenth Amendments) against all defendants; **Count 4** (malicious prosecution) against all defendants; **Count 5** (failure to intervene) against all defendants; **Count 6** (civil rights conspiracy) against Sheriff Lopinto, Arey, Commander Meunier, Detective Roniger, Detective Zeagler, Chief Deputy Scanlan, and ADA Rish; **Count 7** (supervisor liability) against Sheriff Lopinto and Commander Meunier; **Count 8** (*Monell* claim) against Sheriff Lopinto in his official capacity; **Count 9** (*Monell* claim) against Coroner Cvitanovich in his official capacity.

14

She advances seven state law claims: **Count 10** (malicious prosecution) against all defendants; **Count 11** (wrongful imprisonment) against all defendants; **Count 12** (negligence and/or gross negligence) against all defendants; **Count 13** (negligent and/or grossly negligent supervision) against Sheriff Lopinto, Commander Meunier, and Coroner Cvitanovich; **Count 14** (intentional or reckless infliction of emotional distress) against all defendants; **Count 15** (vicarious liability/respondeat superior) against Sheriff Lopinto, Coroner Cvitanovich, and DA Connick, in their official capacities; **Count 16** (violations of the Louisiana constitution) against Sheriff Lopinto, Coroner Cvitanovich, and DA Connick, in their official capacities.

As for her claims against the JPDA Defendants, Parria alleges that ADA Rish participated in the investigation and malicious prosecution of Parria,[91] and engaged in a scheme to deprive Parria of her constitutional guarantees.[92] Parria alleges that ADA Rish withheld evidence from the grand jury, including evidence that Parria's DNA was not found on the firearm involved in her husband's death, and further withheld evidence of her husband's history of suicidal ideations, thereby tainting the grand jury deliberations.[93]

Parria contends that the State's case against her "rested on an invented bullet trajectory that was based on a nick in the popcorn ceiling of [their] master bedroom and a non-existent exit wound on top of [her husband's] head."[94] Parria maintains that irrefutable medical evidence disproved the State's theory, but that JPSO refused

---

[91] *Id.* ¶¶ 42, 445.
[92] *Id.* ¶ 14.
[93] *Id.* ¶¶ 297–313, 523–26.
[94] *Id.* ¶ 719.

to change its implausible forensic theory in defiance of this evidence.[95] Parria alleges that testimony from an EMT had indicated that he observed a single spent shell casing on the bed, which posed a significant problem for the State's bullet-trajectory theory.[96] Parria contends that ADA Rish, on an unspecified date, interviewed the EMT, seeking to alter his testimony by injecting doubt into his mind and convincing him to change his testimony to suit the State's theory of the bullet's trajectory.[97] Parria thus asserts that ADA Rish intentionally and in bad faith tampered with witness testimony.[98]

Though ADA Rish is included among a group of defendants in most of the counts, Parria specifically names Rish in two claims pursuant to 42 U.S.C. § 1983: Count 1 and Count 6. In Count 1, Parria alleges that Rish intentionally and in bad faith: (1) delayed the production of exculpatory evidence in an effort to wear Parria down and prolong her imprisonment to further the goal of inducing Parria to plead guilty, despite Rish's knowledge that Parria had committed no crime;[99] (2) refused to agree to a meaningful bond reduction because prolonging Parria's imprisonment increased the probability of Parria changing her plea to guilty;[100] (3) sought and obtained an indictment based on "material misrepresentations, omissions, outright falsehoods, and fabricated evidence," which tainted the grand jury's deliberations;[101]

---

[95] *Id.* ¶¶ 722–25.
[96] *Id.* ¶¶ 727–31.
[97] *Id.* ¶¶ 734–38.
[98] *Id.* ¶ 792.
[99] *Id.* ¶ 795.
[100] *Id.* ¶ 796.
[101] *Id.* ¶ 797.

(4) tampered with the EMT's witness testimony during an investigative interview;[102] and (5) leaked false and willfully misleading details of the case to the media in an effort to "poison the jury pool" against Parria, to increase public pressure on her to plead guilty, and to elicit and preemptively bolster "fabricated snitch testimony" against Parria.[103]

In Count 6, civil rights conspiracy, Parria alleges that Rish and others agreed to act in concert to deprive Parria of her clearly established rights not to be deprived of liberty without due process of the law, not to be illegally seized and detained, and to be free from malicious prosecution.[104] Parria alleges that, in furtherance of the conspiracy, Rish and others agreed to engage in and facilitate numerous overt acts, including withholding and suppressing exculpatory evidence; delaying the production of exculpatory evidence; obtaining an indictment based on misrepresentations and fabricated evidence; and intentionally leaking false and misleading details to the media.[105]

ADA Rish is not explicitly named in the other counts; however, Parria purports to assert certain claims "against all individual defendants" and thereby purports to allege Rish's complicity in: unlawfully seizing and detaining her without probable cause, manufacturing of false evidence, maliciously prosecuting her, and failing to intervene, all pursuant to 42 U.S.C. § 1983.[106] As for state law liability, Parria alleges

---

[102] *Id.* ¶ 792.
[103] *Id.* ¶ 799.
[104] *Id.* ¶ 842 (Count 6).
[105] *Id.* ¶ 843.
[106] *Id.* ¶¶ 802–840

that ADA Rish maliciously prosecuted her, wrongfully imprisoned her, was negligent and/or grossly negligent, and intentionally inflicted emotional distress on Parria.[107] Additionally, Parria seeks to hold District Attorney Paul Connick liable in his official capacity as Rish's employer under the doctrine of vicarious liability/*respondeat superior* and for alleged violations of the Louisiana State Constitution.[108]

ADA Rish and DA Connick now move to dismiss Parria's claims against them for failure to state a claim and on the grounds that they are immune from suit/liability and that Parria's claims are time-barred or prescribed.[109]

## II.    LEGAL STANDARDS

### A. *Procedure*: Pleading Standard

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint that does not meet Rule 8(a)(2)'s pleading standard should be dismissed for failing to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitations of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at

---

[107] *Id.* ¶¶ 881–893; 897–900.
[108] *Id.* ¶¶ 901–907.
[109] ECF No. 24.

555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Ultimately, "[t]o survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although courts "accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff, conclusory allegations, unwarranted factual inferences, or legal conclusions are not accepted as true." *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023) (cleaned up).

These same pleading standards apply to civil rights claims like Parria's. Specific applications of the ordinary pleading standards to civil rights lawsuits are relevant here. For example, resort to group pleading—faulting defendants "as a group without factual material suggesting that any particular defendant" violated the plaintiff's civil rights—is insufficient to state a plausible claim against a particular individual defendant. *Armstrong v. Ashley*, 60 F.4th 262, 274-75 (5th Cir. 2023). This is so because "a § 1983 plaintiff 'must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* at 275.

**B. *Substance*: 42 U.S.C. § 1983 and Louisiana Law**

**1. Federal Civil Rights**

Enacted pursuant to Congress's authority to enforce the Fourteenth Amendment, 42 U.S.C. § 1983 "provides a cause of action against state actors who violate an individual's rights under federal law." *Filarski v. Delia*, 566 U.S. 377, 380 (2012). It provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any ... person … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

42 U.S.C. § 1983. The statute's "purpose [] is to deter state actors from using their badge of authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (citation omitted). Because § 1983 merely provides a remedy for designated rights, rather than creating substantive rights, "an underlying constitutional or statutory violation is a predicate to liability." *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citation omitted). To establish § 1983 liability, the plaintiff must satisfy three elements: "(1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor." *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted).

**2. Capacities and Immunities**

**a. *Official Versus Individual Capacity Liability***

"The performance of official duties creates two potential liabilities, individual-capacity liability for the person and official-capacity liability for the municipality."

*Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 484 (5th Cir. 2000). The substantive law distinguishes between federal civil rights claims pursued against an official in his *official* capacity and those against an official his *individual* (or personal) capacity. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (explaining the doctrinal and practical differences between the two capacities).

Official capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Id.* (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978)). Because the entity is the real party in interest, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166. "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official," liability is premised upon "the entity's 'policy or custom' [which] must have played a part in the violation of federal law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). (citation omitted).

In contrast, "[p]ersonal-capacity suits seek to impose individual liability upon a government officer for actions taken under color of state law." *Id.* Thus, "[o]n the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Id.* (citation omitted). That is, the plaintiff pursuing a personal-capacity claim need not establish a connection to governmental "policy or custom[.]" *Id.* Another distinction of consequence: "officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively

21

reasonable reliance on existing law." *Id.* (citation omitted); *see also Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999) (citation omitted).

### b. Absolute Immunity for Advocacy; Qualified Immunity for Investigation or Discretionary Functions

Section 1983's text does not confer any immunities from suit. *Malley v. Briggs*, 475 U.S. 335, 342 (1986). Nevertheless, the Supreme Court has determined that Congress intended that the statute embrace traditional concepts of immunity existing at common law at the time Congress enacted Section 1983. *Rehberg v. Paulk*, 566 U.S. 356, 361 (2012) ("[Section 1983] was not meant to effect a radical departure from ordinary tort law and the common-law immunities applicable in tort suits.").

Accordingly, when a plaintiff sues a state actor in his individual capacity, the state actor may advance immunity defenses to claims for alleged deprivations of constitutional rights. That is, "[a]bsolute and qualified immunity protect . . . *individuals* from claims for *damages*." *Singleton v. Cannizzaro*, 956 F.3d 773, 778 n.3 (5th Cir. 2020) (citation omitted, emphasis in original). Prosecutors, for example, enjoy absolute immunity when they perform judicial or quasi-judicial functions because their independence is essential to a properly functioning criminal justice system. *See Imbler v. Pachtman*, 424 U.S. 409, 427-48 (1976). Witnesses, too, enjoy absolute immunity from civil damages liability: "witnesses were absolutely immune at common law from subsequent damages liability for their testimony in judicial proceedings 'even if the witness knew the statements were false and made them with malice.'" *Burns v. Reed*, 500 U.S. 478, 489 (1991) (citation omitted); *accord Rehberg*,

566 U.S. at 361-63 (determining that a "complaining witness" in a grand jury proceeding is absolutely immune from civil damages suit).

*Absolute Immunity*

In *Imbler v. Pachtman*, the Supreme Court "extended absolute immunity for § 1983 claims to state prosecutors[.]" *Singleton*, 956 F.3d at 779 (citing 424 U.S. 409 (1976)). It is settled that "a state prosecuting attorney who act[s] within the scope of his duties in initiating and pursuing a criminal prosecution" enjoys absolute immunity from allegations of alleged deprivations of constitutional rights. *See Imbler,* 424 U.S. at 410; *see also Rehberg*, 566 U.S. at 363 (identifying various functions to which absolute immunity attaches including "actions taken by prosecutors in their role as advocates").

Absolute immunity, however, is more limited in scope than its name implies. And it is not automatic. *Cousin v. Small*, 325 F.3d 627, 631 (5th Cir. 2003) (*per curiam*). Given that it "is premised on the nature of the function performed by the prosecutor, not on the actor's title[,]" it does not extend "to 'advising the police in the investigative phase of a criminal case 'where qualified immunity is sufficient.'" *Terwilliger v. Reyna*, 4 F.4th 270, 280 (5th Cir. 2021) (citations omitted). To determine whether a prosecutor is entitled to absolute immunity, thus, courts take a "functional approach" in which "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991).

The dichotomy is between advocacy functions (which enjoy absolute immunity) and investigative or administrative functions (which do not). *See Wearry v. Foster*, 33 F.4th 260, 266 (5th Cir. 2022) (describing the distinction "between the advocacy function of organizing, evaluating, and presenting evidence, and the separate investigatory function of gathering or acquiring evidence"). If the conduct predicating liability involved advocacy for the State intimately associated with the judicial process—as opposed to investigative work typical of police officers in the field—the prosecutor likely enjoys absolute immunity for performance of such an advocatory function. *See Buckley v. Fitzsimons*, 509 U.S. 259, 273-74 (1993). "Prosecutors are shielded by absolute immunity for activities 'intimately associated with the judicial phase of the criminal process,' including 'initiating a prosecution and [ ] presenting the State's case.'" *Terwilliger*, 4 F.4th at 280 (quoting *Imbler*, 424 U.S. at 430-31).

Though "the test for absolute immunity is functional rather than temporal[,]" to be sure, "the timing of events, while not determinative, can be highly relevant to the inquiry into function." *Cousin,* 325 F.3d at 636. Indeed, "[t]he pendency of a judicial proceeding is logically related to the determination whether a prosecutor's 'activities [are] intimately associated with the judicial phase of the criminal process, and thus [are] functions to which the reasons for absolute immunity apply with full force." *Id.* (quoting *Imbler*, 424 U.S. at 430). Relatedly, "it is more likely that the prosecutor acts as an advocate . . . after probable cause has been established." *Id.* at 633.

Accordingly, prosecutors are absolutely immune for actions taken "in preparing for the initiation of judicial proceedings or for trial, and [that] occur in the course of [the prosecutor's] role as an advocate for the State." *Buckley*, 509 U.S. at 273. "Conversely, 'a prosecutor is afforded only qualified immunity for acts performed in the course of administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings.'" *Wooten v. Roach*, 964 F.3d 395, 407 (5th Cir. 2020) (citations omitted).

Certain judicial or quasi-judicial functions are quintessentially advocatory. These include "the professional evaluation of . . . evidence assembled by the police," *Buckley*, 509 U.S. at 273, as well as "decisions to charge, not to charge, or to dismiss charges[.]" *See Jason v. Par. Of Plaquemines*, No. 16-2728, 2017 WL 993152, at *4 (E.D. La. Mar. 15, 2017) (Vance, J.) (citing *Van de Kamp v. Goldstein*, 555 U.S. 335, 341 (2009)). When a prosecutor "appear[s] before a grand jury to present evidence and obtain an indictment[,]" *see Wooten*, 964 F.3d at 411 (citing *Buckley*, 509 U.S. at 273), or participates in a probable cause hearing in support of a warrant, *see Burns*, 500 U.S. at 486, or otherwise receives information regarding the violation of criminal law and then obtains an arrest warrant, *Rykers v. Alford*, 832 F.2d 895, 897 (5th Cir. 1987), she generally functions as an advocate for the state such that prosecutorial immunity attaches. *See McGruder v. Necaise*, 733 F.2d 1146, 1148 (5th Cir. 1984) (holding that the "decision to initiate, maintain, or dismiss criminal charges is at the core of the prosecutorial function").

When a prosecutor's function implicates absolute immunity, it "shelters prosecutors even when they act 'maliciously, wantonly, or negligently[.]'" *Loupe v. O'Bannon*, 824 F.3d 534, 539-40 (5th Cir. 2016) (citations omitted); *see also Morrison v. City of Baton Rouge*, 761 F.2d 242, 248 (5th Cir. 1985) (When a state prosecutor "present[s] evidence to a grand jury in a manner calculated to obtain an indictment," he enjoys absolute immunity, "even when [the same is] maliciously, wantonly or negligently accomplished[.]"). That is, the focus remains "on the conduct for which immunity is claimed" regardless of the lawfulness or motivation for it, or the harm that the conduct may have caused. *See Buckley*, 509 U.S. at 271. Thus, other advocatory conduct shielded by absolute immunity may include suppressing exculpatory evidence, suborning perjury, and filing false affidavits in or related to judicial proceedings. *See Cousin*, 325 F.3d at 635 (finding that absolute immunity cloaked prosecutor's interview of witness in which prosecutor allegedly told witness to implicate Cousin falsely in the murder and coached witness as to how to testify, given that interview was intended to secure evidence to be used in the presentation of the state's case at the pending trial of an already identified suspect); *see also Bruce v. Wade*, 537 F.2d 850, 852 (5th Cir. 1976) (affirming dismissal of Section 1983 claims against prosecutor alleged to have suborned perjury and filed false affidavits at trial and during post-conviction proceeding).

Conversely, when a prosecutor appears on the scene to evaluate whether a warrantless search was justified, participates in searching for and seizing evidence, or makes statements to the press, he operates outside of the judicial process and will

be denied absolute immunity. *See Wooten*, 964 F.3d at 408 (citations omitted) (affirming denial of absolute immunity where prosecutor "act[ed] as a stand-in for law enforcement [and] used the [grand] juries to investigate as part of the effort to assemble the evidence that would be needed to indict Wooten"); *see also Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009) ("[A]bsolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation, . . . [or] when the prosecutor makes statements to the press[.]"). For these are occasions in which the prosecutors themselves are acting outside of their quasi-judicial role or engaged in purely investigative conduct "in order to decide whether a suspect may be arrested." *See Buckley*, 509 U.S. at 275 (holding that prosecutors were not absolutely immune for allegedly fabricating evidence and making false statements at a press conference announcing the return of an indictment because they lacked probable cause to arrest the plaintiff or initiate judicial proceedings at the time of the fabrication).

In other words, when a prosecutor steps outside of her role as an advocate for the State, conducts herself like a police officer, or gives investigative advice to a police officer, she enjoys only that degree of immunity conferred on a police officer, that is, qualified immunity. *See Burns*, 500 U.S. at 493-95 (citation omitted) ("Advising the police in the investigative phase of a criminal case is [not] so 'intimately associated with the judicial phase of the criminal process' that it qualifies for absolute immunity."); *see also Terwilliger v. Reyna*, 4 F.4th 270, 281 (5th Cir. 2021). Denial of absolute immunity is appropriate where:

- State prosecuting attorney ordered the warrantless arrest of an accused. *Loupe v. O'Bannon*, 824 F.3d 534, 536 (5th Cir. 2016).

- State prosecuting attorneys allegedly created and used fake subpoenas to compel victims and witnesses to meet with them outside of court in order to pressure them to cooperate in criminal cases. *Singleton v. Cannizzaro*, 956 F.3d 773, 781 (5th Cir. 2020); *see also Brown v. Williams*, 757 F. Supp. 3d 668, 677 (E.D. La. 2024) (Vance, J.).

- State prosecutor, who was present at the scene "investigating the shooting," was allegedly the driving force behind mass arrests and approval of a global arrest warrant of "all bikers wearing colors[.]" *Terwilliger*, 4 F.4th at 280-81; *see also Hoog-Watson v. Guadalupe County*, 591 F.3d 431 (5th Cir. 2009) (denying absolute immunity to prosecutor who was on the scene searching for and seizing evidence to evaluate whether a warrantless search was justified, rather than evaluating evidence gathered by the police).

- State prosecutors allegedly "invented a false narrative and then coerced a vulnerable juvenile to adopt and testify to it in court." *See Wearry*, 33 F.4th at 268 (rejecting prosecutors' "campaign to intimidate and coerce a vulnerable child into falsely testifying against Wearry . . . over the course of at least six meetings").

Critically, the same federal pleading standards apply to determinations of immunity. That is, at the pleadings stage, mere "conclusory allegations about [a prosecutor's] involvement in the overall investigation fail to strip him of prosecutorial immunity." *Wooten,* 964 F.3d at 411. Alleging that a prosecutor was involved in "investigation," without alleging facts indicating that or *how* the prosecutor participated in ways that were investigatory, will be insufficient to overcome a prosecutor's entitlement to absolute immunity. *See id.* Furthermore, district courts are admonished against "pars[ing] the activities of a prosecutor incident to the bringing and trial of a case so closely, [otherwise] the cloak of immunity would be tattered." *Geter v. Fortenberry*, 849 F.2d 1550, 1555 (5th Cir. 1988).

*Qualified Immunity*

If absolute immunity is not available because the prosecutor acts outside her quasi-judicial role—for example, if a prosecutor functions as a police officer performing investigative tasks—then "the prosecutor . . . is given the same immunity a police officer would have: qualified immunity." *Singleton*, 956 F.3d at 781 (citation omitted). Unlike the actor claiming absolute immunity who bears the burden of establishing he enjoys absolute immunity, when a defendant invokes a qualified immunity defense in a motion to dismiss, "[t]he plaintiff [bears] the burden of demonstrating that qualified immunity is inappropriate." *Green v. Thomas*, 129 F.4th 877, 883 (5th Cir. 2025) (citation omitted). In the face of a qualified immunity defense, "the plaintiff must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm alleged and that defeat a qualified immunity defense with equal specificity." *Nevarez v. Dorris*, 135 F.4th 269, 274 (5th Cir. 2025) (citation omitted). Accordingly, "[t]o defeat a qualified immunity defense, the plaintiff must show '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Id.* With respect to the second prong, "[a] [g]overnment official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Courts

"have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

"[T]he qualified immunity defense [] provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). That is, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *al-Kidd*, 563 U.S. at 743.

### 3.  State-Law Claims

Though the Section 1983 remedy is technically distinct from pre-existing common law torts, state laws provide counterpart tort causes of actions and equivalent remedies. *See Rehberg*, 566 U.S. at 361, 366. So too here. Parria alleges a litany of such tort claims against the JPDA Defendants: malicious prosecution, wrongful imprisonment, negligence, intentional infliction of emotional distress, vicarious liability, and violations of the Louisiana constitution.

Unsurprisingly then, where a prosecutor enjoys absolute immunity from federal or constitutional deprivations under § 1983, Louisiana confers coextensive absolute immunity for the same conduct. *See Singleton*, 956 F.3d at 779 n.4 ("Louisiana law tracks federal law on absolute prosecutorial immunity.") (citation omitted); *see also Holmes v. White*, 718 F. Supp. 3d 585, 602 (E.D. La. 2024) (Africk, J.) (applying Louisiana's absolute immunity doctrine and determining that the plaintiff failed to state a claim against prosecutor defendants for state-law torts

including intentional infliction of emotional distress, defamation, fraud, and abuse of process).

## III.  ANALYSIS

The JPDA Defendants, DA Connick and ADA Rish, advance several independent grounds for dismissing Parria's claims against them. First, they contend that Parria's resort to group and conclusory allegations fails to comply with pleading standards and compels dismissal of Parria's claims for failure to state a plausible claim.[110] Second, ADA Rish contends that Parria's allegations target conduct by ADA Rish in which she functioned in her advocatory role for the State which is protected by absolute immunity and, additionally, as to the federal malicious prosecution claim, qualified immunity.[111] Third, the JPDA Defendants contend that Parria's claims are time-barred.[112] And, finally, the JPDA Defendants urge dismissal of Parria's claims against JPDA John Doe Nos. 4-6 on the ground that any amendment substituting the names for the fictitious defendants will not relate back and will therefore be untimely.[113]

Parria counters that ADA Rish has not met her burden of showing entitlement to absolute immunity, concluding that "all of Rish's actions from [Parria's] arrest through her trial were investigative in nature because of the absolute absence of

---

[110] ECF No. 24-1.
[111] *Id.*
[112] *Id.*
[113] *Id.*

competent, affirmative evidence of guilt."[114] Parria further contends that her allegations regarding an investigative interview and leaking information to the media exceed the scope of absolute immunity, and that it is permissible for her to refer to the defendants as a group because she alleges that they acted collectively.[115] Finally, Parria contends that her claims are timely, and urges the Court not to dismiss the John Doe defendants at this time and to permit her to amend her complaint if the Court deems dismissal appropriate.[116]

### A.    Federal Individual-Capacity Claims: Plausibility, Absolute Immunity, and/or Qualified Immunity

ADA Rish contends that she functioned as an advocate and therefore is absolutely immune from Parria's claims. Generally, the JPDA Defendants argue that Parria improperly relies on group pleading such that her allegations against them are "very thin on facts," observing that Parria names ADA Rish in merely 23 paragraphs of the 907-paragraph complaint and names DA Connick just twice. For her part, Parria does not dispute the scope of the settled prosecutorial immunity law and the applicable functional approach, but she appears to resist the functional approach insofar as she counters that *all* actions by Rish (and every other defendant) were investigative in nature because no competent, affirmative evidence of guilt was ever produced.

Taking as true only well-pled facts, the Court turns to address each allegedly wrongful act Parria attributes to ADA Rish and to consider the factual content of the

---

[114] ECF No. 38 at 6.
[115] *Id.* at 13-14, 16.
[116] *Id.* at 22-25.

allegations to classify each well-pled act according to its function to determine whether Rish has carried her burden to demonstrate that she was functioning as an advocate in all respects. If she was not, the Court considers whether the well-pled facts defeat her alternative assertion of qualified immunity. The Court then addresses whether Parria has stated a plausible claim against DA Connick, whether the JPDA John Does should be dismissed, and whether Parria should be granted leave to amend her complaint.

Applying this functional approach and these authorities, ADA Rish has carried her burden to demonstrate entitlement to absolute immunity as to nearly all of her alleged conduct for which immunity is claimed. Insofar as Parria alleges facts allowing the Court to assess the substantive quality of Rish's conduct, most of her alleged conduct in pursuing Parria's prosecution for second degree murder involved evaluation and preparation for presentation of evidence in her role as advocate for the State. Where factual content is absent, Parria fails to state a plausible claim for relief against Rish. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (finding that a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution).

The Court proceeds to consider each of ADA Rish's alleged acts for which immunity is claimed. All of Rish's alleged conduct predicates Parria's overlapping causes of action, thus making it more sensible to proceed act-by-act rather than claim-by-claim.

1. **<u>Alleged Due Process Violations</u>**

In Counts 1 and 3, Parria alleges that all defendants violated her Fourteenth Amendment right to be free from liberty deprivations without due process of law.[117] Most of Rish's allegedly unconstitutional conduct is referenced in Count 1. There, Parria alleges that Rish denied her due process by: (i) delaying the production of exculpatory evidence;[118] (ii) opposing reduction in Parria's bond;[119] (iii) obtaining an indictment based on misrepresentations and fabricated evidence;[120] (iv) tampering with and falsifying witness testimony;[121] and (v) leaking false and misleading details of the case to the media.[122] Count 3 focuses on due process deprivations due to "manufacturing false evidence" and is alleged against "all individual defendants."

To determine whether Rish has carried her burden in showing she is entitled to absolute immunity, the Court endeavors to "map the allegations in [Parria's] complaint onto [the] dichotomy" between "investigatory actions and advocatory ones, with only the latter due absolute immunity." *Wearry v. Foster*, 33 F.4th at 266 (citing *Singleton*, 956 F.3d at 780).

---

[117] As a threshold matter, Parria erroneously invokes the Fifth Amendment's due process clause, which applies only to actions of the federal government. *See Arnold v. Williams*, 979 F.3d 262, 265 n.2, 270 (5th Cir. 2020) (affirming dismissal of Fifth Amendment due process claim because defendant "was an officer of the state of Louisiana rather than of the federal government"). Here, Parria sues only non-federal government officials, ADA Rish and DA Connick. Accordingly, Parria's due process claims are properly considered under the Fourteenth Amendment.
[118] ECF No. 1 ¶ 795.
[119] *Id.* ¶¶ 778, 796.
[120] *Id.* ¶ 797.
[121] *Id.* ¶ 792.
[122] *Id.* ¶ 799.

*(i) delayed evidence production, (ii) opposing bond reduction,*
*(iii) obtaining indictment based on fabricated evidence*

The Court takes up the first three acts together: (i) delaying the production of exculpatory evidence, (ii) opposing reduction in Parria's bond, and (iii) obtaining an indictment based on misrepresentations and fabricated evidence. Rish amply has carried her burden to show that she functioned as an advocate for the State for this alleged conduct and thus enjoys absolute immunity from Parria's lawsuit based on these acts. All three fall squarely within the ambit of advocatory actions entitled to absolute immunity. *See, e.g., Imbler*, 424 U.S. at 425–30 (holding that prosecutor enjoys absolute immunity from suit for deliberately withholding exculpatory evidence or for failing to disclose all facts casting doubt on the state's testimony); *Cousin v. Small*, 325 F.3d 627, 633 (5th Cir. 2003) ("The [pre-trial] suppression of exculpatory evidence is shielded by absolute immunity."); *Warney v. Monroe Cnty.*, 587 F.3d 113, 124–25 (2d Cir. 2009) (holding that prosecutors who delayed disclosing exculpatory DNA evidence and fingerprint analysis to prisoner were entitled to absolute immunity for liability); *Reid v. State of N.H.*, 56 F.3d 332, 336–38 (1st Cir. 1995) (holding that prosecutors were entitled to absolute immunity for knowing suppression and delayed disclosure of exculpatory evidence); *Ghaith v. Rauschenberger*, 493 F. App'x 731, 740 n.4 (6th Cir. 2012) ("[P]rosecutors[ ] appearing at a bond hearing and arguing against a reduction in bond . . . [are] shielded by absolute prosecutorial immunity for such conduct since they were acting as advocates.") (citation omitted)); *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1149 (2d Cir. 1995) (holding that "actions in connection with a bail application are best

35

understood as components of the initiation and presentation of a prosecution, and therefore are protected by absolute immunity," and that district attorneys are absolutely immune from claim for malicious prosecution and presentation of false evidence to the grand jury); *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 n.5 (1993) (acknowledging that absolute immunity shields "a prosecutor's decision to bring an indictment, whether he has probable cause or not"); *Wooten v. Roach*, 964 F.3d 395, 411 (5th Cir. 2020) ("[A]ppearing before a grand jury to present evidence and obtain an indictment is the function of an advocate for the state to which prosecutorial immunity attaches." (citations omitted)); *Slavin v. Curry*, 574 F.2d 1256, 1264 (5th Cir. 1978), *overruled on other grounds*, *Sparks v. Duval Cnty. Ranch Co., Inc.*, 604 F.2d 976 (5th Cir. 1979) (holding that absolute prosecutorial immunity extends to presenting fraudulent and illegal evidence to a grand jury and for requests that a defendant's bond be cancelled); *Baez v. Hennessy*, 853 F.2d 73, 75 (11th Cir. 1998) (holding that prosecutors have absolute immunity for the preparation and filing of charging documents, including an indictment).

Accordingly, insofar as Parria's Fourteenth Amendment due process claims (and any other claim) against Rish are predicated on this alleged conduct (delay in producing exculpatory evidence, refusal to agree to a bond reduction, and role in obtaining the grand jury indictment), Rish enjoys absolute immunity.

Rish's two remaining alleged acts warrant additional scrutiny.

*(iv) witness tampering*

Up next, witness tampering: Parria purports to allege that Rish tampered with and falsified witness testimony when she interviewed EMT Guillot.[123] As explained below, Parria fails to articulate what fabricated statement she believes Rish tried to convince Guillot to provide, much less how the fabricated testimony would have been relevant or helpful to the prosecution. Rish contends that she is absolutely immune from any claim based on her alleged interview with EMT Guillot because Parria fails to plead facts supporting her mere conclusion that the interview was investigative and, further, that the few facts pled including the timing of the alleged interview plausibly implicate only advocatory functions. In other words, Rish contends that Parria's conclusion that Rish interviewed EMT Guillot in an investigative capacity fails to overcome her assertion of absolute immunity. The Court agrees.

According to Parria, Rish was engaged in purely investigative activity when she interviewed the EMT about a month and a half before the State's case against Parria was presented to the grand jury.[124] Though prosecutors are not entitled to absolute immunity if they are acting in an investigatory capacity, *see Wearry*, 33 F.4th at 266, Parria's characterization that a meeting between Rish and Guillot was "investigatory" (and her more global contention that all official conduct in her murder case was investigatory because probable cause was never established) is conclusory and thus not entitled to the presumption of truth; as such, it is not sufficient to defeat Rish's claim of absolute prosecutorial immunity. Put differently, a mere possibility

---

[123] *Id.* ¶ 792.
[124] ECF No. 38 at 10-11.

that Rish acted outside her advocacy role falls short of nudging her allegations to plausible. Thus, "[a]bsent a non-conclusory allegation of how [Rish] participated in ways that were investigatory, [Rish] is entitled to immunity." *See Wooten*, 964 F.3d at 411 (citation omitted) ("Wooten's conclusory allegations about White's involvement in the overall investigation fail to strip him of prosecutorial immunity.").

Parria fails to allege factual material indicating that or *how* Rish functioned as an investigator at all, much less in the context of Guillot's interview. Context is critical. The lion's share of Parria's factual allegations target JPSO conduct: according to Parria, it was JPSO that initiated, investigated, and arrested Parria. JPSO allegedly concocted a forensic theory at odds with the evidence. JPSO was, in Parria's telling, singularly motivated to frame Parria for murder for optics purposes and because the deceased was one of its own. Unlike Parria's allegations lodged against JPSO and various JPSO officers which identify specific JPSO officials and allege in detail their investigative conduct, Parria nowhere alleges even *when* ADA Rish became involved in Parria's prosecution.

Unlike her factual allegations targeting JPSO's alleged tunnel-vision and malicious investigation, Parria nowhere alleges *facts* indicating Rish functioned as an investigator in the first instance. Rish is not alleged to be on the scene, at the hospital, or providing advice to JPSO. From a temporal perspective, Parria's singular allegation respecting Rish's interview with Guillot comes not before Parria was arrested but, instead, months after the Preliminary Examination where the state commissioner found probable cause for arresting her. Regardless of any factual issue

38

as to when if ever probable cause was established, Parria alleges only that Rish interviewed EMT Guillot about a month and a half before the State's case against Parria was presented to the grand jury.

Assessing Parria's *factual* allegations renders implausible Parria's conclusion that Rish was interviewing Guillot on a clean slate in the hunt for (or to confect) probable cause. Parria alleges that Guillot initially told JPSO on July 13, 2018—three days after Parria was arrested and almost one month after the shooting—that he recalled seeing a single spent shell casing on the bed.[125] Parria alleges that JPSO "recovered a single spent shell casing on the floor against the wall at the foot of the bed" and took photographs of the shell casing there at the scene.[126] That is, Parria alleges that Guillot's initial on-the-bed recollection, shared with JPSO in July 2018, conflicted with the on-the-floor recovery by JPSO as reflected in its report and crime scene photographs. Critically, however, each of these locations supported Parria's account of the shooting; according to Parria, neither supported JPSO's murder theory. Parria alleges that—regardless of whether the shell casing was found on the floor (as depicted by JPSO crime scene photographs) or on the bed (as recounted by EMT Guillot)—both locations aligned with Parria's account of Smith's self-inflicted wound and thus both were problematic for the JPSO's bullet trajectory reconstruction.[127]

But Parria nowhere articulates facts concerning Guillot's changed statement or testimony. The Court is left to speculate as to the content of Guillot's changed

---

[125] ECF No. 1 ¶ 728.

[126] *Id.* ¶ 724 and Figs.42-44.

[127] *Id.* ¶ 725-32.

testimony. In attempting to support her conclusion that ADA Rish functioned as an investigator, Parria resorts to more vague conclusions, alleging "on information and belief" that Rish interviewed Guillot and "sought to alter Mr. Guillot's testimony by injecting doubt into his mind" concerning the location of the spent shell casing and that she "convinced [him] to change his testimony because his testimony undermined Defendants' absurd murder theory."[128] Though Parria concludes that Rish "fabricated this testimony[,]" Parria fails to indicate what the content of "this" fabricated testimony may have been or in what context the testimony was given.[129] That is, she does not indicate whether Rish convinced Guillot to backtrack his "on the bed" account to JPSO in favor of the "on the floor" depictions in the crime scene photographs (both of which Parria alleges exculpate her), or whether Guillot testified to some other location entirely.[130]

Even parsing other allegations between arrest/preliminary examination and grand jury indictment, there are no facts alleged indicating that Rish was *finding* facts in her interview with Guillot. To the contrary, at the point in which Rish

---

[128] *Id.* ¶¶736-37.

[129] *Id.* ¶738.

[130] In this regard, it is noteworthy that Parria's allegations also likely fall short of alleging a plausible due process violation against Rish for fabrication. "If fabrication occurred, [Parria] does not allege how it was material or harmful to [Parria's] case." *See Armstrong v. Ashley*, 60 F.4th 262, 272 (5th Cir. 2023) (plaintiff provided no details about alleged recantation other than it happened and was documented). Parria's allegations are devoid of supporting factual detail that could render plausible her naked assertion that Rish fabricated Guillot's testimony. *See id.* Absent some factual material suggesting *how* Rish changed Guillot's testimony or statement, why Parria believes the testimony or statement to be fabricated, or how it was used against Parria, her claim that Rish violated Parria's due process rights by "fabricating" Guillot's statement/testimony concerning the location of the bullet lacks sufficient factual matter to state a plausible claim to relief against Rish. *See id.* Regardless, the few facts provided concerning Rish's conduct in interviewing Guillot fail to overcome Rish's immunity so the Court need not reach the ultimate plausibility of the fabrication conclusion predicating the due process claim against her.

interviewed Guillot, the other alleged facts indicate that Rish was engaged in evidence evaluation—an advocatory function—in preparation for presenting the State's case at the grand jury proceeding. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009) (finding "absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding, [] or appears in court to present evidence in support of a search warrant application") (citations omitted). The facts alleged by Parria indicate that Rish was evaluating evidence already collected and provided by JPSO (*e.g.,* JPSO crime scene photographs showing a shell casing on the floor and the July 2018 statement conveyed to JPSO by EMT Guillot indicating he saw a shell casing on the bed).

To be sure "[t]here is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for [a judicial proceeding], on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." *Wearry*, 33 F.4th at 267 (citation omitted). Parria claims that Rish was "on a hunt for probable cause."[131] But the allegations concerning timing do not support Parria's conclusion. Timing informs the functional assessment: whether Rish was functioning as an advocate or investigator. Parria indicates that the meeting/interview and any alleged alteration of Guillot's prior statement occurred *after* Parria's arrest and *after* the preliminary examination hearing, *i.e.,* "roughly a month and a half before the State's case against [Parria] was presented to the grand

---

[131] ECF No. 38 at 12.

jury."[132] Pretermitting whether the state commissioner correctly determined that there was probable cause to arrest and detain Parria, by the time Rish interviewed Guillot, legal process had issued such that it had been indicated to the State that probable cause existed to arrest and detain Parria. Though "the existence of probable cause is not a bright-line rule," *Wearry*, 33 F.4th at 268, "after probable cause has been established, it is more likely that the prosecutor acts as an advocate." *Cousin*, 325 F.3d at 633.

Considering that Parria alleges Guillot provided a post-arrest statement to JPSO in July, that a preliminary examination occurred in August, and that Rish interviewed Guillot in the weeks leading up to the November grand jury proceeding, the alleged facts belie a characterization of Rish's interview as "investigatory" in nature. These facts do not indicate evidence collection in the first instance but, rather, evidence evaluation and a witness interview incident to preparing for grand jury proceedings. The Fifth Circuit has held that a prosecutor is absolutely immune against claims related to interviewing witnesses in preparation for trial, *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 739 (5th Cir. 2019), including interviewing witnesses before presenting them to a grand jury, *see Cook v. Houston Post*, 616 F.2d 791, 793 (5th Cir. 1980). Indeed, prosecutors would be negligent in their duties if they did not interview witnesses before presenting their testimony to a grand jury. *Cook*, 616 F.2d at 793. All told, Parria's own factual allegations indicate that Rish

---

[132] *Id.* at 11.

functioned as an advocate in interviewing EMT Guillot while preparing for the grand jury hearing.

Interviewing a witness to determine whether they should be called to testify for the State at a grand jury proceeding or trial is conduct that is intimately associated with the judicial phase of the case and thus conduct that falls within the scope of prosecutorial immunity. Sidelining Parria's "investigatory" label, the sparse factual material Parria alleges concerning the Guillot interview fails to overcome Rish's assertions of immunity: Rish's alleged post-arrest, post-preliminary-examination interview with Guillot before the grand jury proceeding falls squarely within her advocatory role. In applying the functional test, the Court is mindful not to "pars[e] the activities of a prosecutor incident to the bringing and trial of a case so closely, [otherwise] the cloak of immunity would be tattered." *Geter v. Fortenberry*, 849 F.2d 1550, 1555 (5th Cir. 1988).

Ultimately, Parria concludes that all conduct by the defendants qualifies as investigative because there was never any evidence against her. Such "conclusory allegations about [Rish's] involvement in the overall investigation fail to strip h[er] of prosecutorial immunity." *Wooten*, 964 F.3d at 411. In failing to plead facts indicating how Rish participated in ways which were investigatory, Parria fails to plead plausible facts that Rish conducted herself as a police detective and not an advocate for the State in interviewing Guillot. She thus fails to allege facts which overcome Rish's invocation of absolute immunity. Rish is absolutely immunity from all claims predicated on her interview of Guillot.

43

*(v) media leak*

Finally, the Court considers Parria's allegations that Rish leaked false and misleading details of the case to the media.[133] Rish contends that Parria's final allegation against Rish in connection with the due process claims—that one or more of six defendants, including Rish, leaked false and willfully misleading details to the media "to poison the jury pool against Shantel"—fails to state a claim against Rish. Rish concedes (as she must) that prosecutors are not entitled to absolute immunity for making false assertions during a press conference.[134] Nevertheless, ADA Rish contends that Parria's claim that defendants leaked false and misleading details of the case to the media[135] improperly rests on group pleading and fails to state a plausible claim for relief against her. The Court agrees.

At the pleadings stage, the Court is instructed to identify those patently conclusory allegations—or labels—not entitled to the assumption of truth and then to consider only the factual allegations to determine if the facts plausibly suggest entitlement to relief. *Iqbal*, 556 U.S. at 679-81. Disregarding the conclusory allegations, Parria fails to plead any *facts* that might connect Rish to this media leak; she merely concludes that Rish or other JPSO defendants must have leaked information to the media given the coverage of her arrest on a news segment. But as to Rish, this allegation is purely speculative and conclusory.

---

[133] *Id.* ¶ 799.
[134] ECF No. 24-1 at 12 (citing *Buckley*, 509 U.S. at 278).
[135] ECF No. 1 ¶ 799.

Resort to group pleading—faulting defendants "as a group without factual material suggesting that any particular defendant" violated the plaintiff's civil rights—is insufficient to state a plausible claim against a particular individual defendant. *Armstrong v. Ashley*, 60 F.4th 262, 274-75 (5th Cir. 2023). This is so because "a § 1983 plaintiff 'must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* at 275. Parria's media-leak allegation suffers from this pleading deficiency: Parria simply faults six defendants as a group without factual material suggesting that any particular one leaked misleading details to the media. In so doing, Parria fails to allege facts that would permit the Court to infer that it was Rish who leaked information to the media.

Parria alleges that the media leak occurred on or before the WDSU segment that aired on July 16, 2018, less than a week after Parria's arrest.[136] Notably, there are no allegations that suggest whether or that Rish was even involved in Parria's case at that time—all factual allegations are focused on JPSO. There are no factual allegations implicating Rish in the investigation at the scene, or at the hospital, or in conferring with JPSO in connection with Parria's arrest. In this regard, Parria's failure to allege basic facts contextualizing Rish's involvement are self-defeating. Where, as here, there are no facts indicating when Rish became involved in Parria's prosecution, Parria's speculation that Rish may have been the one (out of possibly six defendants) to leak information to the media, one month after the shooting and days

---

[136] *Id.* ¶ 745.

after Parria's arrest fails to allege facts that could render her speculation plausible. *See Armstrong*, 60 F.4th at 272. Thus, notwithstanding that Rish would not be entitled to absolute immunity for any conduct in leaking false information to the media, insofar as Parria bases any of her claims on her conclusory allegation that Rish leaked false information to the media, such claim must be dismissed because Parria's allegations lack "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *See id.* (quoting *Iqbal*, 556 U.S. at 677).

### 2. <u>Other Alleged Unconstitutional Conduct</u>

For the same reasons articulated above, the remainder of Parria's claims against Rish are doomed. All claims rest on the same alleged conduct for which Rish is cloaked with absolute immunity and/or are improperly premised on group pleading without alleging facts implicating Rish. The Court briefly considers each in turn.

As for Count 2 (Fourth Amendment unlawful detention), Count 4 (malicious prosecution), and Count 5 (failure to intervene), Parria brings these claims against "all individual defendants." She does not name Rish. Insofar as any of these claims is predicated on Rish's alleged delay in producing exculpatory evidence, opposing Parria's request for bond reduction, obtaining an indictment based on misrepresentations and fabricated evidence, or tampering with and falsifying Guillot's testimony, the Court has already determined that Rish is absolutely immune from claims predicated on this conduct. And insofar as any of these counts is predicated on the alleged leak to the media, the Court has already determined that Rish would not enjoy absolute immunity but that any claim based thereon must be

dismissed for failure to state a plausible claim against Rish. So, too, with these counts.

Parria's resort to "group pleading" rather than identifying conduct by ADA Rish (in effectuating Parria's unlawful arrest and detention or failing to intervene) is improper and thus her claims against Rish fail under the ordinary pleading standard. *See Armstrong*, 60 F.4th at 273 (upholding dismissal of claims relating to fingerprint evidence where plaintiff faulted eight law enforcement defendants as a group "without factual material suggesting any particular defendant suppressed evidence"). The alleged *factual* predicate for Parria's unlawful arrest and detention (and her alternative claim for failure to intervene) focuses on the JPSO arresting officers' conduct.[137]

Count 4, Parria's federal malicious prosecution claim, fails for these reasons and for an additional one. As the JPDA Defendants submit, even if Parria had alleged facts falling outside the scope of prosecutorial immunity to predicate this claim, Rish would be entitled to qualified immunity because no such federal cause of action existed in the Fifth Circuit until April 2022. Before *Thompson v. Clark*, 596 U.S. 36 (2022) was decided in April 2022, the Fifth Circuit "explicitly denied the possibility of a [federal] constitutional malicious prosecution claim." *See Espinal v. City of Houston*, 96 F.4th 741, 748 (5th Cir. 2024) (citation omitted); *see also Wood v. Bexar County, Texas*, 147 F.4th 534, 548 (5th Cir. 2025) (finding that malicious prosecution

---

[137] Parria's failure to allege any specific facts pertaining to Rish's conduct in connection with these claims is fatal. *See Armstrong*, 60 F.4th at 280 (internal quotations omitted) (affirming district court's dismissal of failure to intervene claim where "claim lack[ed] detail as to which of the Defendants did what[.]").

claim fails the clearly-established prong of qualified immunity where the Fifth Circuit had denied the possibility of a constitutional malicious prosecution claim at the time of the plaintiff's arrest and prosecution); *Guerra v. Castillo*, 82 F.4th 278, 288-89 (5th Cir. 2023) (affirming district court's Rule 12 dismissal of plaintiff's federal malicious prosecution claim because "this court's caselaw explicitly disclaimed the existence of a constitutional claim for malicious prosecution at the time of [the] alleged conduct"); *Folks v. Sainato*, No. 23-643, 2024 WL 2271668, at *6 (E.D. La. May 20, 2024) (Long, J.) (denying plaintiff's motion for summary judgment on malicious prosecution claim because "this cause of action was not recognized under Fifth Circuit law at the time of the events giving rise to it"); *Quinlan v. Jefferson Parish Sheriff's Office*, No. 22-889, 2023 WL 3072814, at *5 (E.D. La. Apr. 25, 2023) (Vance, J.) (finding that defendants were entitled to qualified immunity as to plaintiff's federal malicious prosecution claim because "a claim that is 'expressly not recognized is the antithesis of a clearly established one'" (citation omitted)).

Whether law is clearly established is assessed at the time of the challenged conduct. *Nevarez*, 135 F.4th at 274. Here, Parria's factual allegations pertaining to Rish's conduct implicate Rish in Parria's prosecution in mid to late 2018, years before *Thompson*. Parria fails to allege facts that would overcome the JPDA Defendants' qualified immunity for alleged conduct before April 2022. Though Rish would have been on notice that any malicious misconduct on her part post-*Thompson*/April 2022 was actionable under Section 1983 for malicious prosecution, Parria alleges no facts indicating that Rish engaged in any post-April 2022 conduct for which she would not

enjoy absolute immunity in her advocatory function, much less any malicious misconduct.

Turning to Count 6, Parria alleges that Rish and six JPSO employees and others "agreed among themselves to deprive [Parria] of her clearly established rights" by engaging in a litany of wrongful acts. ECF No. 1 ¶¶842-43. Again, Rish enjoys absolute immunity for those advocatory acts outlined *supra*. And, again, Parria's allegations fail against Rish insofar as they are premised on "group pleading" and/or mere conclusions devoid of facts. Rish contends that Parria's civil rights conspiracy claim fails to allege facts plausibly indicating she agreed with others to violate Parria's rights. The Court agrees.

To state a conspiracy claim under § 1983, Parria must allege facts indicating that "there was an agreement among the alleged co-conspirators to deprive [her] of [her] constitutional rights and that such an alleged deprivation actually occurred." *Montgomery v. Walton*, 759 F. App'x 312, 314 (5th Cir. 2019). "Conclusory allegations that do not reference specific factual allegations tending to show an agreement do not suffice to state a civil rights conspiracy claim under § 1983." *Id.* (citation omitted). So too here. "[Parria] must plead specific, nonconclusory facts that establish that there was an agreement among the defendants to violate [her] federal civil rights. *Id.* (citation omitted). The alleged facts, when "placed in . . . context [must raise] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.

49

Parria's allegations are devoid of factual content plausibly suggesting that Rish entered into an agreement with certain JPSO investigators to violate Parria's civil rights. That Parria claims Rish and the defendants "acted in concert" and committed several "overt acts," including their alleged fabrication of the bullet trajectory theory, evidence tampering, and disclosure of details to the media falls short of meeting the requisite pleading standard. Conclusions aside, Parria fails to allege any specific facts to indicate that an agreement was formed among Rish and others to commit wrongful acts, much less when the agreement was formed or that it was executed. Factual details, including the "times, places and other circumstances" of any meetings between Rish and the other defendant to form such an agreement are "notably absent." *Jabary v. City of Allen*, 547 F. App'x 600, 611 (5th Cir. 2013) (affirming dismissal of conspiracy claim where plaintiff "fail[ed] to create a reasonable inference that such an agreement existed"). Mere conclusions or possibilities do not suffice to nudge a conspiracy claim from possible to plausible.

Furthermore, "an alleged conspiracy claim can only survive with respect to the [defendants] against whom [the court finds plaintiff has] made sufficient [constitutional] claims in their individual capacities." *Jabary*, 547 F. App'x at 611. The Court has already determined that Parria fails to state a plausible constitutional claim against Rish and/or that Rish is entitled to absolute prosecutorial immunity for Rish's alleged conduct in connection with Parria's federal constitutional claims.

Accordingly, each of Parria's § 1983 claims against Rish in her individual capacity must be dismissed.

### 3. Official Capacity Claims

Parria purports also to sue Rish in her official capacity. But Parria alleges that Rish was an Assistant District Attorney and that Paul Connick was the District Attorney for Jefferson Parish.

"As an assistant district attorney, [Rish] did not have final policymaking authority and therefore would 'not [be] the proper defendant in an official capacity claim against the District Attorney's Office.'" *See Holmes v. White*, 718 F. Supp. 3d 585, 604 (E.D. La. 2024) (Africk, J.) (citing *Truvia v. Julien*, 187 F. App'x 346, 350 (5th Cir. 2006)); *cf. Burge v. Par. of St. Tammany*, 187 F.3d 452, 468-70 (5th Cir. 1999). DA Connick would be the proper defendant to sue in his official capacity.[138] Parria has named DA Connick in his official capacity with respect to state-law claims addressed below. Parria's claims against Rish in her official capacity are dismissed.

### B.    State-Law Claims

Parria's state-law claims are foreclosed by immunity under Louisiana law and Parria's pleading deficiencies.

The Louisiana Supreme Court has embraced *Imbler*'s same functional approach to conferring absolute immunity. In *Knapper v. Connick,* 681 So. 2d 944 (La. 1996), the Louisiana Supreme Court concluded that absolute immunity protects prosecutors from claims under Louisiana law. *Id.* at 950; *see also Jameson v. Montgomery*, 366 So. 3d 1210 (La. 2023) (holding that absolute immunity foreclosed

---

[138] Though she does not advance a federal *Monell* claim against Connick in his official capacity, as addressed below, Parria purports to advance official capacity state law claims against him for *respondeat superior*/vicarious liability and Louisiana constitutional violations.

various Louisiana tort and constitutional claims). Thus, Louisiana courts apply the same functional analysis used by federal courts to determine whether a prosecutor is entitled to absolute immunity. *See id.* at 950 (adopting the same "functional analysis of the role a prosecutor is fulfilling when the alleged misconduct occurs" outlined in *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993)). As set forth *supra*, insofar as facts are alleged, none indicate that Rish functioned as an investigator rather than an advocate. *See Wooten*, 964 F.3d at 411 ("Absent a non-conclusory allegation of how [Rish] participated in ways that were investigatory, [Rish] is entitled to [prosecutorial] immunity.").

Rish's absolute immunity for Parria's federal claims is thus coextensive with the absolute immunity she enjoys for Parria's state law claims. Accordingly, applying the same functional approach to the alleged conduct of the JPDA Defendants predicating Parria's state law claims compels the same result: dismissal for claims predicated on advocatory conduct by ADA Rish.

Similarly, insofar as any of Parria's state law claims are based on conduct for which Rish is *not* absolutely immune (*i.e.,* the alleged media leak), her claims fail for the same reason as her federal claims based on such alleged conduct. By resorting to group pleading and conclusions, Parria has not alleged facts implicating Rish in conduct for which she would not enjoy absolute immunity. Accordingly, Parria fails to state any claim against Rish for maliciously prosecuting her (Count 10), wrongfully imprisoning her (Count 11), negligence (Count 12), or intentional infliction of emotional distress (Count 14). Absent facts implicating Rish in wrongful investigative

or administrative conduct, or any malicious or extreme conduct falling outside her advocacy role, Parria fails to state any claim against Rish. Furthermore, by failing to state any plausible claim against Rish, there is nothing to anchor Parria's claim against DA Connick for *respondeat superior* (Count 15) or for violations of the Louisiana constitution (Count 16).

Accordingly, the Court's determinations concerning Rish's immunity and/or Parria's failure to state a plausible claim apply equally to each of her state law claims. The Court need not consider the additional dismissal grounds predicated on failure to state a claim and/or prescription.

Parria does not purport to allege a *Monell* claim against DA Connick. Instead, in Counts 15 and 16, Parria alleges that DA Connick is vicariously liable for Rish's alleged misconduct and thus is liable under a *respondeat superior* theory and for violations of the state constitution. Given that the Court has determined that Parria fails to state any plausible claim for relief against Rish (and/or that she enjoys immunity from suit), it follows that Parria's claims against DA Connick fail as a matter of law.

### C.    Parria's Request for Leave to Amend

Parria requests leave to amend her complaint in the event of dismissal.[139] The JPDA Defendants counter that amendment would be futile. The Court agrees.

A plaintiff's "bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not

---

[139] ECF No. 38 at 25.

constitute a motion within the contemplation of Rule 15(a)." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1170 (5th Cir. 2022) (quotation omitted); *cf. Porretto v. City of Galveston Park Bd. of Trs.*, 113 F.4th 469, 491 (5th Cir. 2024) (affirming denial of "bare bones" request in motion-to-dismiss opposition for "an opportunity to amend the [c]omplaint if the Court deems additional factual allegations are necessary" (quotation omitted)).

Even if Parria's request were in proper form, denial of leave remains appropriate. Though leave to amend should be freely given when justice requires, Fed. R. Civ. P. 15(a), leave may be denied in the Court's discretion where amendment would be futile. *See, e.g., Aldridge v. Miss. Dep't of Corrs.*, 990 F.3d 868, 878 (5th Cir. 2021) ("[G]ranting leave to amend would have been futile, because 'the complaint as amended would be subject to dismissal' on the basis of preemption and sovereign immunity." (citation omitted)); *Edmiston v. La. Small Bus. Dev. Ctr.*, 931 F.3d 403, 408 (5th Cir. 2019) (denying leave to amend where the defendants were immune from suit).

Parria offers no indication that or how she could plead facts sufficient to overcome the JPDA's absolute immunity defense or the group pleading deficiencies. "The rule is that a defendant's entitlement to qualified immunity should be determined at the earliest possible stage of the litigation—full stop." *Carswell v. Camp*, 54 F.4th 307, 312 (5th Cir. 2022) (quotations omitted). Given "the importance of resolving immunity questions at the earliest possible stage in litigation," *Pearson v. Callahan*, 555 U.S. 223 at 231–32 (2009), and Parria's failure to offer any indication

that she could plead facts sufficient to overcome these defenses against these defendants, the Court finds that leave to amend would be futile.

Relatedly, the JPDA Defendants seek to dismiss Parria's claims against JPDA John Does 4, 5, and 6, whom Parria alleges are employees of the Jefferson Parish District Attorney's Office, because Parria cannot pursue a lawsuit against unidentified individuals and any amendment substituting the actual defendants for the John Doe Defendants will not relate back and therefore Parria's claims against them will be prescribed.[140] Parria does not dispute the case law invoked by the JPDA Defendants that supports dismissal of her claims against the JDPA John Doe Defendants, but she suggests that dismissal is not appropriate at this time considering that inquiries into prescription and/or any applicable tolling doctrines may be fact-intensive.

A district court permissibly denies leave to amend a complaint to add named defendants in place of fictitious "John Doe" defendants where the added claims would have been futile as barred by the statute of limitations. *See Winzer v. Kaufman Cty.,* 916 F.3d 464, 471 (5th Cir. 2019) (citation omitted) (observing that "an amendment to substitute a named party for a John Doe [is not a 'mistake' and thus] does not relate back under Rule 15(c)").

Given that the Court has determined that Parria fails to allege any claim against ADA Rish or DA Connick insofar as nearly all allegations fall within the ambit of absolute prosecutorial immunity or are too conclusory to state a plausible

---

[140] ECF No. 24-1 at 23-24.

claim, Parria's claims against the unidentified John Doe defendants fail for the same reasons. Additionally, applying *Winzer*, even if the Court construed Parria's broad request to amend to include amendment to add the identities of the JPDA John Doe Defendants, any such request is denied as futile.

## IV.    CONCLUSION

**IT IS ORDERED** that the motion[141] to dismiss is **GRANTED**. Parria's claims against the JPDA Defendants are **DISMISSED WITH PREJUDICE.**

New Orleans, Louisiana, this 26th day of September, 2025.

BRANDON S. LONG
UNITED STATES DISTRICT JUDGE

---

[141] ECF No. 24.