## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SHANTEL PARRIA** | **CIVIL ACTION** |
| **VERSUS** | **NO. 23-3663** |
| **GERALD CVITANOVICH, ET AL.** | **SECTION "O"** |

## ORDER AND REASONS

Jefferson Parish Sheriff's Office Sergeant Troy Smith died one week after sustaining a single gunshot wound to his head, inflicted during a domestic dispute with Shantel Parria, his wife. The Jefferson Parish Sheriff's Office arrested Parria, who was charged with his murder. After four years in custody pending her state criminal trial, Parria was acquitted and released. This civil rights lawsuit followed against certain police officers, coroner's office officials, and prosecutors involved in the death investigation and her prosecution. Defendants include officials in the Jefferson Parish Sheriff's Office, Coroner's Office, and District Attorney's Office. Before the Court is the Rule 12(b)(6) motion[1] to dismiss by Defendants Jefferson Parish Coroner Gerald Cvitanovich ("Cvitanovich"), Forensic Pathologist Dana Troxclair ("Troxclair"), and Investigator Julia Powers ("Powers") (collectively, the "JPCO Defendants"). Plaintiff Shantel Parria opposes[2] the motion, and Defendants filed a reply.[3] For the following reasons, Defendants' motion to dismiss is **GRANTED.**

---

[1] ECF No. 29.
[2] ECF No. 44.
[3] ECF No. 49.

# I.   BACKGROUND

Plaintiff Shantel Parria filed suit under 42 U.S.C. § 1983 and Louisiana law against 11 named defendants and six unknown defendants whom Parria alleges were complicit in a scheme to wrongfully accuse, arrest, and prosecute her for her husband's murder.[4] Parria's complaint consists of a narrative recitation of facts followed by a series of legal claims. At this, the pleadings, stage, the Court "accept[s] all well-pleaded facts as true and view[s] those facts in the light most favorable to" Parria. *Anderson v. Valdez*, 845 F.3d 580, 589 (5th Cir. 2016) (internal quotation marks omitted).

### *Troy Smith Is Shot in the Head with His Own Glock 19*

At 11:24 p.m. on June 17, 2018, Parria called 9-1-1 seeking emergency medical services for her husband, Jefferson Parish Sheriff's Office ("JPSO") Sergeant Troy Smith, whom Parria frantically reported, "sho[]t himself in the head" in the bedroom of their home in Waggaman, Louisiana.[5] Within six minutes, JPSO Deputies (and partners) Jeffrey Truong and Matthew Veazey arrived to respond to the shooting of one of their own.[6] The scene was "chaotic."[7]

Deputy Truong observed "a firearm located on the far side of the bed from the entry door of the room with the barrel facing the headboard."[8] Deputy Truong, wearing gloves, retrieved the firearm, cleared it, and placed it back on the bed in the

---

[4] ECF No. 1.
[5] *Id.* ¶¶ 1, 59.
[6] *Id.* ¶ 2, 61.
[7] *Id.* ¶ 76.
[8] *Id.* ¶ 62. The firearm was Smith's Glock 19. *Id.* ¶¶ 302, 305 at Fig. 16.

2

same general area.[9] JPSO Deputies Truong and Veazey found Troy Smith—with blood streaming from the right side of his head—lying on the floor next to the bed, against the wall; he was still breathing.[10] Smith was JPSO Deputy Veazey's police academy instructor—Veazey immediately recognized Smith and was distraught by his condition.[11] JPSO Deputy Truong became physically ill.[12] The deputies rendered aid to Smith until Emergency Medical Services arrived.[13] Smith, critically injured but clinging to life, was transported to the hospital.[14]

Just 15 minutes after the shooting, Deputy Veazey escorted Parria outside and took her initial statement in the driveway.[15] Deputy Veazey's report recounts that Parria advised that her husband, Sergeant Smith, had been drinking and had taken a muscle relaxer on that day—he was upset because neither of his children had called to wish him a happy Father's Day.[16] That evening, Parria and Smith argued. When the argument resumed hours later, Parria attempted to pack a bag so she could leave for the night, and she told Smith she was leaving him.[17] Smith took the bag from her and walked towards the bedroom and stated "I am just going to kill myself then!"[18] Parria followed him into the room—the report states—but before Parria crossed the

---

[9] *Id.* ¶ 63.
[10] *Id.* ¶ 64-65.
[11] *Id.* ¶ 75.
[12] *Id.* ¶ 76.
[13] *Id.* ¶ 66.
[14] *Id.* ¶¶ 5, 61.
[15] *Id.* ¶¶ 68-69.
[16] *Id.* ¶ 70.
[17] *Id.*
[18] *Id.*

threshold to the bedroom, she heard a loud noise then saw Smith laying on the ground, bleeding from his head, at which time she called 9-1-1.[19]

According to Parria's complaint, Deputy Veazey "sadly misunderstood" Parria's description of the events leading up to the shooting such that his report was flawed.[20] There is no audio, video, or body cam recording of her alleged statements to Deputy Veazey—accordingly, there is no corroboration that Parria ever indicated that she was outside the bedroom when Smith shot himself.[21] In later statements to JPSO, Parria unequivocally told JPSO Homicide Division Commander Donald Meunier and Detective Kurt Zeagler that she never told Veazey that she was outside of the bedroom when the shooting occurred.[22] Yet, "JPSO used [Veazey's] misunderstanding as the catalyst to mount a baseless and malicious crusade to punish [] Parria for a 'murder' that simply never happened."[23]

Shortly after the shooting, Smith's supervisor, Director of JPSO's Municipal Training Academy, James Arey—at the direction of Jefferson Parish Sheriff Joseph Lopinto—arrived at the hospital before Smith and declared to West Jefferson ER personnel that "this is a murder."[24] This declaration "revealed JPSO's intention to manufacture a case against Shantel Parria for murder, regardless of the facts and evidence."[25] According to Parria, JPSO was motivated to determine that its own

---

[19] Id.
[20] Id. ¶ 77.
[21] Id. ¶¶ 71-72.
[22] Id. ¶ 73.
[23] Id. ¶ 78.
[24] Id. ¶91.
[25] Id. ¶ 96.

Sergeant Smith was murdered. If Parria was responsible for Smith's murder, JPSO could avoid the scandal and reputational harm that would ensue if it became known that one of JPSO's own (Smith, a highly trained firearms expert) was unstable and shot himself intentionally and/or shot himself accidentally.[26]

Thirty minutes after his deputies arrived on scene, Sheriff Lopinto arrived to the scene.[27] Sheriff Lopinto and Parria spent hours alone together, driving to the emergency room and then to the other hospital to which Smith ultimately was transported.[28] Though Parria described to Sheriff Lopinto the events leading up to Smith's shooting, Sheriff Lopinto later denied that he discussed the incident with her.[29]

Twelve hours after the shooting, while holding vigil at Smith's bedside in the hospital's Intensive Care Unit, JPSO Detective William Roniger took Parria's statement, which he audio-recorded.[30] During the five-minute statement, Parria described the day of the shooting: Parria and Smith woke up late morning, ran errands, and argued over Smith being jealous.[31] Smith began drinking around 4:00 p.m. when his children failed to call him to wish him a happy Father's Day.[32] Smith was "upset" and "depressed" about not celebrating Father's Day, both because his children did not call him and because Smith's own father was deceased.[33] After

---

[26] *Id.* ¶¶ 97-99, 104-05, 108-09.
[27] *Id.* ¶ 80.
[28] *Id.* ¶¶ 81-82.
[29] *Id.* ¶¶ 82-86.
[30] *Id.* ¶ ¶ 111-12.
[31] *Id.* ¶ 113.
[32] *Id.*
[33] *Id.*

dinner, Smith continued to drink before they went to bed at 9:00 p.m., when they argued more.[34] Parria fell asleep, but Smith woke her up at 11:00 p.m. to continue arguing.[35] To deescalate the argument, Parria left the house, but she returned minutes later to retrieve clothes.[36] Once inside, Smith resumed the argument.[37] He prevented her from getting into her car when she tried to leave.[38] Then Smith "stormed back into the house with [Parria's] phone and keys so that she could not leave."[39] As he walked back through the front door, Smith said, "f*ck it, I'll just kill myself."[40] Parria followed Smith into the bedroom, where he was on his side of the bed and "before [Parria] could stop him he picked up his gun, took it out of the holster, and shot himself."[41]

Exactly one week after he sustained a gunshot wound to his head, Smith died at the hospital.[42]

*JPSO Investigates the Shooting*

The day after Smith died, on June 25, 2018, Sheriff Lopinto directed Arey to take Parria to JPSO's Human Resources Office to discuss financial arrangements for Smith's funeral.[43] Once there, Arey called Commander Meunier to advise that Parria was in the "insurance department," which prompted Commander Meunier to later

---

[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.* ¶ 121.
[43] *Id.* ¶¶ 123-24.

allege that, just 24 hours after Sergeant Smith died, Parria presented herself at JPSO "for the purposes of assessing departmental life insurance payout to her as the beneficiary."[44] Though Parria learned for the first time at the Human Resources meeting that the JPSO departmental life insurance policy was for $130,000, JPSO Commander Meunier and Detective Zeagler later (during the Preliminary Examination hearing) "use[d] this orchestrated incident to accuse [Parria] of murdering her husband to obtain his insurance benefits."[45]

That same day following Smith's death, Pathologist Dana Troxclair of the Jefferson Parish Coroner's Office ("JPCO") conducted Smith's autopsy.[46] During this same late June 2018 timeframe, JPSO met with JPCO to convey "[t]he general investigative findings of the Homicide Division . . . to provide context for the medical findings."[47] Parria alleges that JPSO (including Lopinto, Meunier, Zeagler, and Scanlan) "leaned heavily on JPCO [through Jefferson Parish Coroner Gerald Cvitanovich and JPCO Forensic Pathologist Dana Troxclair] to ignore the evidence and to classify [Smith's] death as anything other than a 'suicide' or 'accident.'"[48] The JPCO's July 2, 2018 draft case report, which was shared with JPSO and which was generated after two in-person meetings with JPSO's Homicide Division and a call between Sheriff Lopinto and Coroner Cvitanovich, reflected JPCO's preliminary finding of suicide or self-inflicted wound (with "manner of death" as "pending").[49]

---

[44] *Id.* ¶¶ 125-27.
[45] *Id.* ¶¶ 134-35.
[46] *Id.* ¶¶ 127, 337.
[47] *Id.* ¶¶ 174, 293-95.
[48] *Id.* ¶ 296.
[49] *Id.* ¶¶ 335-40.

The investigation continued. Informed by, among other things, crime scene photographs and investigative reports and interviews, JPSO Chief Deputy Timothy Scanlan conducted the forensic reconstruction of the scene, and formulated JPSO's bullet trajectory theory: the bullet entered the right side of Smith's head, exited the top of his head, and penetrated the ceiling above Smith's bed.[50] This bullet trajectory theory, which was based on the belief that Smith had an exit wound on top of his head and the discovery of a nick in the popcorn ceiling of the bedroom where the shooting occurred, was "inconsistent with a self-inflicted gunshot wound."[51]

According to Parria, the medical evidence and evidence from the scene undermined JPSO's bullet trajectory theory.[52] For example, one responding Emergency Medical Technician ("EMT"), Alton Guillot, claimed to have observed the single spent "shell casing" on the bed; he conveyed this to JPSO in a July 13, 2018 statement.[53] JPSO did not recover the single spent shell casing on the bed, but instead recovered the single spent shell casing on the floor against the wall at the foot of the bed, as depicted by crime scene photographs.[54] According to Parria, "[t]he location of th[e] shell casing was consistent with [her] account that [Smith] was facing her across the bed with his back to the window when he pulled the trigger."[55] Though Scanlan downplayed the significance of the location of the shell casing, regardless of whether it was discharged onto the bed (as Guillot suggested) or on the floor (as JPSO

---

[50] *Id.* ¶¶ 203-08.
[51] *Id.* ¶¶ 203-04, 208 and Fig. 8, 397, 411, 415.
[52] *Id.* ¶¶ 202-208, 255, 278-85.
[53] *Id.* ¶¶ 67, 728-29.
[54] *Id.* ¶¶ 724 and Figs. 42-44.
[55] *Id.* ¶ 725.

crime scene photographs depict), either location undermined JPSO's bullet trajectory theory as each was consistent with Parria's account that Smith "shot himself with his back to the window while facing her on the opposite side of the bed."[56]

*Parria Is Arrested, Charged with Murder, and Detained*

On July 11, 2018, Parria was arrested for second degree murder.[57] The arrest warrant was issued by a commissioner of the 24th Judicial District Court upon JPSO Commander Meunier's Affidavit for Arrest Warrant.[58] Meunier's affidavit, recounted: Parria's alleged "deception" and "divergent accounts"; that Parria's assertions concerning Smith's depression and intoxication "were disproved"; entry and exit wounds on Smith's head were "inconsistent" with a self-inflicted gunshot wound; the "wound pattern, the crouched position [Smith would have had to assume], the scene reconstruction and the video surveillance collectively refute each and all of [Parria's] versions of the shooting[.]"[59]

Parria alleges that Commander Meunier's affidavit was submitted *before* obtaining Smith's medical records[60] and *before* receiving the first DNA report,[61] and that he intentionally omitted from his affidavit any evidence of Smith's depression and his positive test for opiates and amphetamines upon hospital admission. Parria also alleges that Meunier knew as early as two days after the shooting that there was no exit would on top of Smith's head, a finding later confirmed by Smith's medical

---

[56] *Id.* ¶¶ 728-33, 724-26.
[57] *Id.* ¶¶ 137, 826.
[58] *Id.* ¶¶ 137, 826.
[59] *Id.* ¶¶ 139, 253.
[60] *Id.* ¶¶ 275, 447.
[61] *Id.* ¶ 448.

records.[62] The hole in Smith's head was instead caused by a craniectomy performed by surgeons, who drilled several small holes and placed a drain in Smith's skull during interventions to stabilize him.[63]

After being arrested by JPSO in the middle of the night on July 11, Parria underwent a three-hour interrogation by JPSO Commander Meunier and Captain Dennis Thornton during which she provided a much more detailed statement than her prior five-minute recorded statement.[64] Parria was then booked on a charge of second degree murder.[65] Her bail was set at $500,000 but she lacked the resources to post it.[66]

On July 16, 2018, WDSU News Channel 6 aired an 11-minute segment during which a panel discussed Parria's arrest on the second-degree murder charge.[67] Panelist Mike Kahn suggested he was "intimately" familiar with the case. Kahn dismissed the idea that Smith died by suicide (and dismissed Smith's suicidal Facebook posts), lauded Jefferson Parish's "state of the art crime lab," observed that Parria's credibility is "a huge issue" if her stories have changed, and foreshadowed the possibility of snitch testimony against Parria because "when people do these crimes, they have this deep-seated need to tell someone what really happened[.]"[68]

---

[62] *Id.* ¶¶ 164, 167, 226-29, 283.
[63] *Id.* ¶¶ 278-84.
[64] *Id.* ¶¶ 450-54.
[65] *Id.* ¶ 478.
[66] *Id.* ¶ 479.
[67] *Id.* ¶ 745.
[68] *Id.* ¶¶ 746-51.

Just two weeks after the segment aired, on or about July 31, 2018, Parria (while in pretrial custody following her arrest on the warrant) allegedly confessed to a jailhouse snitch, Serrita Lambert, that she (Parria) murdered Smith.[69] In reality, Parria alleges, Commander Meunier orchestrated the "confession."[70]

*Parria Remains Detained After Probable Cause and Bond Reduction Hearing*

A week after the "confession," on August 6 and 7, 2018, a Preliminary Examination court hearing was held, contemporaneously with Parria's motion for bond redaction.[71] During the two-day hearing, a state court commissioner considered testimony and evidence to determine whether there was probable cause to hold Parria on the murder charge. Smith and Parria's friend, Laura Vignoe, testified that the day before the shooting, Smith texted her that he was having suicidal thoughts.[72] JPCO Forensic Pathologist Dana Troxclair testified that it was *not* possible that the purported "exit wound" then-identified on the top of Smith's skull could have been related to Smith's medical treatment.[73] Commander Meunier testified, among other things, that Parria "confessed" to a jailhouse snitch, Serrita Lambert, who was housed with Parria.[74] According to Lambert's alleged statement to Commander Meunier and Detective Zeagler, Lambert asked Parria why she killed her husband to which Parria allegedly responded that they were having financial problems and "one

---

[69] *Id.* ¶ 598
[70] *Id.* ¶ 613.
[71] *Id.* ¶¶ 372-73; 485.
[72] *Id.* ¶¶ 485-93.
[73] *Id.* ¶¶ 372-74.
[74] *Id.* ¶ 622.

day she just woke up and snapped."[75] In her complaint, Parria alleges that Lambert had snitched for Commander Meunier in other prior cases, and that he coerced Lambert to provide this fabricated testimony to supply probable cause where there was none.[76]

The state court commissioner determined there was probable cause to continue to hold Parria. Though Parria's bail was decreased to $300,000, she lacked the resources to post it.[77]

*JPCO's Autopsy Reports Reflect "Undetermined" Manner of Death*

On September 17, 2018, days after conducting an internal in-depth case review involving its forthcoming Autopsy and Case Report, JPCO released its original Autopsy Report and Case Report, which listed Smith's manner of death as "undetermined."[78] This September Report differed from JPCO's July 2 draft report in which JPCO Troxclair had then indicated "preliminary findings: gunshot wound to the head. Suicide" and "manner of death: pending[;] describe how injury occurred: decedent shot self."[79] Though JPCO "would not go so far as to rule [Smith's] death a 'homicide,'" Parria alleges, "[JPCO] served up medical findings that were inconsistent with the evidence but consistent with Defendants' murder narrative."[80]

On October 23, 2018, JPCO amended its Autopsy Report to reflect that the wound "previously designated as the Exit Gunshot Wound was a drainage tube

---

[75] *Id.* ¶¶ 602-07.
[76] *Id.* ¶ 622.
[77] *Id.* ¶ 480.
[78] *Id.* ¶¶ 330-35.
[79] *Id.* ¶ 340.
[80] *Id.* ¶ 343.

insertion site[.]"[81] But JPCO did not change its assessment of Smith's manner of death—it remained "undetermined."[82] Nor did JPSO Chief Deputy Scanlan change his forensic theory of the case.[83]

### *Parria Is Indicted, Tried, and Acquitted of Second-Degree Murder*

On November 8, 2018, a grand jury returned an indictment against Parria for second-degree murder.[84] For another three years and nine months, Parria remained in custody pending trial.

On August 15, 2022, Parria's jury trial began.[85] On August 26, 2022, after two hours of deliberation, Parria was acquitted.[86]

### *Parria Files the Instant Civil Rights Lawsuit*

On August 18, 2023, Parria filed in this Court[87] a 147-page, 907-paragraph Complaint in which she advances 16 federal and state claims and names as defendants individuals from JPSO (Sheriff Lopinto, JPSO Deputy/Homicide Division Commander Donald Meunier, JPSO Detective Kurt Zeagler, JPSO Detective William Roniger, JPSO Director of Municipal Training Academy James Arey, JPSO Chief Deputy Timothy Scanlan, JPSO John Doe 1, JPSO John Doe 2, and JPSO John Doe 3); JPCO (Jefferson Parish Coroner Gerald Cvitanovich, JPCO Forensic Pathologist Dana Troxclair, and JPCO Investigator Julia Powers); and JPDA (District Attorney

---

[81] *Id.* ¶ 376.

[82] *Id.* ¶ 382.

[83] *Id.* ¶¶ 411, 442-45.

[84] *Id.* ¶ 827.

[85] *Id.* ¶ 756.

[86] *Id.* ¶ 776.

[87] This matter was initially allotted to another section of Court. The case was transferred to this section of Court on December 28, 2023.

Paul Connick, Assistant District Attorney Kellie Rish, JPDA John Doe 4, JPDA John Doe 5, and JPDA John Doe 6), as well as certain insurers. Parria purports to sue all municipal defendants in their individual and official capacities.

Parria advances nine federal claims under 42 U.S.C. § 1983: **Count 1** (deprivation of liberty without due process under the Fifth and Fourteenth Amendments) against all defendants; **Count 2** (unlawful seizure/detention without probable cause under the Fourth and Fourteenth Amendment) against all defendants; **Count 3** (manufacturing false evidence in violation of the Fifth and Fourteenth Amendments) against all defendants; **Count 4** (malicious prosecution) against all defendants; **Count 5** (failure to intervene) against all defendants; **Count 6** (civil rights conspiracy) against Sheriff Lopinto, Arey, Commander Meunier, Detective Roniger, Detective Zeagler, Chief Deputy Scanlan, and ADA Rish; **Count 7** (supervisor liability) against Sheriff Lopinto and Commander Meunier; **Count 8** (*Monell* claim) against Sheriff Lopinto in his official capacity; **Count 9** (*Monell* claim) against Coroner Cvitanovich in his official capacity.

She advances seven state law claims: **Count 10** (malicious prosecution) against all defendants; **Count 11** (wrongful imprisonment) against all defendants; **Count 12** (negligence and/or gross negligence) against all defendants; **Count 13** (negligent and/or grossly negligent supervision) against Sheriff Lopinto, Commander Meunier, and Coroner Cvitanovich; **Count 14** (intentional or reckless infliction of emotional distress) against all defendants; **Count 15** (vicarious liability/respondeat superior) against Sheriff Lopinto, Coroner Cvitanovich, and DA Connick, in their

official capacities; **Count 16** (violations of the Louisiana constitution) against Sheriff Lopinto, Coroner Cvitanovich, and DA Connick, in their official capacities.

As for the JPCO Defendants—Coroner Gerald Cvitanovich, Forensic Pathologist Dana Troxclair, and Death Investigator Julia Powers in their individual and official capacities—Parria alleges that the JPCO Defendants fabricated autopsy findings to substantiate the JPSO's theory that Parria shot her husband.[88] Parria claims that the JPCO Defendants' actions thus contributed to her wrongful arrest, detention, and prosecution.[89]

Parria advances five federal claims against all defendants individually and in their official capacities, including the JPCO Defendants Cvitanovich, Troxclair, and Powers (Counts 1-5), as well as a *Monell* claim against JPCO (Cvitanovich, in his official capacity as JPCO). Parria advances four state-law claims against all defendants individually, as well as three additional state-law claims against Cvitanovich in his official capacity; all in connection with her arrest, prosecution, and detention for the death of her husband.

The JPCO Defendants now move to dismiss Parria's claims against them on the grounds that Parria fails to state a claim, Parria's allegations do not defeat the JPCO Defendants' entitlement to qualified immunity, and because Parria's claims are time-barred or prescribed.[90]

---

[88] *Id.* ¶ 344.
[89] *Id.* ¶ 445.
[90] ECF No. 29. The JPCO Defendants also argue that Troxclair is entitled to absolute immunity for her testimony during the August 2018 Preliminary Examination and bond reduction hearing.

## II.   LEGAL STANDARDS

### A. *Procedure*: Pleading Standard

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint that does not meet Rule 8(a)(2)'s pleading standard should be dismissed for failing to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitations of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Ultimately, "[t]o survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although courts "accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff, conclusory allegations, unwarranted factual inferences, or legal

16

conclusions are not accepted as true." *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023) (cleaned up).

These same pleading standards apply to civil rights claims like Parria's. Specific applications of the ordinary pleading standards to civil rights lawsuits are relevant here. For example, resort to group pleading—faulting defendants "as a group without factual material suggesting that any particular defendant" violated the plaintiff's civil rights—is insufficient to state a plausible claim against a particular individual defendant. *Armstrong v. Ashley*, 60 F.4th 262, 274-75 (5th Cir. 2023). This is so because "a § 1983 plaintiff 'must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* at 275. Furthermore, "'a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity.'" *Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020) (citation omitted).

### B. *Substance*: 42 U.S.C. § 1983 and Louisiana Law

#### 1. Federal Civil Rights

Enacted pursuant to Congress's authority to enforce the Fourteenth Amendment, 42 U.S.C. § 1983 "provides a cause of action against state actors who violate an individual's rights under federal law." *Filarski v. Delia*, 566 U.S. 377, 380 (2012). It provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any ... person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

42 U.S.C. § 1983. The statute's "purpose [] is to deter state actors from using their badge of authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (citation omitted). Because § 1983 merely provides a remedy for designated rights, rather than creating substantive rights, "an underlying constitutional or statutory violation is a predicate to liability." *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citation omitted). To establish § 1983 liability, the plaintiff must satisfy three elements: "(1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor." *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted).

### 2. Capacities and Immunities

#### a. *Official Versus Individual Capacity Liability*

A § 1983 plaintiff may pursue remedies against state actors in their official or individual capacities. Parria pursues both.

"The performance of official duties creates two potential liabilities, individual-capacity liability for the person and official-capacity liability for the municipality." *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 484 (5th Cir. 2000). The substantive law distinguishes between federal civil rights claims pursued against a an official in his *official* capacity and those against an official his *individual*

(or personal) capacity. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (explaining the doctrinal and practical differences between the two capacities).

Official capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Id.* (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978)). Because the entity is the real party in interest, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166. "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official," liability is premised upon "the entity's 'policy or custom' [which] must have played a part in the violation federal law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citation omitted).

Thus, a person may sue a municipality that violates his or her constitutional rights "under color of any statute, ordinance, regulation, custom, or usage." *See Monell*, 436 U.S. at 690. A plaintiff pursuing a municipal *Monell* liability claim must show "the deprivation of a federally protected right caused by action taken pursuant to an official municipal policy." *Hutcheson v. Dallas Cnty., Texas*, 994 F.3d 477, 482 (5th Cir. 2021) (citation omitted). Specifically, "[a] plaintiff must identify '(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom).'" *Id.* (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (cleaned up)). Critically, "[m]unicipalities are not liable 'on the theory of *respondeat superior*' and are 'almost never liable for an isolated unconstitutional act

19

on the part of an employee.'" *Id.* (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009)).

In contrast, "[p]ersonal-capacity suits seek to impose individual liability upon a government officer for actions taken under color of state law." *Hafer*, 502 U.S. at 25 (citation omitted). Thus, "[o]n the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Id.* (plaintiff pursuing individual capacity claim need not establish a connection to governmental "policy or custom"). Another distinction of consequence: "officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law." *Id.* (citation omitted); *see also Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999) (citation omitted).

> b. *Absolute Immunity for Testimony; Qualified Immunity for Discretionary Functions*

Section 1983's text does not confer any immunities from suit. *Malley v. Briggs*, 475 U.S. 335, 342 (1986). Nevertheless, the Supreme Court recognizes that the statute was intended to embrace traditional concepts of immunity existing at common law at the time Congress enacted § 1983. *Rehberg v. Paulk*, 566 U.S. 356, 361 (2012) (Section 1983 "was not meant to effect a radical departure from ordinary tort law and the common-law immunities applicable in tort suits.").

Accordingly, when a plaintiff sues a state actor in his individual capacity, the state actor may advance immunity defenses to claims for alleged deprivations of constitutional rights. That is, "[a]bsolute and qualified immunity protect . . .

20

*individuals* from claims for *damages*." *Singleton v. Cannizzaro*, 956 F.3d 773, 778 n.3 (5th Cir. 2020) (citation omitted, emphasis in original). Prosecutors, for example, enjoy absolute immunity when they perform judicial or quasi-judicial functions because their independence is essential to a properly functioning criminal justice system. *See Imbler v. Pachtman*, 424 U.S. 409, 427-48 (1976). Witnesses, too, enjoy absolute immunity from civil damages liability: "witnesses were absolutely immune at common law from subsequent damages liability for their testimony in judicial proceedings 'even if the witness knew the statements were false and made them with malice.'" *Burns v. Reed*, 500 U.S. 478, 489 (1991) (citation omitted); *accord Rehberg*, 566 U.S. at 361-63 (determining that a "complaining witness" in a grand jury proceeding is absolutely immune).

Immunity more limited in scope—qualified or "good faith" immunity—is available for officials sued in their individual capacities for executory or investigatory functions. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 807-08 (1982) (citations omitted); *accord Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (citation omitted). Because such immunity is an immunity from suit, not merely a defense to liability, "it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (denial of qualified immunity is immediately

appealable; a defendant's entitlement to qualified immunity should be determined at the earliest possible stage of the litigation).

Assertion of qualified immunity "adds a wrinkle to § 1983 pleadings." *Arnold v. Williams*, 979 F.3d 262, 266-67, 269 (5th Cir. 2020) ("Ordinarily, after determining that a plaintiff had plausibly alleged constitutional violations, we would turn to the qualified-immunity analysis."). Unlike the actor claiming absolute immunity (who bears the burden of establishing he enjoys absolute immunity), when a defendant invokes a qualified immunity defense in a motion to dismiss, "[t]he plaintiff [bears] the burden of demonstrating that qualified immunity is inappropriate." *Green v. Thomas*, 129 F.4th 877, 883 (5th Cir. 2025) (citation omitted). In the face of a qualified immunity defense, "the plaintiff must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm alleged and that defeat a qualified immunity defense with equal specificity." *Nevarez v. Dorris*, 135 F.4th 269, 274 (5th Cir. 2025) (citation omitted). Accordingly, "[t]o defeat a qualified immunity defense, the plaintiff must [allege facts which] show '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Id.* With respect to the second prong, which encompasses the objective reasonableness of the defendant-official's conduct, "[a] [g]overnment official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Anderson v.*

22

*Creighton*, 483 U.S. 635, 640 (1987)). "The reasonableness of the official's conduct and the degree to which the particular right in question was clearly established are thus merged into one issue for purposes of the qualified immunity analysis." *Ramirez v. Guadarrama*, 3 F.4th 129, 133-34 (5th Cir. 2021) (*per curiam*). The reviewing court may tackle these questions in whatever order it deems expeditious. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### 3. State-Law Claims

Though the Section 1983 remedy is technically distinct from pre-existing common law torts, state laws provide counterpart tort causes of actions and equivalent remedies. *See Rehberg*, 566 U.S. at 361, 366. As set forth below, like the qualified immunity conferred for federal claims, Louisiana grants immunity to coroners and support staff for discretionary acts performed within the scope of their duties.

## III.  ANALYSIS

Applying these pleading standards and legal principles to Parria's allegations, the Court turns to consider whether Parria has stated plausible federal or state law claims against the JPCO Defendants and/or whether the JPCO Defendants are entitled to immunity.

### A.    § 1983 Claims Against the JPCO Defendants

The Court first considers Parria's § 1983 claims against the JPCO Defendants: deprivation of liberty without due process and manufacturing false evidence in

violation of the Fifth and Fourteenth Amendments (Counts 1 and 3), unlawful seizure and detention without probable cause in violation of the Fourth and Fourteenth Amendments (Count 2), malicious prosecution (Count 4), and failure to intervene (Count 5). Next the Court considers Parria's *Monell* claim against Cvitanovich in his official capacity (Count 9).

### 1. Individual Capacity Claim: Absolute Immunity

Pressing absolute immunity, the JPCO Defendants seek to dismiss any claim predicated on Troxclair's testimony as a witness in the Preliminary Examination hearing.[91] Parria counters that her claims against Troxclair are unrelated to her testimony; rather, Parria indicates that she predicates her claims on non-testimonial pretrial actions such as evidence fabrication, independent of Troxclair's testimony.[92]

In her complaint, Parria alleges that, during the Preliminary Examination hearing, Troxclair "refused to admit" the possibility that the supposed exit wound discussed in the draft autopsy report was not caused by a gunshot, despite Troxclair's knowledge that Smith "had no exit wound on top of his head prior to" the release of the initial autopsy report, but that Troxclair "intentionally and in bad faith fabricated the exit wound fiction[.]"[93]

Troxclair enjoys absolute immunity for any claim based on her witness testimony during the pretrial Preliminary Examination. *See Rehberg*, 566 U.S. at 367 (finding that "[t]he factors that justify absolute immunity for trial witnesses apply

---

[91] ECF No. 29-1 at 5-6.
[92] ECF No. 44 at 18.
[93] ECF No. 29-1 (citing ECF No. 1 ¶¶ 372-74, 785).

with equal force to grand jury witnesses"); *see also Moffett v. Bryant*, 751 F.3d 323, 326 (5th Cir. 2014) (citation omitted) ("[W]hen [defendant] testified, he was testifying as a witness in an adversarial proceeding and is thus absolutely immune from § 1983 liability."). Parria does not dispute this clear application of binding law. Accordingly, insofar as Parria predicates any part of her overlapping claims on Troxclair's testimony, the motion to dismiss is granted; any such claim is dismissed in relevant part.[94]

### 2. Individual Capacity Claims: Plausibility and Qualified Immunity

Cvitanovich, Troxclair, and Powers contend that Parria fails to plead sufficient facts that state plausible claims for relief against them including insofar as group pleadings fail to plead that each of them through their own action violated her Constitutional rights. Additionally, the JPCO Defendants invoke qualified immunity, which they contend immunizes them from Parria's Section 1983 claims against them in their individual capacities.[95]

"[T]he qualified immunity defense [] provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). That is, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *al-Kidd*, 563 U.S. at 743. "The crucial question is 'whether the complaint pleads facts that, if true, would permit the inference that Defendants are liable under

---

[94] As noted, Parria's complaint offers a lengthy narrative reciting facts, including the fact of Troxclair's testimony, then later lists causes of action.

[95] ECF No. 29-1 at 6-22.

§ 1983 . . . and would overcome their qualified immunity defense.'" *Green*, 129 F.4th at 883 (quoting *Terwilliger v. Reyna*, 4 F.4th 270, 280 (5th Cir. 2021) (citation omitted)).

At the pleadings stage, tackling the first prong, the Court asks "whether the facts, 'taken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a federal right.'" *Degenhardt v. Bintliff*, 117 F.4th 747, 753 (5th Cir. 2024) (citations omitted). "Second, [the Court] ask[s] whether the right in question was 'clearly established' at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his or her conduct." *Id.; see also al-Kidd*, 563 U.S. at 735 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Cvitanovich, Troxclair, and Powers argue they are entitled to qualified immunity for Parria's Section 1983 claims asserted against them in their individual capacities.[96] The Court agrees. Parria fails to allege facts which, if true, would overcome the defense of qualified immunity. *See Iqbal*, 556 U.S. at 678–79 (directing that a plaintiff must "state a claim for relief that is plausible on its face"—excluding statements that are "no more than conclusions" which are "not entitled to the assumption of truth"). Though Parria's claims are overlapping and based on the same universe of allegations against the JPCO Defendants, the Court dutifully considers each claim.

---

[96] ECF No. 29.

### a. Counts 1 and 3: Alleged Due Process Violations

First, due process. In Counts 1 and 3, Parria alleges that the JPCO Defendants (along with all defendants individually) deprived her of liberty without due process and that they manufactured false evidence, all in violation of the Fifth and Fourteenth Amendments.[97] Because both claims allege due process violations predicated (at least in part) on alleged fabricated evidence, the JPCO Defendants and Parria sensibly address these two claims together.[98] The Court does too.

As a threshold matter, Parria erroneously invokes the Fifth Amendment's due process clause, which applies only to actions of the federal government. *See Arnold v. Williams*, 979 F.3d at 265 n.2, 270 (affirming dismissal of Fifth Amendment due process claim because defendant "was an officer of the state of Louisiana rather than of the federal government"). Here, Parria sues only non-federal government officials, Cvitanovich, Troxclair, and Powers, and a non-federal governmental entity, the JPCO. Accordingly, her due process claims are properly considered under Fourteenth Amendment.

No state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, §1. To plead a plausible Fourteenth Amendment due process claim against the JPCO Defendants, Parria must allege facts indicating: (1) that (and how) each defendant deliberately fabricated evidence or destroyed exculpatory evidence; and (2) that misconduct caused a deprivation of

---

[97] ECF No. 1 ¶¶ 777–801.

[98] For Count 3, Parria refers collectively to "Defendants" but because the cause of action is predicated on "manufacturing evidence" under the same due process theory as Count 1, the same analysis applies to the same alleged facts.

the plaintiff's liberty. *Cf. Green*, 129 F.4th at 884 n. 25 and 884-85 (citations omitted) (noting that due process under the Fourteenth Amendment generally protects an arrestee's right to be free from police officers' witness interference and concealment of exculpatory evidence resulting in unlawful arrest, detention, or conviction and that such protection overlaps with but may be pursued simultaneously with Fourth Amendment claims).

More specifically directed to Parria's due process claims against the JPCO Defendants, well before Smith's death investigation, the Fifth Circuit had recognized that "deliberate or knowing creation of misleading and scientifically inaccurate [evidence] amounts to a violation of the defendant's due process rights[.]" *Brewer v. Hayne*, 860 F.3d 819, 824 (5th Cir. 2017) (citing *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008)). Like other investigative officers, "[c]oroners [and forensics officials] generally enjoy qualified immunity when acting within the scope of their duties." *Crawford v. Caddo Parish Coroner's Office*, No. 17-01509, 2019 WL 943411, at *17 (W.D. La. Feb. 25, 2019) (citing *Lawyer v. Kernodle*, 721 F.2d 632, 635 (8th Cir. 1983)).

In determining whether a plaintiff alleging due process violations has pled facts sufficient to overcome a coroner or forensic official's qualified immunity, the analytical key is *deliberate* falsification. On one end of the continuum is *Brown*. Twenty years after Brown was convicted of rape and sentenced to life in prison, DNA exonerated him, proving that he could not have been the semen donor. *Brown*, 519 F.3d at 234. When Brown sued the laboratory technician for civil rights violations, the district court denied the lab tech's motion to dismiss on qualified immunity

grounds. *Id.* The Fifth Circuit affirmed, finding that qualified immunity was properly denied where Brown alleged facts indicating that the lab technician *deliberately* overstated or *falsified* the results of blood tests to support misleading scientific conclusions inculpating the plaintiff, and concealed or destroyed the results of additional tests exculpating the plaintiff. *Id.* at 235-236 (finding the technician's alleged course of conduct to be objectively unreasonable in light of clearly established law). Notably, based on the technician's "confirmation" of a blood type match, the arresting officer "immediately" swore out an affidavit that Brown had been "positively identified" by the blood test. *Id.* at 235 (noting that the victim had identified Brown in a line-up though he was only included in the line-up as a fill-in).

On the other end of the continuum, when at most grossly negligent conduct is implicated, qualified immunity properly is granted. In *Brewer*, the plaintiff whose murder conviction had been vacated sued two forensic consultants—a private pathologist and a forensic orthodontist—who provided scientific evidence and testimony against the plaintiff in the underlying criminal trial. 860 F.3d at 824. Though the forensic consultants had concluded at the criminal trial that bite marks found on the victims' bodies matched Brewer, this evidence later turned out to be baseless when DNA evidence matched a different individual who confessed to the crime. *Id.* The Fifth Circuit affirmed the district court's summary judgment determination that the defendants were entitled to qualified immunity because the evidence tended to show at most that the forensic consultants were negligent or grossly negligent. *Id.* at 825-26 (plaintiff presented no evidence indicating that

defendants intentionally created false evidence, or intentionally produced evidence they knew to be scientifically inaccurate, or deliberately failed to perform biopsies or withheld exculpatory evidence, noting that "at most, Plaintiffs have presented evidence that Dr. Hayne was negligent in failing to perform . . . biopsies or in failing to examine biopsied tissue.").

The upshot is that negligent or grossly negligent production of scientific evidence or analysis does not implicate the Due Process Clause. *See id.* at 825 ("negligence alone will not defeat qualified immunity"; declining to reach "whether recklessness in producing scientific evidence" would suffice to defeat qualified immunity). Thus, even if a coroner negligently performs an autopsy, or reaches an incorrect medical conclusion, the same is not tantamount to an intent to manufacture evidence and therefore fails to overcome qualified immunity. *Crawford*, No. 17-01509, 2019 WL 943411, at *17-18 (citations omitted). This makes sense considering that "the qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000) (citation omitted).

The JPCO Defendants invoke qualified immunity for engaging in discretionary investigative functions including performing an autopsy and drafting reports. They contend that the complaint's allegations at most implicate the qualified immunity doctrine's ample room for mistaken judgments. Specifically, the JPCO Defendants contend that Parria fails to allege facts indicating that they caused a due process violation, that the alleged facts do not lead to a plausible inference of deliberate

fabrication, and that at best Parria alleges that they were negligent, all of which is insufficient to overcome their assertion of qualified immunity. The Court agrees.

All told, the JPCO prepared three reports: one draft, one initial, and one amended report. None determined that the cause of death was homicide. That is, Parria alleges that JPCO never went so far as to determine that Smith was murdered (and, thus, JPSO could never use a non-existent "homicide" determination to support Parria's arrest and detention). This absence of a "homicide" determination by JPCO contrasts with Parria's allegations that JPSO detectives persistently declared that Parria "murdered" Smith and that JPSO was motivated to pursue murder charges against her. Nevertheless, the existence (or not) of an exit wound is central to Parria's due process claims against the JPCO Defendants insofar as Parria alleges that an exit wound on the top of Smith's head would be critical to the defendants' alleged theory that the gunshot wound was not self-inflicted.[99]

Chronology is instructive to determining whether Parria has alleged facts that permit the reasonable inference that the JPCO Defendants deprived her of due process by deliberately falsifying the autopsy report(s). After Smith was shot on June 17, 2018, but before he died a week later on June 24, he underwent extensive medical intervention, including a craniectomy.[100] Troxclair never examined Smith prior to his craniectomy, and Troxclair did not have access to Smith's medical records at the time

---

[99] *Id.* ¶ 203.
[100] *Id.* ¶¶ 88, 244, 248.

she performed the autopsy on June 25, the day after Smith died.[101] However, two healthcare providers had indicated there was no exit wound.[102]

On July 2, 2018, the JPCO first issued a draft case report with its preliminary autopsy findings.[103] The JPCO Defendants produced this draft report one week after Smith's autopsy and, as Parria claims, after multiple meetings and calls with the JPSO.[104] These preliminary findings reflected in the draft report included "Gunshot wound to the head. Suicide."[105] The pre-arrest draft report also stated that Smith "shot [him]self," and described his manner of death as "pending."[106] Before this draft was issued, JPCO Investigator Powers spoke with one of Smith's treating physicians, Dr. Joyce Kim.[107] In Powers' notes from her conversation with Dr. Kim, Powers writes "apparent[ly] self-inflicted" to describe the gunshot wound.[108] Dr. Kim informed Powers that Smith tested positive for opiates and amphetamines on the day of his death.[109] Powers' notes also reflect that Dr. Kim equivocated regarding the exit wound: she told Powers that "she did not think there was an exit wound but wasn't certain."[110]

Parria was arrested on July 11, 2018—one day after a warrant issued upon JPSO Commander Meunier's warrant affidavit. The Preliminary Examination and

---

[101] *Id.* ¶¶ 235-46.
[102] *Id.* ¶ 247.
[103] *Id.* ¶¶ 337–40.
[104] *Id.* ¶¶ 337–38.
[105] *Id.* ¶ 340.
[106] *Id.*
[107] *Id.* ¶ 234
[108] *Id.* ¶ 235.
[109] *Id.* ¶ 173.
[110] *Id.* ¶ 240.

bond reduction hearing took place during the first week of August. Troxclair testified and refused to admit that the exit wound mentioned in the draft report could have been caused by medical intervention after shooting rather than the shooting incident itself. At the conclusion of the two-day hearing, the state commissioner found probable cause to continue detaining Parria on the second-degree murder charge and reduced her bond (which Parria still could not post).

More than one month after the Preliminary Examination hearing, the JPCO issued its initial Case and Autopsy Report, which reflected changes from the initial pre-arrest draft.[111] In the September 17, 2018 report drafted by Troxclair and signed by Cvitanovich, the JPCO's preliminary findings still included "gunshot wound to the head."[112] And the case report's description of how the injury occurred similarly states that Smith "sustained [a] gunshot wound to the head."[113]

The September 2018 report describes an exit wound on the top of Smith's head.[114] Parria alleges that the JPCO noted the existence of this exit wound despite knowing that no such wound existed.[115] Parria also alleges that "[t]he CT scans of [Smith's] brain before and after his June 18, 2018 craniectomy which were contained in his medical records plainly reveal [Smith] had no hole on top of his head until after

---

[111] *Id.* ¶¶ 331, 342.
[112] *Id.* ¶ 342.
[113] *Id.*
[114] *Id.*
[115] *Id.* ¶¶ 330, 785.

the surgery."[116] Parria thus alleges that the JPCO Defendants must have ignored or failed to review Smith's medical records.[117] This sounds in negligence.

Indeed, Parria herself describes Troxclair's exit wound references as "at best grossly negligent."[118] Parria also takes issue with Troxclair's testimony about this exit wound during Parria's August 2018 preliminary examination hearing insofar as Troxclair "refused to admit" that it was possible that the so-called exit wound was a hole drilled by doctors during Smith's treatment.[119]

But Troxclair and JPCO issued a corrected autopsy report stating just that.[120] In Parria's words, "Troxclair quietly changed her report two months later [two months after the preliminary hearing; one month after the September report] to reflect what the Defendants knew two days after the shooting: that there was no exit wound on top of Troy Smith's head."[121] On October 23, 2018, the amended Autopsy Report was issued, indicating that there was no exit wound on the top of the head.[122] The Amended Autopsy Report reflected that what was previously designated the exit wound was actually a "drainage tube insertion site" created by doctors while treating Smith's gunshot wound.[123] This became clear, the amended report explains, after discussions with Smith's neurosurgeons and reviews of Smith's CT scans.[124] The

---

[116] *Id.* ¶¶ 355.

[117] *Id.* ¶ 361.

[118] *Id.* ¶ 251 ("Defendant Meunier used Defendant Troxclair's at best grossly negligent opinion because it fit the conclusion JPSO came to mere minutes after Troy Smith's initial shooting—that is, that Troy Smith's shooting was a 'murder' and that Shantel Parria was his murderer.").

[119] *Id.* ¶¶ 372–74.

[120] *Id.* ¶¶ 375–76.

[121] *Id.* ¶ 375.

[122] *Id.*

[123] *Id.* ¶ 376.

[124] *Id.*

amended report also describes the gunshot wound as "tangential" and "superficial," with the bullet exiting through the same wound; "information [which] was confirmed at a meeting on 10/22/2018 with Dr. John Joslyn, an independent Neuroradiologist, who also reviewed the CT scans."[125] The amended report maintained that "at this time the manner of death is best classified as undetermined."[126]

This amendment and its timing are critical to the qualified immunity analysis. Parria alleges that the JPCO Defendants indicated in the initial report that the superior right parietal scalp wound was made by the bullet exiting Smith's head and not by a physician's surgical interventions. Parria herself alleges that this was an evaluation of an objective reality: a hole in the top of Smith's head that was present when Troxclair performed Smith's autopsy, which was after Smith's weeklong stay at the hospital. Whether the result of confusion or negligence, the JPCO Defendants corrected this incorrect evaluation when the report was amended in October 2018— before the grand jury proceeding and well before the August 2022 trial—to reflect that the hole was, in fact, not a wound made by an exiting bullet but, instead, had been drilled by physicians while performing a craniectomy. The correction was made by JPCO after confirming the same from the medical records and discussions with the neurosurgeons who performed the craniectomy on Smith after the showing but before the autopsy. That Parria alleges the JPCO Defendants should have more quickly dispelled the exit wound finding based on conversations with treating physicians sounds in negligence and falls short of plausibly rendering the provisional

---

[125] Id.
[126] Id. ¶ 382.

and interim "exit wound" finding a deliberate fabrication. All considered, at best these alleged facts do not plausibly indicate deliberate or intentional fabrication on the JPCO Defendants' part. Their alleged negligence does not implicate the Due Process Clause. Thus, the JPCO Defendants are entitled to qualified immunity.

This determination is reinforced not just by *Brown* and *Brewer* but by non-binding persuasive authority. Consider *Galbraith v. Cnty. Of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002). There, the Ninth Circuit held that "a coroner's reckless or intentional falsification of an autopsy report that plays a material role in the false arrest and prosecution of an individual can support a [§ 1983] claim" (though under the Fourth, not Fourteenth, Amendment). *Galbraith*, 307 F.3d at 1126 (citation omitted) (citing with approval the district court's analogy to warrant affidavit cases requiring that falsifications be material to the finding of probable cause). Galbraith, the plaintiff—who was acquitted of the charge that he murdered his wife, whom he maintained had committed suicide—stated a constitutional violation against the coroner, whom in performing an autopsy on the deceased concluded that Galbraith's wife did not commit suicide, but, instead, was strangled. *Id.* at 1121-22, 1126. It was the coroner's strangulation finding that "shifted the focus of the investigation" from the police officer's initial conclusion that the death was a suicide. *Id.* at 1122. After Galbraith's acquittal, the decedent's body was exhumed and an expert examining it found objective indications on the body that wholly undermined the coroner's findings in the original autopsy. *Id.* at 1122.

In his civil rights suit, Galbraith alleged that the county coroner deliberately or recklessly disregarded the truth by asserting in the autopsy that the deceased was strangled by an assailant, notwithstanding the apparent lack of injury to the neck (internally and externally), while ignoring substantial evidence that pointed to suicide. *Id.* at 1127. The plaintiff also described deficiencies in the report indicating the coroner did not perform the work he claimed he had done to support the conclusion that an assailant had killed the deceased. *Id.* It was further alleged that the coroner lied in the autopsy report, in his communications with investigators, and on the witness stand at the preliminary hearing to disguise his incompetence. *Id.* Those lies, the plaintiff alleged, directly caused his wrongful arrest and prosecution for murder. *Id.* The Ninth Circuit affirmed the district court's determination that the complaint adequately alleged a constitutional violation. *Id.* at 1127 (agreeing with the district court that the complaint alleged a Fourth, not Fourteenth, Amendment violation).

Parria's allegations concerning the JPCO Defendants' conduct most closely resemble the negligent conduct in *Brewer* and *Crawford* than the intentional fabrication in *Brown* or *Galbraith*. That is, Parria at most alleges facts indicating that JPCO Defendants performed discretionary functions negligently in classifying the superior right parietal scalp wound as an "exit wound," but relatively promptly corrected the error after further consultation with treating physicians (and before the grand jury proceeding). Without more, a provisional and negligent error does not implicate the Due Process Clause or overcome these officials' good faith immunity.

37

Furthermore, as the JPCO Defendants suggest, if the JPCO was indeed attempting to fabricate evidence to support the JPSO's forensic theory related to the exit wound and JPSO's theory that Parria murdered Smith, JPCO would not have amended the report to reflect the corrected "drainage site" reason for the hole.

Parria alleges that Troxclair performed the autopsy after Smith's weeklong hospital stay but before JPCO had his medical records. But Parria fails to allege any facts plausibly indicating that any of the JPCO Defendants deliberately altered their reports or rendered any opinions or findings directly implicating Parria in a murder. Perhaps just as critically, JPCO's manner of death determination was "undetermined," not "homicide."[127] This "undetermined" manner of death finding simply does not support Parria's conclusion that JPCO's autopsy findings were

---

[127] *Compare Dean v. Harris Cnty.*, No. H-13-00073, 2013 WL 5214351, at *1-4, *7 (S.D. Tex. Sept. 17, 2013) (allegations that medical examiner intentionally fabricated evidence and classified manner of death as "homicide" before receiving the forensic and toxicology test results and in blatant disregard of evidence that the decedent-wife committed suicide—where plaintiff alleged that the autopsy findings were the basis of the probable cause affidavit, arrest warrant, and his prosecution for murder—stated plausible Fourth Amendment claim and overcame assertion of qualified immunity); *see also generally Dean v. Phatak*, 911 F.3d 286, 288-90 (5th Cir. 2018) (recounting summary judgment evidence that investigating officer attended the autopsy and conveyed to medical examiner his hope that autopsy would confirm his suspicions that the husband shot the decedent, that the report's conclusion of "homicide" was critical to the husband's arrest, indictment, and two trials on murder charges, and further how (in response to an expert report weapons-to-wounds comparison to demonstrate the gun orientation) the manner of death was changed in the middle of the second trial from "homicide" to "undetermined" which led to the state dismissing the charges in the middle of the second trial). Though the *Dean* case is analogous to the instant case insofar as the underlying criminal case involved the question of spousal suicide versus homicide for a shooting that occurred during a domestic dispute, the extent of the alleged conduct and dispositions of the coroner or forensic defendants—and the alleged materiality of the manner of death findings on the charges and proceedings—are quite different. Here, according to Parria's allegations, JPCO never concluded that the manner of death was homicide; rather, JPCO indicated in an initial draft report that the manner of death was pending but might be suicide, then in its original and amended report indicated that the manner of death was "undetermined." Though Parria concludes that JPCO fabricated the exit wound finding, the facts she alleges does not support her conclusion. Rather, the facts she alleges indicate that JPCO corrected their erroneous exit wound finding before even the grand jury proceeding, nearly four years prior to trial.

"modified to parrot the Defendants' unbelievable murder theory." JPCO never concluded that the gunshot wound that led to Smith's death was inflicted by another person (homicide) and JPCO corrected the top of the head exit wound finding that was consistent with JPSO's trajectory theory. No facts are alleged indicating anything more than negligence on the JPCO's part in failing *initially* to confirm what caused the hole in the top of Smith's head. Such allegedly provisional negligence does not implicate the Due Process Clause. *See Crawford*, No. 17-01509, 2019 WL 943411, at *18 (finding that plaintiff's allegations that coroner was "possibly incorrect" in concluding that the decedent died due to suffocation were insufficient to defeat qualified immunity).[128]

Viewing the facts in the light most favorable to her, Parria has not alleged facts to plausibly support that the JPCO Defendants violated her Fourteenth Amendment due process rights and thus her allegations cannot overcome the JPCO Defendants' assertion of qualified immunity. *See Hampton v. Oktibbeha Cnty. Sheriff Dep't*, 480 F.3d 358, 363 (5th Cir. 2007) ("If the plaintiff fails to state a constitutional claim or if the defendant's conduct was objectively reasonable under clearly established law, then the government official is entitled to qualified immunity."). Accordingly, Counts 1 and 3 against JPCO Defendants must be dismissed.

---

[128] There, Crawford's years-earlier conviction for the first-degree murder of his son was reversed and his charges dismissed. But he failed in his § 1983 suit to allege deliberate misconduct by the forensic pathologist, who had determined the son's cause of death was suffocation from smothering and that the manner of death was "homicide" but so determined without taking tissue samples that would have revealed the timing of the observed injuries and further failed to perform additional testing to determine if positive blood test culture was the result of sepsis. *Id.*

### b. Count 2: Unlawful Seizure and Detention Without Probable Cause in Violation of the Fourth and Fourteenth Amendments

Second, the Court considers Parria's allegations concerning her right to be free from unreasonable seizure/detention. That Parria alleges the same through-line of JPCO misconduct (*i.e.,* the provisional exit wound assessment and failure to change manner of death from "undetermined")—and considering the overlap between her due process and unlawful detention theories—compels the same outcome for her Fourth Amendment claim. Parria's resort to group pleading likewise compels dismissal of this claim against the JPCO Defendants.

The JPCO Defendants contend that Parria's Fourth Amendment unlawful seizure and detention claim against them should be dismissed.[129] They contend that Parria fails to allege facts implicating the JPCO Defendants in even having the ability to procure her arrest and that Parria's group allegations against "all defendants" is improper in failing to implicate them and in failing to state a plausible claim as to JPCO Defendants. Furthermore, they contend that the only provisional conclusion rendered by JPCO before the arrest warrant issued was JPCO's interim draft report finding of "gunshot wound to the head. Suicide." Parria counters that the JPCO Defendants' "two pathological findings [the exit wound and alteration from self-inflicted injury in draft report to undetermined in initial and amended reports] were

---

[129] ECF No. 29-1 at 15–16; ECF No. 1 ¶¶ 802–12.

the centerpiece of the facially defective Affidavit for Arrest Warrant by which Defendants procured [Parria's] arrest without probable cause."[130]

The Fourth Amendment enshrines "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures" and the mandatory prerequisite that "no Warrants shall issue, but upon probable cause[.]" U.S. CONST. amend. IV. The Fourth Amendment thus "requires a judicial determination of probable cause as a prerequisite to any extended restraint on liberty following arrest." *Green v. Thomas*, 129 F.4th 877, 884 (5th Cir. 2025) (citations omitted). "As a baseline, '[t]he constitutional claim of false arrest requires a showing of no probable cause.'" *Hughes v. Garcia*, 100 F.4th 611, 619 (5th Cir. 2024) (quoting *Club Retro, LLC v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009)). "Probable cause in turn requires 'a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Id.* (citations omitted). Whether the Fourth Amendment has been violated thus "turn[s] on whether a reasonable officer would believe the suspect had committed a crime." *Id.* (citation omitted).

Parria ostensibly alleges a *Franks* violation against all defendants.[131] For a *Franks* claim, "a defendant's Fourth Amendment rights are violated if (1) the affiant, in support of the warrant, includes 'a false statement knowingly and intentionally, or with reckless disregard for the truth' and (2) 'the allegedly false statement is

---

[130] ECF No. 44 at 22.
[131] ECF No. 1 ¶¶ 803–04. *But see* ECF No. 44 (referencing "facially defective warrant" which might suggest that Parria instead or also claims a *Malley* defect or a *Malley* exception to the independent intermediary doctrine). Regardless, at the pleadings stage, the Court considers the complaint's allegations.

necessary to the finding of probable cause.'" *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018) (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)). The Fifth Circuit has explained that "the intentional or reckless omission of material facts from a warrant application [or affidavit] may amount to a Fourth Amendment violation." *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006).

Neither side identifies any cases addressing Fourth Amendment unlawful arrest or detention claims based on *Franks* against coroner-office defendants. Indeed, such claims generally are predicated on the arresting law enforcement officers' reasonable belief in their probable cause to arrest and/or the officers' conduct, motives, and assertions to independent intermediaries. *See, e.g., Hughes v. Garcia*, 100 F.4th 611 (5th Cir. 2024); *Wilson v. Stroman*, 33 F.4th 202 (5th Cir. 2022); *Terwilliger v. Reyna*, 4 F.4th 270 (5th Cir. 2021).

Parria alleges that JPSO never had probable cause to arrest and prosecute her. More specifically, Parria alleges that none of the three times JPSO initiated her arrest or initiated different intermediaries' determinations of probable cause to continue her arrest and detention were supported by probable cause. Pretermitting Parria's claims against JPSO, she fails to allege facts linking deliberate misconduct on the JPCO Defendants' part to any of the probable cause determinations.

First, Parria alleges that JPSO Commander Meunier obtained an arrest warrant by submitting a false affidavit. But, insofar as Parria seeks to link procurement of that initial (ostensibly false) arrest warrant to the JPCO Defendants, Parria herself alleges that—before Meunier obtained the warrant—the only

provisional pre-arrest finding by JPCO Defendants as of July 2 was "Gunshot wound to the head. Suicide." More critically, Parria does not allege that any of the JPCO Defendants had the authority to or served as affiants for obtaining her arrest warrant, or otherwise prepared the warrant application. Accordingly, insofar as Parria seeks to implicate the JPCO Defendants in the alleged Fourth Amendment violation predicated on procurement of the warrant, all JPCO Defendants are entitled to qualified immunity because they are not liable as a matter of law for any JPSO officer or officers' procurement of the warrant. *See Hampton v. Oktibbeha Cnty. Sheriff Dept.*, 480 F.3d 358 (5th Cir. 2007) (citation omitted) (granting qualified immunity to those police officers who were not the affiant officer or the officer who prepared the warrant with the knowledge that a warrant would be based solely on the document prepared).

Second, Parria alleges that (i) Troxclair refused to disclaim the interim exit wound finding during her testimony at the August 2018 preliminary examination and bond reduction hearing and (ii) the initial September 2018 report perpetuated the "exit wound fiction." But (i) indisputably fails because Troxclair is cloaked with absolute immunity for her testimony. *See Armstrong*, 60 F.4th at 275 (citation omitted) (affirming dismissal of claims against coroner insofar as those claims related to his testimony). As for (ii), Parria generally alleges that all defendants, despite knowing probable cause did not exist to arrest her, continued to detain and prosecute her while ignoring and suppressing evidence that Smith's injuries were self-

inflicted.[132] Parria purports to allege that the JPCO Defendants' exit wound finding, before it was corrected in October 2018, was a foundation or ingredient in the unlawfully obtained warrant and in the probable cause finding after the preliminary examination hearing, *i.e.,* that the JPCO Defendants "conjure an 'exit wound'" in the September 2018 autopsy and report.[133] Even assuming Parria properly attempts to plead facts implicating the JPCO Defendants in her alleged Fourth Amendment unlawful arrest and detention (for post-arrest, post-preliminary examination testimony conduct), the same allegations amounting to mere provisionally negligent conduct that doomed her due process claims (Counts 1 and 3)—the only factual allegations asserted respecting JPCO conduct—equally doom Count 2. *Cf. Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018) (considering invocation of qualified immunity by arresting officer and observing that "negligence alone will not defeat qualified immunity").

Third, Parria does not allege that the provisional exit wound finding that was ultimately corrected by mid-October 2018 had any bearing on the grand jury's issuance of an indictment in November 2018. Parria has failed to allege facts directly linking the JPCO Defendants to procurement of the warrant or to her indictment.

Parria's Fourth Amendment violation theory as against the JPCO Defendants fails for another reason. Parria brings this count against "all defendants" and fails to name Cvitanovich, Troxclair, or Powers, or plead any specific facts as to their actions in connection with this count. Parria's resort to "group pleading" rather than

---

[132] ECF No. 1 ¶¶ 805, 807.
[133] *Id.* ¶ 348.

identifying conduct by the JPCO Defendants in effectuating her unlawful arrest and detention is improper and thus her Fourth Amendment claim against the JPCO Defendants fails under the ordinary pleading standard. *See Armstrong v. Ashley*, 60 F.4th 262 (5th Cir. 2023) (upholding dismissal of claims relating to fingerprint evidence where plaintiff faulted eight law enforcement defendants as a group "without factual material suggesting any particular defendant suppressed evidence"). The alleged *factual* predicate for Parria's unlawful arrest and detention focuses on the JPSO arresting officers' conduct. *Cf. Hampton*, 480 F.3d at 365.

As to her Fourth Amendment claim against the JPCO Defendants, Parria fails to meet the ordinary pleading standard required to withstand a motion to dismiss, or to plead facts that overcome qualified immunity.

### c. Count 4: Malicious Prosecution

Next up: the Court considers the two grounds advanced by the JPCO Defendants to dismiss Parria's Fourth Amendment claim based on malicious prosecution.[134]

First, Defendants contend that no such federal cause of action existed at the relevant time and therefore Parria fails to state a claim and/or fails to overcome the JPCO Defendants' assertions of qualified immunity because there was no clearly established right to be free from malicious prosecution until April 2022, when the Supreme Court decided *Thompson v. Clark*. 596 U.S. 36 (2022).[135] Second, Defendants contend that Parria merely recites the elements of such a claim and

---

[134] ECF No. 29-1 at 16–21.
[135] *Id.* at 17–18.

impermissibly relies on group pleadings and therefore fails the ordinary pleading standard insofar as no facts pertaining to the JPCO Defendants' conduct in effecting malicious prosecution are alleged.[136] Either ground independently compels dismissal and both persuade.

First, Parria's federal malicious prosecution claim fails to overcome the clearly-established prong of qualified immunity. No such federal cause of action existed in the Fifth Circuit until the *Thompson* decision. Before *Thompson* was decided in April 2022, the Fifth Circuit "explicitly denied the possibility of a constitutional malicious prosecution claim." *See Espinal v. City of Houston*, 96 F.4th 741, 748 (5th Cir. 2024) (citation omitted); *see also Wood v. Bexar County, Texas*, 147 F.4th 534, 548 (5th Cir. 2025) (finding that malicious prosecution claim fails the clearly-established prong of qualified immunity where the Fifth Circuit had denied the possibility of a constitutional malicious prosecution claim at the time of the plaintiff's arrest and prosecution); *Guerra v. Castillo*, 82 F.4th 278, 288-89 (5th Cir. 2023) (affirming district court's Rule 12 dismissal of plaintiff's federal malicious prosecution claim because "this court's caselaw explicitly disclaimed the existence of a constitutional claim for malicious prosecution at the time of [the] alleged conduct"); *Folks v. Sainato*, No. 23-643, 2024 WL 2271668, at *6 (E.D. La. May 20, 2024) (Long, J.) (denying plaintiff's motion for summary judgment on malicious prosecution claim because "this cause of action was not recognized under Fifth Circuit law at the time of the events giving rise to it"); *Quinlan v. Jefferson Parish Sheriff's Office*, No. 22-889, 2023 WL

---

[136] *Id.* at 18–19.

3072814, at *5 (E.D. La. Apr. 25, 2023) (Vance, J) (finding that defendants were entitled to qualified immunity as to plaintiff's federal malicious prosecution claim because "a claim that is 'expressly not recognized is the antithesis of a clearly established one'" (citation omitted)).

Whether law is clearly established is assessed at the time of the challenged conduct. *Nevarez*, 135 F.4th at 274. Here, Parria's factual allegations pertaining to the JPCO Defendants' conduct span from June 2018 through October 23, 2018, years before *Thompson*. Her more general allegations indicate that she was arrested in 2018 and unlawfully detained until August 26, 2022, when she was released after her acquittal. In other words, Parria was arrested and indicted in 2018, and JPCO Defendants investigated Smith's death and drafted reports with their findings, when the constitutional malicious prosecution tort did not exist in this circuit. Parria thus fails to allege facts that would overcome the JPCO Defendants' qualified immunity.

Though the JPCO Defendants would have been on notice that any malicious misconduct on their part post-*Thompson*/April 2022 was actionable under Section 1983 for malicious prosecution, Parria alleges no facts indicating that JPCO Defendants engaged in *any* conduct related to her case after April 2022, much less any malicious misconduct whatsoever.

Parria's federal malicious prosecution claim thus fails for a second reason and even if such a claim had been clearly established at the relevant time. Parria fails to allege facts implicating the JPCO Defendants in her alleged malicious prosecution. To state a claim for malicious prosecution, Parria must show "(1) the commencement

47

or continuance of an original criminal proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) malice; and (6) damages." *Armstrong v. Ashley*, 60 F.4th 262, 279 (5th Cir. 2023) (discussing *Thompson v. Clark*, 596 U.S. 36, 44 n.3 (2022)).

Parria alleges that criminal proceedings were initiated against Parria and that the JPCO Defendants issued case and autopsy reports in connection with these proceedings. However, Parria ultimately fails to state a claim for malicious prosecution against the JPCO Defendants. She fails to allege facts that support either the legal causation or malice elements.

As for causation, Parria fails to allege facts that the JPCO Defendants initiated or continued the criminal prosecution against her, or that they had any power to do so. When Parria was arrested on July 11, 2018, Parria herself alleges that the JPCO had only issued its draft report with these preliminary findings: "gunshot wound to the head. Suicide."[137] This finding in no way implicates Parria. The JPCO Defendants' entire alleged course of conduct occurred before Parria's indictment in November 2018. None of Parria's well pled factual allegations supports a reasonable inference that the JPCO Defendants played any role or had any authority in Parria's arrest, detention, indictment, or prosecution. Nor does Parria allege facts plausibly suggesting that the JPCO Defendants acted with malicious intent in performing their duties to investigate Smith's death and issue case and autopsy reports reflecting their

---

[137] ECF No. 1 ¶ 340.

assessments. As discussed above, at most Parria's factual allegations suggest potentially negligent conduct.

Accordingly, Parria's malicious prosecution claim against defendants in their individual capacities is doomed because no such federal cause of action existed in the Fifth Circuit until April 2022 and, independently, she fails to allege facts indicating that the JPCO Defendants acted maliciously or that any conduct on their part caused the criminal proceedings to be instituted and continued against her.

### d. Count 5: Failure to Intervene

The JPCO Defendants next move to dismiss Count 5, Parria's failure to intervene claim. Parria claims that "all defendants" were complicit in her civil rights violations insofar as they failed to intervene in her unlawful pretrial seizure, detention, and prosecution.[138]

As a threshold and now familiar matter, Parria's resort to group pleading renders her bystander liability claim merely possible and thus implausible as to the JPCO Defendants. Parria offers general, conclusory allegations that all defendants failed to intervene in her unlawful detention spanning four years. Her failure to allege any specific facts pertaining to the JPCO Defendants' conduct in connection with this claim is fatal. *See Armstrong*, 60 F.4th at 280 (internal quotations omitted) (affirming district court's dismissal of failure to intervene claim where "claim lack[ed] detail as to which of the Defendants did what[.]").

---

[138] ECF No. 1 ¶¶ 836–40.

Additionally and relatedly, Parria fails to allege facts that would overcome the JPCO Defendants' assertion of qualified immunity. Considering that the mine-run bystander liability or failure to intervene cases in the Fifth Circuit target police officer conduct in which the officers are literally standing by at the scene where constitutional (typically, excessive force) violations are unfolding, Parria's conclusory allegations that these coroner officer defendants failed to intervene do not fit the mold. Even the elements of the cause of action are framed in terms of police officer liability at the scene:

> A failure to intervene claim against a police office requires that the officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) is present at the scene of the constitutional violation; (3) has a reasonable opportunity to prevent the harm; and (4) chooses not to act.

*Armstrong*, 60 F.4th at 280 (citing *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013)); *see also Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 342 (5th Cir. 2020) ("Bystander liability requires more than mere presence in the vicinity of the violation; 'we also consider whether an officer acquiesced in the alleged constitutional violation.'"); *Norman v. Ingle*, --- F.4th ---, 2025 WL 2371174, at *4 (5th Cir. Aug. 15, 2025) (where police officer "did not actively participate in the challenged conduct" and plaintiff offered no analogous case law that a reasonable officer would know of his duty to intervene in the circumstances presented, plaintiff failed to meet his burden of demonstrating that his claim was not barred by qualified immunity).

Parria fails to allege factual material plausibly implicating the JPCO Defendants as "bystanders" present at the scene choosing not to act while other

defendants violate Parria's constitutional rights (much less does she allege any reasonable opportunity the JPCO Defendants had to prevent the harm) during the course of her arrest, probable cause hearing, grand jury proceeding, or for three more years that lapsed before her trial. Moreover, she fails to identify an analogous case to enable the Court to assess whether (and if so what) clearly established law applied to Cvitanovich, Troxclair, and Powers and required any one of them to intervene. Accordingly, Parria fails to allege facts sufficient to overcome the JPCO Defendants' qualified immunity on her failure to warn claim.

Like her other individual capacity claims against each JPCO Defendant, Parria's failure to warn claim must be dismissed.

### 2.    Official Capacity Claims

### a.    Official Capacity Claim Against Troxclair and Powers

In addition to suing Troxclair and Powers in their individual capacities, Parria sued them in their official capacities. Troxclair and Powers move to dismiss Parria's official capacity claims against them as duplicative of her claims against Cvitanovich in his official capacity because Cvitanovich, "the chief policymaker for JPCO,"[139] has already been named in his official capacity.[140] Parria does not oppose the request.[141] Because Parria's official capacity claims advanced against Troxclair and Powers are merely redundant of the official capacity claim against the Jefferson Parish Coroner (and because Parria fails to allege that Troxclair or Powers had any policymaking

---

[139] ECF No. 1 ¶ 852.
[140] ECF No. 29-1 at 4–5.
[141] ECF No. 44 at 18.

authority), the official capacity claims against Troxclair and Powers must be dismissed. *See Garza v. Escobar*, 972 F.3d 721, 734 (5th Cir. 2020) (citation omitted).

### b. *Monell* Claim Against Cvitanovich (Count 9)

In her final §1983 claim, Parria brings an official-capacity claim against Cvitanovich under *Monell*.[142] Parria alleges that, as the "chief policymaker for JPCO," Cvitanovich is liable for the JPCO's alleged altering of Smith's autopsy reports "to mirror JPSO's forensic murder theory."[143] She further purports to premise *Monell* liability on Cvitanovich's failure to train. Neither states a plausible claim against Cvitanovich in his official capacity as Coroner.

As a threshold matter, Parria fails to allege facts plausibly indicating that the JPCO Defendants violated her constitutional rights. Absent an underlying constitutional violation, there can be no *Monell* liability. *Garza*, 972 F.3d at 734 (citation omitted). *Monell* liability is predicated on "the deprivation of a federally protected right caused by action taken pursuant to an official municipal policy." *Hutcheson v. Dallas Cnty.*, 994 F.3d 477, 482 (5th Cir. 2021) (citation omitted). To state such a claim, plaintiff "must [allege facts tending to] show that (1) an official policy (2) promulgated by a policymaker (3) was the moving force behind the violation of a constitutional right." *Hicks-Fields v. Harris Cty.*, 860 F.3d 803, 808 (5th Cir. 2017) (internal quotation marks omitted). Thus, to get past the pleading stage," Parria's "description of a policy or custom and its relationship to the underlying constitutional violation cannot be conclusory; it must contain specific facts." *Id.*

---

[142] ECF No. 1 ¶¶ 866–80.
[143] *Id.*

52

(citing *Peña v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018) (quotation omitted)).

Cvitanovich contends that Parria fails to plead facts supporting these elements—that Parria does not provide any factual allegations supporting the existence of an official policy or custom.[144] The Court agrees.

Even if Parria alleged unconstitutional conduct on the part of any JPCO Defendant, she fails to allege facts directly attributing such conduct to JPCO through some sort of official action. Parria points to what she labels as JPCO's "constitutionally deficient policies" and its "general practice of fabricating and altering independent medical investigatory findings."[145] But Parria must "allege facts that show an official policy, promulgated or ratified by the policymaker, under which the [JPCO] is said to be liable." *Groden v. City of Dallas,* 826 F.3d 280, 284 (5th Cir. 2016). Parria has not done so. Her complaint lacks well-pleaded factual allegations from which the Court can plausibly infer that Cvitanovich, the JPCO policymaker, "promulgated" these challenged practices or that these challenged practices even amount to official policies.

Cvitanovich also challenges Parria's attempt to plead *Monell* liability premised on a failure to train theory.[146] Parria fails to allege any facts that would plausibly support this theory. She likewise fails to defend this theory and appears to have

---

[144] ECF No. 29-1 at 24.
[145] ECF No. 1 ¶¶ 877–78.
[146] *Id.* ¶¶ 866–80.

abandoned or forfeited it. *See McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1010 (5th Cir. 2023) (citations omitted).

"To establish a failure-to-train claim, [Parria] must "prove that (1) [JPCO] failed to train or supervise the [employees] involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of [Parria's] rights; and (3) the failure to train or supervise constituted deliberate indifference to [Parria's] constitutional rights." *Hutcheson*, 994 F.3d at 482 (internal quotations and citations omitted).

Parria's conclusory failure-to-train allegations fail to satisfy the Rule 12(b)(6) standard. Parria claims that "JPCO demonstrated deliberate indifference to [Parria's] constitutional rights by failing to establish policies and procedures that adequately trained, monitored, and supervised" JPCO employees "regarding the constitutional duty not to fabricate evidence, despite the obviousness that such training, monitoring, or supervision was required to prevent constitutional violations."[147] Merely alleging in conclusory fashion that the JPCO fabricated its findings to mirror the JPSO's theory is insufficient to allege a failure to train claim.

Nor does Parria allege facts that might satisfy the deliberate indifference element, which requires that the plaintiff allege "a pattern of similar constitutional violations by untrained employees." *Hutcheson*, 994 F.3d at 482 (citation omitted). In this regard, Parria's allegations are self-defeating. Far from alleging a pattern, Parria argues that she alleges that Cvitanovich acted "contrary to his normal practice of not

---

[147] *Id.* ¶ 876.

involving himself in the manner and cause of death."[148] But municipalities "are almost never liable for . . . isolated unconstitutional act[s]" or for a "single incident" (as opposed to a pattern) of unconstitutional conduct. *See id.* (citations omitted).

In assessing plausibility, the Court may not indulge conclusions devoid of factual material. By failing to plead facts indicating an official policy, pattern of similar violations, moving force causation, and/or deliberate indifference, Parria fails to state a plausible *Monell* claim.

### B.     State-Law Claims

Parria asserts four state-law claims against all defendants including each of the JPCO Defendants: malicious prosecution (Count 10), wrongful imprisonment (Count 11), negligence or gross negligence (Count 12), and intentional infliction of emotional distress (Count 14). She also asserts three more state-law claims against Cvitanovich: in his individual capacity for negligent or grossly negligent supervision (Count 13) and in his official capacity for vicarious liability/*respondeat superior* (Count 15) and violations of the Louisiana constitution (Count 16). The JPCO Defendants seek to dismiss all of them on grounds of immunity, prescription, and failure to state a claim.

First, the JPCO Defendants contend they are shielded by state-law immunity entitled to coroners and support staff.[149] Parria counters that the statutory exception to immunity is implicated because the JPCO Defendants' conduct was criminal, fraudulent, malicious, intentional, outrageous, reckless, or flagrant. Just like her

---

[148] ECF No. 44 at 27.
[149] ECF No. 29-1 at 28–30.

55

federal claims, Parria's state-law claims against the JPCO Defendants are foreclosed by Parria's pleading deficiencies and immunity.

In Louisiana, the coroner is statutorily obliged to investigate the cause and manner of death in cases involving, *inter alia*, suspicious or unexpected death, sudden or violent death, or when death was due to a suspected suicide or homicide. La.R.S. § 13:5713(A)(1), (2), (6). Similarly, the coroner must perform an autopsy "in the case of any death where there is a reasonable probability that the violation of a criminal statute has contributed to the death." *Id.* at § 13:5713(B)(1).

By the same statute, Louisiana grants immunity to the coroner and support staff for the discretionary acts performed within the scope of their powers and duties. *Id.* at § 13:5713(I)(1) ("(1) Liability shall not be imposed on an elected coroner or his support staff based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties."). Of course, there are exceptions. Coroners and support staff do not enjoy immunity for "acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists[; or for] acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct." *Id.* at § 13:5713(I)(2)(a)-(b).

The JPCO Defendants argue that Parria's state law claims against them stem from their performance of discretionary acts well within a coroner's statutory duties such that they enjoy immunity from Parria's state-law claims.[150] The Court agrees.

Parria's allegations concerning each JPCO Defendant's conduct simply exemplifies their discretionary acts performed within the course of scope of their duties. Parria alleges that Powers, a JPCO investigator, participated in the investigation into Smith's death through (1) obtaining information from Smith's physician regarding the presence of drugs in Smith's system; (2) meeting with the JPSO and JPCO to discuss investigative findings; and (3) speaking with Smith's doctor about Smith's death and obtaining information from that doctor that she "did not think there was an exit wound but wasn't certain."[151]

Parria claims that Troxclair, a JPCO forensic pathologist, participated in the investigation of Smith's death through (1) performing the autopsy; (2) participating in meetings with JPSO and JPCO employees to discuss investigative findings; (3) preparing the initial autopsy report; (4) rendering conclusions on Smith's manner of death; (5) testifying regarding the autopsy and report; and (6) amending the autopsy report after obtaining new information from Smith's doctors and reviewing CT scans.[152]

Finally, Parria claims that Cvitanovich, the Coroner, participated in the investigation through: (1) attending meetings with the JPCO and JPSO to discuss

---

[150] *Id.*
[151] ECF No. 1 ¶¶ 175–78, 240, 293–94.
[152] *Id.* ¶¶ 231, 294, 330–31, 335, 372, 376, 382.

investigative findings along with speaking with JPSO Sheriff Lopinto; (2) meeting with Troxclair and other JPCO personnel to conduct an "in-depth Case Review Meeting" regarding the autopsy and case report; (3) signing the Case Report; (4) and issuing both the initial and amended autopsy reports with Troxclair which included conclusions on Smith's manner of death.[153]

Parria fails to allege any conduct that might fall outside the broad scope of immunity conferred on coroners and support staff performing their discretionary functions. In her opposition papers, Parria merely quotes the statutory exception to suggest that immunity is defeated because the JPCO Defendants' "acts or omissions constituted criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct."[154] Parria's conclusory statements, unsupported by factual allegations, do not overcome the JPCO Defendants' statutory immunity. *See Hassen v. Bowman*, No. 3:23-CV-01027, 2024 WL 3152654, at *12 (W.D. La. June 24, 2024), *appeal dismissed*, No. 24-30467, 2024 WL 5347225 (5th Cir. Sept. 25, 2024) ("There are no plausible allegations that [the coroner] was acting outside the course and scope of his lawful powers and duties as parish coroner[.]").

As addressed by the Court *supra*, Parria fails to allege facts indicating that any JPCO Defendant engaged in such conduct as would be excepted from immunity. At best, Parria's allegations amount to merely negligent conduct, the sort of conduct which falls comfortably within Louisiana's grant of immunity to coroners and support staff. Accordingly, Parria's state law claims must be dismissed.

---

[153] *Id.* ¶¶ 292–95, 330–35, 337–42, 375–76.
[154] ECF No. 44 at 27.

For the same reasons articulated compelling dismissal of Parria's federal claims predicated on the same conduct, Parria fails to plead any facts that overcome the JPCO Defendants' assertions of immunity with respect to their performance of their discretionary duties, which is the same alleged conduct on which all of Parria's claims are based. Given that Parria has failed to plead facts indicating that the JPCO Defendants engaged in the sort of malicious or outrageous conduct that would overcome their assertion of immunity, the JPCO Defendants' outstanding alternative grounds for dismissal are moot. It is unnecessary to resolve the JPCO Defendants' arguments that Parria's state-law claims additionally fail to state a claim and/or are prescribed.

Briefly, the Court observes that each of Parria's state law claims is based on the same course of conduct alleged by her and addressed throughout this Order and Reasons. The same pleading deficiencies that plague her federal claims thus doom her state-law claims. Given Parria's failure to allege *facts* plausibly suggesting deliberate, extreme, or malicious conduct on the part of the JPCO Defendants, her claims for malicious prosecution and intentional infliction of emotional distress fail. Parria appears to concede that the JPCO Defendants enjoy immunity from her negligence-based claims. And her wrongful imprisonment claim, predicated on the same alleged conduct addressed above in her Fourth Amendment claim, fails to state a claim against the JPCO Defendants for the same reasons. Insofar as Parria's state-law claims against Cvitanovich necessarily rely on the state-law claims against his

staff, Parria's claims against Cvitanovich fail. *See Terrell v. Pichon*, 413 F. Supp. 3d 515, 522 (E.D. La. 2019), *aff'd*, 795 F. App'x 935 (5th Cir. 2020).

And as to Parria's final claim that Cvitanovich violated her rights under several provisions of the Louisiana Constitution, Parria merely indicates that such claims are the same as her federal ones: *i.e.,* "the same intentional, malicious, reckless and deliberate conduct that violated [Parria's] rights under the United States Constitution" likewise violated her rights under the Louisiana Constitution.[155] Her state constitutional claims thus fail for identical reasons as articulated *supra*. Simply put, Parria fails to allege facts that if true would state plausible claims against the JPCO Defendants.

### C.    Futility of Amendment

Parria requests leave to amend her complaint in the event of dismissal.[156] The JPCO Defendants counter that amendment would be futile. The Court agrees with JPCO.

A plaintiff's "bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion within the contemplation of Rule 15(a)." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1170 (5th Cir. 2022) (quotation omitted); *cf. Porretto v. City of Galveston Park Bd. of Trs.*, 113 F.4th 469, 491 (5th Cir. 2024) (affirming denial of "bare bones" request in motion-to-dismiss opposition for "an opportunity to amend

---

[155] *Id.*
[156] *Id.* at 32.

the [c]omplaint if the Court deems additional factual allegations are necessary" (quotation omitted)).

Even if Parria's request were in proper form, denial of leave remains appropriate. Though leave to amend should be freely given when justice requires, Fed. R. Civ. P. 15(a), leave may be denied in the Court's discretion where amendment would be futile. *See, e.g., Aldridge v. Miss. Dep't of Corrs.*, 990 F.3d 868, 878 (5th Cir. 2021) ("[G]ranting leave to amend would have been futile, because 'the complaint as amended would be subject to dismissal' on the basis of preemption and sovereign immunity." (citation omitted)); *Edmiston v. La. Small Bus. Dev. Ctr.*, 931 F.3d 403, 408 (5th Cir. 2019) (denying leave to amend where the defendants were immune from suit).

Parria offers no indication that or how she could plead facts sufficient to overcome the JPCO's federal and state law immunity defenses. "The rule is that a defendant's entitlement to qualified immunity should be determined at the earliest possible stage of the litigation—full stop." *Carswell v. Camp*, 54 F.4th 307, 312 (5th Cir. 2022) (quotations omitted). Given "the importance of resolving immunity questions at the earliest possible stage in litigation," *Pearson v. Callahan*, 555 U.S. 223 at 231–32 (2009), and Parria's failure to offer any indication that she could plead facts sufficient to overcome these defenses against these defendants, the Court finds that leave to amend would be futile.

## IV.   CONCLUSION

**IT IS ORDERED** that the motion[157] to dismiss is **GRANTED**. Parria's claims against the JPCO Defendants are **DISMISSED WITH PREJUDICE.**

New Orleans, Louisiana, this 29th day of September, 2025.

_____
BRANDON S. LONG
UNITED STATES DISTRICT JUDGE

---

[157] ECF No. 29.