**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **SHANTEL PARRIA** | **CIVIL ACTION** |
| **VERSUS** | **NO. 23-3663** |
| **GERALD CVITANOVICH, ET AL.** | **SECTION "O"** |

<u>**ORDER AND REASONS**</u>

Before the Court is a Rule 12(c) motion for partial judgment on the pleadings, or in the alternative, a motion for partial summary judgment,[1] by Defendants Jefferson Parish Sheriff Joseph P. Lopinto, III and Jefferson Parish Sheriff's Office Deputies Donald Meunier, Kurt Zeagler, William Roniger, James Arey, and Timothy Scanlan (collectively, the "JPSO Defendants"). Plaintiff Shantel Parria opposes[2] the motion, and the JPSO Defendants filed a reply.[3] Parria has also filed a sur-reply.[4] For the following reasons, the JPSO Defendants' motion to dismiss is **DENIED**.[5]

## I.    BACKGROUND

Jefferson Parish Sheriff's Office Sergeant Troy Smith died one week after sustaining a single gunshot wound to his head, inflicted during a domestic dispute with his wife, Shantel Parria. The Jefferson Parish Sheriff's Office arrested Parria, who was charged with second-degree murder. After four years in custody pending her

---

[1] ECF No. 51.
[2] ECF No. 52.
[3] ECF No. 55.
[4] ECF No. 72.
[5] The JPSO Defendants do not raise qualified immunity in their motion to dismiss. ECF No. 51. Accordingly, the Court's denial of this motion to dismiss is not a denial of qualified immunity.

state criminal trial, Parria was acquitted and released. This civil rights lawsuit followed against certain police officers, coroner's office officials, and the prosecutors involved in the death investigation and Parria's prosecution.

Parria's complaint consists of a narrative recitation of facts followed by a series of legal claims (including nine federal claims under 42 U.S.C. § 1983 and seven state law claims). At this, the pleadings, stage, the Court "accept[s] all well-pleaded facts as true and view[s] those facts in the light most favorable to" Parria. *Anderson v. Valdez*, 845 F.3d 580, 589 (5th Cir. 2016) (internal quotation marks omitted). A brief summary of those alleged facts bearing on the instant motion follows.

Just before 11:30 p.m. on June 17, 2018, Parria called 9-1-1 seeking emergency medical services for her husband, JPSO Sergeant Troy Smith, whom Parria reported "sho[]t himself in the head" in the bedroom of their home in Waggaman, Louisiana.[6] Within minutes, JPSO deputies arrived on the scene, responding to the shooting of one of their own.[7] The deputies rendered aid to Smith until Emergency Medical Services arrived.[8] Smith, critically injured but clinging to life, was transported to the hospital.[9] The responding deputies took Parria's initial statement in her driveway, but according to Parria, her description of events was "sadly misunderstood."[10]

Smith's supervisor, Director of JPSO's Municipal Training Academy, James Arey—at the direction of Jefferson Parish Sheriff Joseph Lopinto—arrived at the

---

[6] *Id.* ¶¶ 1, 59.
[7] *Id.* ¶¶ 2, 61.
[8] *Id.* ¶ 61.
[9] *Id.* ¶¶ 5, 61.
[10] *Id.* ¶¶ 68-70, 77-78.

2

hospital before Smith and declared to West Jefferson ER personnel that "this is a murder."[11] This declaration, according to Parria, "revealed JPSO's intention to manufacture a case against Shantel Parria for murder, regardless of the facts and evidence."[12] If Parria was responsible for Smith's murder, in Parria's telling, JPSO could avoid the scandal and reputational harm that would ensue if it became known that one of JPSO's own (Smith, a highly trained firearms expert) was unstable and shot himself intentionally and/or shot himself accidentally.[13]

Twelve hours after the shooting, while at Smith's bedside in the hospital's Intensive Care Unit, JPSO Detective William Roniger took Parria's statement, which he audio-recorded.[14] During the five-minute statement, Parria described the day of the shooting: Parria and Smith woke up late morning, ran errands, and argued over Smith being jealous.[15] Smith began drinking around 4:00 p.m. when his children failed to call him to wish him a happy Father's Day.[16] Smith was "upset" and "depressed" about not celebrating Father's Day, both because his children did not call him and because Smith's own father was deceased.[17] After dinner, Smith continued to drink before they went to bed at 9:00 p.m., when they argued more.[18] Parria fell asleep, but Smith woke her up at 11:00 p.m. to continue arguing.[19] To deescalate the

---

[11] *Id.* ¶91.
[12] Id. ¶ 96.
[13] Id. ¶¶ 97-99, 104-05.
[14] *Id.* ¶¶ 111-12.
[15] *Id.* ¶ 113.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

argument, Parria left the house, but she returned minutes later to retrieve clothes.[20] Once inside, Smith resumed the argument.[21] He prevented her from getting into her car when she tried to leave.[22] Then Smith "stormed back into the house with [Parria's] phone and keys so that she could not leave."[23] As he walked back through the front door, Smith said, "f*ck it, I'll just kill myself."[24] Parria followed Smith into the bedroom, where he was on his side of the bed and "before [Parria] could stop him he picked up his gun, took it out of the holster, and shot himself."[25] Exactly one week after he sustained a gunshot wound to his head, Smith died at the hospital.[26]

The day after Smith died, on June 25, 2018, Sheriff Lopinto directed Arey to take Parria to JPSO's Human Resources Office to discuss financial arrangements for Smith's funeral.[27] Once there, Arey called Commander Meunier to advise that Parria was in the "insurance department," which prompted Commander Meunier to later allege that, just 24 hours after Sergeant Smith died, Parria presented herself at JPSO "for the purposes of assessing departmental life insurance payout to her as the beneficiary."[28] Though Parria learned for the first time at the Human Resources meeting that the JPSO departmental life insurance policy was for $130,000, JPSO Commander Meunier and Detective Zeagler later (during the Preliminary

---

[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.* ¶ 121.
[27] *Id.* ¶¶ 123-24.
[28] *Id.* ¶¶ 125-27.

Examination hearing) "use[d] this orchestrated incident to accuse [Parria] of murdering her husband to obtain his insurance benefits."[29]

That same day following Smith's death, Pathologist Dana Troxclair of the Jefferson Parish Coroner's Office ("JPCO") conducted Smith's autopsy.[30] During this same late June 2018 timeframe, JPSO met with JPCO to convey "[t]he general investigative findings of the Homicide Division . . . to provide context for the medical findings."[31] Parria alleges that JPSO (including Lopinto, Meunier, Zeagler, and Scanlan) "leaned heavily on JPCO [through Jefferson Parish Coroner Gerald Cvitanovich and JPCO Forensic Pathologist Dana Troxclair] to ignore the evidence and to classify [Smith's] death as anything other than a 'suicide' or 'accident.'"[32] The JPCO's July 2, 2018 draft case report, which was shared with JPSO and which was generated after two in-person meetings with JPSO's Homicide Division and a call between Sheriff Lopinto and Coroner Cvitanovich, reflected JPCO's preliminary finding of suicide or self-inflicted wound (with "manner of death" as "pending").[33]

The investigation continued. Informed by, among other things, crime scene photographs and investigative reports and interviews, JPSO Chief Deputy Timothy Scanlan conducted the forensic reconstruction of the scene, and formulated JPSO's bullet trajectory theory: the bullet entered the right side of Smith's head, exited the top of his head, and penetrated the ceiling above Smith's bed.[34] This bullet trajectory

---

[29] *Id.* ¶¶ 134-35.
[30] *Id.* ¶¶ 127, 337.
[31] *Id.* ¶¶ 174, 293-95.
[32] *Id.* ¶ 296.
[33] *Id.* ¶¶ 335-40.
[34] *Id.* ¶¶ 203-08.

theory, which was based the belief that Smith had an exit wound on top of his head and the discovery of a nick in the popcorn ceiling of the bedroom where the shooting occurred, was "inconsistent with a self-inflicted gunshot wound."[35] According to Parria, the medical evidence and evidence from the scene wholly undermined JPSO's bullet trajectory theory.[36]

Two weeks after Smith died, on July 11, 2018, Parria was arrested for second degree murder.[37] The arrest warrant was issued by a commissioner of the 24th Judicial District Court upon JPSO Commander Meunier's Affidavit for Arrest Warrant.[38] Meunier's Affidavit, recounted: Parria's alleged "deception" and "divergent accounts"; that Parria's assertions concerning Smith's depression and intoxication "were disproved"; entry and exit wounds on Smith's head were "inconsistent" with a self-inflicted gunshot wound; the "wound pattern, the crouched position [Smith would have had to assume], the scene reconstruction and the video surveillance collectively refute each and all of [Parria's] versions of the shooting[.]"[39]

Parria alleges that Commander Meunier intentionally omitted from his Affidavit any evidence of Smith's depression and his positive test for opiates and amphetamines upon hospital admission. Parria further alleges that Meunier submitted the affidavit *before* obtaining Smith's medical records[40] and *before*

---

[35] *Id.* ¶¶ 203-04, 208 (and Fig. 8), 397, 411, 415.
[36] *Id.* ¶¶ 202-208, 255, 278-85.
[37] *Id.* ¶¶ 137, 826.
[38] *Id.* ¶¶ 137, 826.
[39] *Id.* ¶¶ 139, 253.
[40] *Id.* ¶¶ 275, 447.

receiving the first DNA report,[41] but that he knew as early as two days after the shooting that there was no exit would on top of Smith's head, a finding later confirmed by Smith's medical records.[42] The hole in Smith's head was instead caused by a craniectomy performed by surgeons, who drilled several small holes and placed a drain in Smith's skull during interventions to stabilize him.[43]

After being arrested by JPSO in the middle of the night on July 11, Parria underwent a three-hour interrogation by JPSO Commander Meunier and Captain Dennis Thornton during which she provided a much more detailed statement than her prior five-minute recorded statement.[44] Parria was then booked on a charge of second degree murder.[45] Her bail was set at $500,000 but she lacked the resources to post it.[46]

On July 31, 2018, Parria (while in pretrial custody following her arrest on the warrant) allegedly confessed to a jailhouse snitch, Serrita Lambert, that she (Parria) murdered Smith.[47] In reality, Parria alleges, Commander Meunier orchestrated the "confession."[48]

A week after the "confession," on August 6 and 7, 2018, a Preliminary Examination hearing was held, contemporaneously with Parria's motion for bond redaction.[49] During the two-day hearing, a state court commissioner considered

---

[41] *Id.* ¶ 448.
[42] *Id.* ¶¶ 164, 167, 226-29, 283.
[43] *Id.* ¶¶ 278-84.
[44] *Id.* ¶¶ 450-54.
[45] *Id.* ¶ 478.
[46] *Id.* ¶ 479.
[47] *Id.* ¶ 598
[48] *Id.* ¶ 613.
[49] *Id.* ¶¶ 372-73; 485.

testimony and evidence to determine whether there was probable cause to hold Parria on the murder charge.[50] The state court commissioner found probable cause to hold Parria on the murder charge.[51]  Though Parria's bail was decreased to $300,000, she lacked the resources to post it.[52]

On November 8, 2018, a grand jury returned an indictment against Parria for one count of second-degree murder.[53] For another three years and nine months, Parria remained in custody pending trial.

On August 15, 2022, Parria's jury trial began.[54] On August 26, 2022, after two hours of deliberation, Parria was acquitted.[55]

On August 18, 2023, Parria filed in this Court[56] a 147-page, 907-paragraph Complaint in which she advances nine federal and seven state-law claims seeking redress from 11 named defendants and six unknown defendants whom allegedly were complicit in a scheme to wrongfully accuse, arrest, and prosecute her for her husband's murder.[57] The defendants are from JPSO (Sheriff Lopinto, JPSO Deputy/Homicide Division Commander Donald Meunier, JPSO Detective Kurt Zeagler, JPSO Detective William Roniger, JPSO Director of Municipal Training Academy James Arey, JPSO Chief Deputy Timothy Scanlan, JPSO John Doe 1, JPSO John Doe 2, and JPSO John Doe 3); JPCO (Jefferson Parish Coroner Gerald

---

[50] *Id.* ¶¶ 372-73; 485.

[51] *Id.* ¶¶ 135, 779.

[52] *Id.* ¶ 480.

[53] *Id.* ¶ 827.

[54] *Id.* ¶ 756.

[55] *Id.* ¶ 776.

[56] This matter was initially allotted to another section of Court. The case was transferred to this section of Court on December 28, 2023.

[57] ECF No. 1.

Cvitanovich, JPCO Forensic Pathologist Dana Troxclair, and JPCO Investigator Julia Powers); and Jefferson Parish District Attorney's Office ("JPDA") (DA Paul Connick, ADA Kellie Rish, JPDA John Doe 4, JPDA John Doe 5, and JPDA John Doe 6), as well as certain insurers. Parria purports to sue nearly all defendants in their individual and official capacities.

As for the JPSO Defendants, Parria alleges that they violated her constitutional rights, used the JPCO, and conspired with the JPDA to implicate Parria for the murder of her husband.[58] According to Parria, this conspiracy was rooted in the JPSO's conflicted and bad-faith murder investigation.[59] She alleges the JPSO Defendants continually opposed her bond reduction, fabricated evidence, tampered with witnesses, and attempted to deprive her of counsel.[60] Parria also points to specific incidents at her August 2018 hearing, including that Defendant Meunier offered fabricated testimony to increase Parria's bond obligation and that the JPSO Defendants induced witnesses to falsely testify.[61] Parria contends this scheme led to her four-year incarceration until her acquittal and release on August 26, 2022.[62]

The JPSO Defendants now seek partial judgment on the pleadings or partial summary judgment dismissing five claims: Count 2 (Section 1983 claim for unlawful seizure/detention without probable cause in violation of the Fourth Amendment),

---

[58] *Id.* ¶¶ 14, 297, 507.
[59] *Id.* ¶¶ 29–34.
[60] *Id.* ¶¶ 18, 506, 570–74, 621–23.
[61] *Id.* ¶¶ 617–623.
[62] *Id.* ¶¶ 776, 828.

Count 11 (state law wrongful imprisonment), Count 12 (negligence), Count 13 (negligent supervision), and Count 16 (violations of the Louisiana constitution) as time barred or prescribed.[63]

## II.    LEGAL STANDARDS

### A. Procedural

#### 1.  Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). The Court applies the same standard it applies to motions under Rule 12(b)(6). *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004) (citation omitted). The Court must construe all pleadings "so as to do justice." FED. R. CIV. P. 8(e).

Under Rule 12(b)(6), a complaint that does not meet Rule 8(a)(2)'s pleading standard should be dismissed for failing to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"

---

[63] ECF No. 51.

*Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Ultimately, "[t]o survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although courts "accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff, conclusory allegations, unwarranted factual inferences, or legal conclusions are not accepted as true." *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023) (cleaned up).

### 2. Extra-Pleading Material: Conversion to Summary Judgment

If the Court considers matters outside the pleadings in resolving a Rule 12(b)(6) or 12(c) motion, the Court must convert the motion into a Rule 56 motion for summary judgment. *See* FED. R. CIV. P. 12(d). The Court has "complete discretion" to consider (or not to consider) matters beyond the pleadings. *See Isquith ex rel. Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 194 n.3 (5th Cir. 1988) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure, § 1366 (3d ed. 2024)). The nature and extent of the proffered extra-pleading material guides discretion. That is, where limited extra-pleading material is offered such that conversion to summary

judgment will not facilitate a rational summary judgment disposition, consideration of the extra-pleading material (and conversion of a motion to dismiss to one for summary judgment) generally should be rejected. *See id.*

## B. Substantive: Statute of Limitations

Statute of limitations is an affirmative defense. FED. R. CIV. P. 8(C)(1). When a defendant seeks dismissal on statute of limitations grounds, generally the defendant bears the burden of proof to show the claim is time-barred. *Frame v. City of Arlington*, 657 F.3d 215, 240 (5th Cir. 2011) (citations omitted). Nevertheless, "[a] statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." *Doe 1 v. City View Independent Sch. Dist.*, --- F.4th ---, 2025 WL 2537001, at *3 (5th Cir. Sept. 4, 2025) (*per curiam*); *see also Frame*, 657 F.3d at 240 (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

### 1. Statute of Limitations for Section 1983 Claims

The JPSO Defendants seek to dismiss as time-barred one of Parria's nine federal claims: Count 2, which seeks to recover under § 1983 for the JPSO's unlawful seizure and continuous detention of Parria through trial, without probable cause (and instead with improper purpose based on false statements and fabricated evidence), in violation of the Fourth Amendment.

Section 1983 does not provide a limitations period. So courts borrow from state law: "[t]he statute of limitations for a suit brought under § 1983 is determined by the general statute of limitations governing personal injuries in the forum state."

*Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001) (citation omitted). In Louisiana, before July 1, 2024, that period is one-year. *See* La. Civ. Code art. 3492, *repealed on July 1, 2024 and replaced by* La. Civ. Code art. 3493.1.[64]

Unlike tolling, "the accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law." *See Wallace v. Kato*, 549 U.S. 384, 387 (2007) (emphasis in original). The Court looks to "general common law tort principles." *McDonough v. Smith*, 588 U.S. 109, 115 (2019) (citing *Wallace*, 549 U.S. at 388)). Accrual occurs "presumptively when the plaintiff has a complete and present cause of action, though the answer is not always so simple." *Id.* (cleaned up); *see also Jenkins v. Tahmahkera*, --- F.4th ---, 2025 WL 2396746, at *4 (5th Cir. Aug. 19, 2025) (the limitations period "begins the moment 'the plaintiff is or should be aware of the causal connection between his injury and the acts of the defendant'" (citation omitted)). "Where, for example, a particular claim may not realistically be brought while a violation is ongoing, such a claim may accrue at a later date." *McDonough*, 588 U.S. at 115 (citing *Wallace*, 549 U.S. at 389)).

Accrual thus depends first on a proper identification of—indeed, "pinpointing" (*Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 370 (2017))—the specific constitutional right at issue. *See McDonough*, 588 U.S. at 115. Assuming no bright line accrual rule applies to the articulated right at issue, courts consider which common-law claim the plaintiff's § 1983 claim most closely resembles, all the while maintaining fidelity "to

---

[64] Effective July 1, 2024, Louisiana's statute of limitations for personal injury claims changed from one to two years. La. Civ. Code art. 3493.1. Before then, Louisiana's prescriptive period was one year under La. Civ. Code art. 3492.

the values and purposes of the constitutional right at issue." *See Manuel*, 580 U.S. at 370. For example, in *Wallace*, the Supreme Court determined that the plaintiff's unlawful warrant-less arrest claim resembled a false-imprisonment claim, which was based on "detention without legal process" and thus the limitations period "beg[an] to run at the time the claimant bec[ame] detained pursuant to legal process." 549 U.S. at 387-89. For the plaintiff there, the false imprisonment ended (*i.e.,* detention pursuant to legal process began) and the limitations clock began to run upon the "initiat[ion] [of] legal process" when the criminal defendant/§ 1983 plaintiff "is bound over by a magistrate or arraigned on charges." *Id.* at 389-90.

But later in *McDonough*, the Supreme Court held that the statute of limitations for a Fourteenth Amendment fabricated-evidence claim "*like McDonough's* does not begin to run until the criminal proceedings against the defendant (*i.e.,* the § 1983 plaintiff) have terminated in his favor." 588 U.S. at 114 (emphasis added).[65] To reach this conclusion, the Supreme Court analogized common-law malicious prosecution claims to the plaintiff's fabricated-evidence claim,

---

[65] Like any § 1983 lawsuit, context is important. Notably, McDonough was not detained in custody pending the trial(s) which ultimately resulted in his acquittal. McDonough, a former commissioner of county elections board, was charged with forging absentee ballots in a local primary election. *Id.* at 112-114. He was acquitted after a second monthlong trial; the first monthlong trial ended in a mistrial. *Id.* McDonough sued Smith and other defendants alleging fabrication of evidence and malicious prosecution. The district court dismissed the malicious prosecution claim as barred by prosecutorial immunity and dismissed the fabricated evidence claim as time-barred. *Id.* McDonough maintained he was unaware the ballots had been forged and alleged that Smith, who was specially appointed to investigate and prosecute, had a grudge against McDonough's family, leaked to the press that McDonough was the target, and fabricated evidence to inculpate McDonough when he refused to confess. *Id.* Such fabricated evidence included falsified affidavits and false witness testimony, and Smith otherwise "orchestrated a suspect DNA analysis to link McDonough to relevant ballot envelopes." *Id.* Using this fabricated evidence, Smith secured a grand jury indictment. McDonough was arrested, arraigned, and released (with travel restrictions) pending trial, during which Smith presented the fabricated evidence. *Id.*

14

observing that "both claims challenge the integrity of criminal prosecutions undertaken 'pursuant to legal process.'" *Id.* at 116-17 (citation omitted). Additionally, the Supreme Court was persuaded by "practical considerations" compelling deferment of accrual: otherwise, "a ticking limitations clock [would be imposed] on criminal defendants as soon as they become aware that fabricated evidence has been used against them." *Id.* at 120. This was problematic, given the reality that "prosecutions regularly last nearly as long as—or even longer than—the relevant civil limitations period." *Id.* (citation omitted). Ultimately, the Supreme Court embraced the accrual rule that "respects the autonomy of state courts and avoids [certain costs]" to litigants such as subjecting criminal defendants to choosing between "(1) letting their claims expire and (2) filing a civil suit against the very person who is in the midst of prosecuting them." *Id.* at 120-21.

After *Wallace* but before *McDonough*, the Supreme Court decided *Manuel v. City of Joliet, Ill.*, 580 U.S. 357 (2017). There, a pretrial detainee, who had been arrested following a traffic stop and held in jail for seven weeks after a judge relied on allegedly fabricated evidence to find probable cause, sued the city and arresting officers alleging his arrest and detention were based on fabricated evidence which violated the Fourth Amendment. *Id.* at 359-363.[66] The Supreme Court observed that it had determined decades prior that "[t]he Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause." *Id.* at 364-66

---

[66] During the traffic stop, police officers found vitamins in a pill bottle. *Id.* Police officers alleged, and a lab report falsely reported, that the vitamins tested positive for ecstasy. *Id.* A judge relied on this fabricated evidence to permit the defendant's (Section 1983 plaintiff's) detention. *Id.*

(citations omitted) (reframing "[*Wallace*'s] somewhat obscure legal lingo [that] the subsequent detention was pursuant to 'legal process[,]'" the Fourth Amendment right in question was the right not to be held in custody in the absence of probable cause that would justify detention). Ultimately, the Supreme Court held that "the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process[,]" and acknowledged that the "legal process itself [may] go[] wrong— when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements." *Id.* at 366-67. Having framed the particular Fourth Amendment right, the accrual issue was remanded to the Seventh Circuit to resolve the parties' competing contentions regarding "what accrual rule should govern a § 1983 suit challenging post-legal-process pretrial detention."[67]

Also post-*Wallace* and *Manuel* but pre-*McDonough*, the Fifth Circuit addressed accrual of a § 1983 claim based on a Fourth Amendment violation in *Winfrey v. Rogers*. There, the Fifth Circuit considered whether the plaintiff's claim that he was wrongfully arrested due to reckless misstatements in the arresting police officer's warrant affidavit resembled the false imprisonment claim like in *Wallace*, or a malicious prosecution claim. 901 F.3d 483, 492 (5th Cir. 2018).[68] Because the plaintiff

---

[67] On remand, the Seventh Circuit determined that the Fourth Amendment "wrongful pretrial detention" claim accrued for limitations purposes when the detainee was released from custody. *Manuel v. City of Joliet*, 903 F.3d 667 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 2777 (2019). After the Supreme Court's decision in *Manuel I*, the Seventh Circuit observed in *Manuel II* that the "Fourth Amendment malicious prosecution [was] the wrong [analog]" because the plaintiff challenged being detained without probable cause, thus, "[t]he problem is the wrongful custody." *Id.* at 670 (citation omitted). Because "the wrong is the detention rather than the existence of criminal charges, the period of limitations also should depend on the dates of the detention." *Id.*

[68] The Fifth Circuit's opinion in *Winfrey II* came seven years into the § 1983 litigation in which the acquittee plaintiff had sued various municipal officers following his arrest for murder after a "botched investigation" led to his detention for 16 months before his trial, after which the jury

16

alleged "a wrongful institution of legal process—an unlawful arrest pursuant to [legal process,] a warrant—instead of a detention with no legal process[,]" the Fifth Circuit held that the claim resembled malicious prosecution rather than false imprisonment and thus "accrued when his criminal proceedings ended in his favor." *Id.* at 493.

## 2. Liberative Prescription for State-Law Claims

The JPSO Defendants seek to dismiss as prescribed four of Parria's state law claims: Count 11 (wrongful imprisonment), Count 12 (negligence), Count 13 (negligent supervision), and Count 16 (violations of the Louisiana constitution).

For tortious conduct occurring before July 1, 2024, Louisiana's one-year prescriptive period for delictual actions applies to claims based on Louisiana law. *See* La. Civ. Code art. 3492.

When it comes to accrual, however, Louisiana differs from common law. The Louisiana Supreme Court has explicitly distinguished between when the statute of limitations begins to run on a § 1983 false imprisonment claim and when it begins to run on a state law false imprisonment claim.

---

acquitted him in just 29 minutes. *Id.* at 487-88. At the time of the Fifth Circuit's opinion, only one deputy defendant remained to answer for the plaintiff's Fourth Amendment claims which focused on the deputy's signing an arrest warrant affidavit that lacked probable cause by omitting and misstating key facts. *Id.* at 488. That unconstitutional warrant, it was alleged, resulted in the plaintiff's unlawful arrest and imprisonment. When the district court granted the deputy's motion for summary judgment based on qualified immunity, the plaintiff appealed. On appeal, the Fifth Circuit determined that the plaintiff had a valid Fourth Amendment claim, that his claim was not time-barred because it accrued when he was acquitted, and that a fact issue remained as to whether the deputy violated the plaintiff's clearly established rights. *Id.* at 491-96. Ultimately, the Fifth Circuit vacated and remanded the district court's judgment for trial "on the factual issue of whether [the deputy] acted recklessly, knowingly, or intentionally by omitting and misrepresenting material facts in his affidavit when seeking [the] arrest warrant." *Id.* at 488, 498.

In *Eaglin*, the state high court found that state claims for false arrest and imprisonment accrued from the date of arrest, *not* from the date the arrestee was released from custody. *Eaglin v. Eunice Police Department*, 2017-1875 (La. 6/27/18), 319 So. 3d 225, 230. There, the plaintiff was arrested on May 4, 2015, released on August 21, 2015, and filed his suit on May 9, 2016. *Id.* at 229–30. Because plaintiff filed his complaint more than one year after his arrest, the court concluded his false arrest and imprisonment claims had prescribed. *Id.* The *Eaglin* court relied on the "well-settled concept that prescription commences to run from the day injury or damage is sustained." *Id.* at 229. Applying this principle, the court explained that it was "undisputed that that [plaintiff's] injury or damages based on the alleged false arrest and false imprisonment was first sustained on May 4, 2015, the date he was arrested." *Id.* It followed that liberative prescription commenced that day. *Id.* at 230.

*Eaglin*'s bright-line rule (state claims for false arrest and imprisonment accrue—and the one-year prescriptive period governing delictual actions begin to run—from date of arrest, not from the date arrestee was released from custody) expressly rejected *Wallace*'s (the statute of limitations in a § 1983 false imprisonment case began to run when the false imprisonment ends). *Id.* at 229. But the concerns underlying deferment of accrual in certain circumstances are not wholly absent in Louisiana law. The Louisiana Supreme Court nevertheless indicated that the concerns elucidated by *Wallace* and the common law rule were adequately addressed in the civil law tradition, where courts may ameliorate the harshness from strict application of prescription through the jurisprudential "doctrine of *contra non*

*valentem agere nulla currit praescriptio*, which provides that under certain specific conditions, prescription may be suspended when a plaintiff is unable to exercise his cause of action when it accrues." *Id.* (citation omitted). That civilian doctrine of *contra non valentem* simply did not apply to *Eaglin*'s plaintiff, who did not assert that he was prevented from filing suit due to incarceration and who was incarcerated for three months but was released from custody with eight months remaining in the prescriptive period. *Id.* at 229-30. But the court left open the possibility of its application where the facts called for it. *Id.*

## III.   ANALYSIS

### A.    Scope of the Instant Motion

### 1. Conversion to Summary Judgment Is Not Warranted.

The Court declines to convert the instant Rule 12(c) motion into a motion for summary judgment because it need not—and does not—consider matters outside the pleadings. In support of their motion, the JPSO Defendants rely exclusively on Parria's allegations in her Complaint though they additionally purport to rely on one exhibit[69] beyond the pleadings. But consideration of this singular exhibit will not facilitate a rational merits disposition. *See Isquith ex rel. Isquith,* 847 F.2d at 194 n.3 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure, § 1366 (3d ed. 2024)). Furthermore, at the time the instant motion was filed, no discovery had been

---

[69] ECF No. 51-1 (citing ECF No. 24-3). ECF No. 24-3 appears to be the cover page and page 54 of the Preliminary Examination/Bond Reduction hearing: "Transcript of Proceedings taken before Paul H. Schneider, Commissioner Presiding" on Tuesday, August 7, 2018.

completed. *See Landry v. Specialty Diving of Louisiana, Inc.*, No. 02-1746, 2002 WL 31478211, at *2 (E.D. La. Nov. 4, 2002) (reasoning that conversion from dismissal to summary judgment "is inappropriate . . . because the parties have not had the opportunity to complete discovery"). For these reasons, the Court declines to convert the JPSO Defendants' partial motion for judgment on the pleadings into a partial motion for summary judgment.

The JPSO Defendants' motion presents a discrete issue of whether a handful of Parria's claims are time-barred or prescribed based entirely on Parria's allegations in her Complaint—specifically, timing and the dates on which she was arrested, detained, and indicted (to which Parria adds the date of her acquittal and release).[70] Resort to a singular extra-pleading exhibit is not necessary to resolve the JPSO Defendants' motion. The Court will resolve the motion solely on the pleadings.

### 2. Adopting Other Defendants' Arguments Is Not Warranted.

Purporting to invoke Rule 10(c), the JPSO Defendants submit that they "adopt and incorporate by reference the arguments of the co-defendants on the issues presented in this Motion as if copied *in extenso*[.]"[71] The Court construes the JPSO Defendants' assertion as a request, and denies it.

The JPSO Defendants fail to persuade the Court that Rule 10(c) permits them to adopt arguments advanced by co-defendants in other motions. Rule 10(c) provides

---

[70] The JPSO Defendants cite to ECF No. 24-3, which purports to be the cover page and page 54 of the Preliminary Hearing transcript, as the source of the August 7, 2018 date of the preliminary examination hearing and the commissioner's probable cause finding. But Parria already alleges in her complaint this early August timeframe and that the commissioner found probable cause to detain her, with only a slight reduction in bond. *See, e.g.,* ECF No. 1 ¶¶ 135, 372-73, 375, 480, 485, 494, 504.

[71] ECF No. 51-1 at 8.

that "[a] statement in a *pleading* may be adopted by reference elsewhere in the same pleading or in any other pleading or motion." FED. R. CIV. P. 10(c) (emphasis added).[72] Rule 7(a) enumerates the pleadings permitted in federal court; absent from the list is any reference to motions, responses, or replies. FED. R. CIV. P. 7(a). In other words, Rule 7 embraces "pleadings" as a term of art, to include only a complaint, an answer, and, if the court orders one, a reply to an answer. *See id.* Motions, responses, and replies are not pleadings. *See Yankton v. Epps*, 652 F. App'x 242, 247 (5th Cir. 2016). Accordingly, the JPSO Defendants' request is denied.

### 3. Extraneous Arguments Collateral to Limitations or Prescription Defenses Are Insufficiently Briefed.

In their Rule 12(c) motion, the JPSO Defendants characterize Parria's complaint as a "shotgun pleading" and vaguely suggest that dismissal on that basis is warranted.[73] Parria counters that "[t]he JPSO Defendants are the absolute nerve-center, focal point of, and driving force behind all of" her allegations.[74]

The JPSO Defendants' critique fails to contend with Parria's factual allegations lodged against them, cites only persuasive (not binding) authorities, and neglects to apply those authorities to Parria's specific allegations against the JPSO Defendants. Considering this "argument" is not briefed and is merely collateral to the crux of their partial dismissal request focused on certain claims being time-barred,

---

[72] Rule 10(c) also specifies that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." FED. R. CIV. P. 10(c).
[73] ECF No. 51-1 at 4-6.
[74] ECF No. 52 at 16.

the Court declines to attempt to resolve the JPSO Defendants' unsupported contention regarding "shotgun pleading."[75]

Instead, mindful of the scope of the instant motion, the Court turns to consider whether the JPSO Defendants are entitled to the relief they seek, that is, whether the JPSO Defendants have carried their burden to show that Parria's claims in Counts 2, 11, 12, 13, and 16 are facially prescribed or time-barred.

### B.    Analysis: Whether Counts 2, 11, 12, 13, and 16 Are Facially Time-Barred.

The JPSO Defendants seek dismissal of the following claims solely on the ground that the claims are time-barred: one federal claim for Fourth Amendment deprivation of liberty without probable cause and several state law claims for wrongful imprisonment, negligence/gross negligence, negligent/grossly negligent supervision, and violations of rights based in the Louisiana constitution. The JPSO Defendants characterize these claims as false arrest claims which accrued upon arrest, whereas Parria characterizes her claims as challenging the integrity of the legal process, specifically, her seizure and detention absent probable cause which she

---

[75] Two final issues pertaining to the scope of the instant motion. First, in an argument relegated to a footnote in the instant motion to dismiss, the JPSO Defendants suggest that Counts 1 and 3 may also be prescribed because they appear to allege false arrest or false imprisonment claims. ECF No. 51-1 at 1–2 n.1. For the purposes of the instant motion, this argument is inadequately briefed and therefore forfeited. *See, e.g.*, *Smith v. Sch. Bd. of Concordia Par.*, 88 F.4th 588, 594 (5th Cir. 2023) ("[Courts] have repeatedly cautioned that arguments appearing only in footnotes are insufficiently addressed in the body of the brief and thus forfeited." (quotation and citations omitted)). Second, in her opposition papers, Parria contends that the JPSO Defendants' qualified immunity defenses should be deemed abandoned. ECF No. 52 at 15. Because Parria admits that the JPSO Defendants "assert this defense in each of their answers," *id.*, and the issue of the JPSO Defendants' qualified immunity is theirs to press by motion or otherwise, the issue is not squarely presented for resolution in the instant motion. But neither is it abandoned. Resolution of the JPSO Defendants' qualified immunity defenses must await another day.

contends support accrual only when her wrongful detention ended. The following dates are relevant to resolving the instant motion:

The JPSO obtained a warrant for Parria's arrest on July 10, 2018 for the second-degree murder of her husband.[76] On July 11, 2018, Parria was arrested on that warrant.[77] On August 6 and 7, a Preliminary Examination was held by a state court commissioner.[78] On the second day of the hearing, the state court found probable cause to continue to detain Parria on the second-degree murder charge.[79] On November 8, 2018, Parria was formally indicted by a grand jury.[80] On August 26, 2022, Parria was acquitted of second-degree murder and released from custody.[81] On August 18, 2023, Parria filed the instant lawsuit.

### 1. Parria's § 1983 Claim Under the Fourth Amendment Is Not Facially Time-Barred.

First, the JPSO Defendants contend that Parria's § 1983 unlawful seizure and detention claim predicated on the Fourth and Fourteenth Amendments should be dismissed as time-barred. Parria counters that Count 2 is not time-barred because it accrued when she was acquitted and released from custody on August 26, 2022, and she filed the instant lawsuit on August 18, 2023, which is within the one-year prescriptive period.[82] Clear and binding precedent supports Parria.

---

[76] ECF No. 1 ¶¶ 137, 450, 825.

[77] *Id.* ¶¶ 137, 450, 826.

[78] *Id.* ¶¶ 135, 372-73, 485, 494, 504, 622-23.

[79] *See id.* ¶ 480.

[80] *Id.* ¶ 827.

[81] *Id.* ¶¶ 776, 828. The JPSO Defendants dispute the relevance of this date.

[82] ECF No. 52 at 13, 17–18.

It is undisputed that the limitations period applicable to Parria's § 1983 claims is one year.[83]  The parties clash on accrual.

In contending that Count 2 is time-barred, the JPSO Defendants maintain that the one-year limitations period for a false imprisonment claim begins to run when the claimant is detained pursuant to legal process.[84] Because Parria was arrested on July 11, 2018 pursuant to a warrant, the JPSO Defendants contend Parria's claims had long prescribed by the time she filed suit five years later on August 18, 2023.[85] In support of their argument, the JPSO Defendants cite no binding case since *Wallace* (which holding they misunderstand), ignore more recent on-point authorities, and oversimplify to the point of distorting Parria's allegations. By ignoring binding precedent, the JPSO Defendants fail to conduct the proper analysis and advocate an incorrect result.

This Court's accrual analysis begins with pinpointing the right alleged to be infringed: here, Parria's Fourth Amendment right to be free from deprivation of liberty—pretrial incarceration for four years pending trial—without probable cause. *See McDonough*, 588 U.S. at 115 (citing *Manuel*, 580 U.S. at 370). From jump, Parria's claim is different from the plaintiff's claim in *Wallace*, which accrued once he was detained pursuant to legal process (when the false, warrant-less imprisonment ended). Parria claims she was never detained pursuant to legal process—that there was never probable cause to arrest or detain her. Parria's claim is thus more like the

---

[83] As set forth *supra*, the Court borrows Louisiana's one-year prescriptive period because Parria's claim concerns conduct which occurred from 2018 through 2022.

[84] ECF No. 1 ¶¶776, 828.

[85] *Id.*

plaintiffs' claims in *Manuel* or in *Winfrey* (and to some, though a lesser, extent the Fourteenth Amendment claim in *McDonough*) insofar as she alleges that her yearslong pretrial detention was based on the wrongful institution of legal process. The Supreme Court in *Manuel* characterized the contours of the right: "[l]egal process did not expunge Manuel's Fourth Amendment claim because the process he received failed to establish what the Amendment makes essential for pretrial detention— probable cause to believe he committed a crime." 580 U.S. at 368-69. These are precisely the circumstances anchoring Parria's Fourth Amendment claim. She claims that probable cause was lacking upon her arrest and never supported her continuing detention notwithstanding the "legal process" that ensued, including the Preliminary Examination and grand jury proceeding. Her Fourth Amendment unlawful arrest and pretrial detention claim thus complains that the "legal process itself [went] wrong" where JPSO Defendants made false statements and fabricated a murder narrative to keep her detained, just as the Supreme Court in *McDonough* indicated might occur "when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements." *See Manuel*, 588 U.S. at 366-67.

For the second step in assessing accrual, the Supreme Court and Fifth Circuit instruct that the Court consider the nuanced facts underlying the claim and whether the identified constitutional right infringed is more like a false-imprisonment claim at common law (a la *Wallace*) or instead resembles a malicious prosecution claim (a la *Manuel* or *Winfrey*). If the former, the limitations clock runs from the date the false

imprisonment ends. If the latter, the claim accrues when the criminal proceedings end in the criminal defendant/§ 1983 plaintiff's favor.

Parria's allegations more closely resemble *Manuel* and *Winfrey*. Like the plaintiff in *Manuel* (who alleged that his pretrial detention was predicated on a judge's order based solely on police fabrications) and *Winfrey* (who alleged that his pretrial detention was based on unreasonably false arrest warrant affidavits predicating court-issued warrants), Parria alleges that JPSO Commander Meunier's arrest warrant affidavit, evidence submitted during the preliminary hearing, and evidence submitted to the grand jury were all based on police officers' false representations and fabrications that objectively did not support probable cause. Just like in *Manuel* and *Winfrey*, then, Parria alleges that the legal process moved forward but did nothing to satisfy the Fourth Amendment probable cause requirement. She thus challenges pretrial detention "accompanied by wrongful institution of legal process" as violative of her Fourth Amendment rights, which the case law instructs is more "like the tort of malicious prosecution" than false imprisonment, which challenges detention in the absence of any legal process. *Winfrey*, 901 F.3d at 493. Thus, the same accrual rule applicable to malicious prosecution or evidence fabrication torts—keyed to detention—applies to Parria's Fourth Amendment claim: her claim accrued when her unlawful detention ended, when criminal proceedings ended in her favor. *Cf. Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 2777 (2019); *Winfrey*, 901 F.3d at 493.[86]

---

[86] *Cf. Quinlan v. Jefferson Parish Sheriff's Office*, No. 22-889, 2023 WL 3072814, at *4 (E.D. La. Apr. 25, 2023) (Vance, J.) (plaintiff's Fourth Amendment unlawful seizure claim based on *Franks*

Citing *Manuel*, *McDonough*, *Wallace*, and *Winfrey*, the Fifth Circuit reached a similar conclusion in an unpublished case, *Fusilier v. Zaunbrecher*, 806 F. App'x 280 (5th Cir. 2020). There, plaintiff alleged "(1) a '48 Hour Warrant' was issued for his arrest, (2) the warrant was signed by a state judge in the usual course, (3) he was arrested pursuant to that warrant, (4) but the officer preparing the warrant knew that there was no probable cause to arrest [plaintiff], and (5) [the officer] was not honest in her statements that formed the basis of the warrant affidavit[.]" *Id.* at 283. Finding *Winfrey* controlling, the Court reasoned that because the plaintiff was "challenging an unlawful detention pursuant to a warrant that the defendants caused to be issued because of 'misstatements,' [plaintiff's] claim best fits with a malicious prosecution analogy." *Id.* Again, the court determined that the plaintiff's claim accrued when he was acquitted, *not* when he first appeared before the magistrate judge. *Id.* (emphasis added).

Applying these controlling authorities compels the same conclusion. Parria's Fourth Amendment-based § 1983 claim did not accrue until she was released from detention upon her acquittal on August 26, 2022.[87] And Parria initiated this lawsuit on August 18, 2023.[88] Thus, on the face of Parria's Complaint, Parria's federal unlawful detention without probable cause claim against the JPSO Defendants was brought within one year from release/acquittal and is thus timely. The JPSO Defendants' motion to dismiss Count 2 must be denied.

---

accrued when the plaintiff was released from custody), *aff'd*, *Quinlan v. Lopinto*, No. 23-30490, 2024 WL 95367 (5th Cir. Jan. 9, 2024), *cert. denied*, 124 S. Ct. 176 (2024).

[87] ECF No. 1 ¶¶ 776, 828.
[88] ECF No. 1.

### 2. Parria's State-Law Claims Are Not Facially Prescribed and/or the Doctrine of *Contra Non Valentem* Is Facially Implicated.

The JPSO Defendants next seek to dismiss as prescribed some of Parria's state-law claims, specifically, Count 11 (wrongful imprisonment), Count 12 (negligence), Count 13 (negligent supervision), and Count 16 (violations of the Louisiana Constitution).[89] Parria counters that the detailed factual allegations in her Complaint sufficiently implicate *contra non valentem* such that even if these state-law claims accrued upon her arrest, accrual was suspended because she was prevented from bringing her lawsuit due to her incarceration, which continued for more than three years after the one-year prescriptive period expired.[90]

Again, the parties clash on the issue of accrual. The JPSO Defendants argue that the prescriptive period began the day of Parria's arrest, July 11, 2018.[91] Defendants contend that Parria's claims are untimely because Parria filed her complaint five years later.[92] Parria counters that the one-year prescriptive period was suspended during her four-year incarceration, making her claims timely.[93]

Again the relevant dates: Parria was arrested for second-degree murder on July 11, 2018,[94] acquitted (and released from custody) on August 26, 2022,[95] and initiated the instant suit on August 18, 2023.[96]

---

[89] ECF No. 51-1 at 10–11.
[90] ECF No. 52 at 19.
[91] *Id.*
[92] *Id.*
[93] ECF No. 52 at 18–22.
[94] ECF No. 1 ¶ 826.
[95] *Id.* ¶¶ 776, 828.
[96] ECF No. 1.

Both sides agree that the Louisiana Supreme Court's rule in *Eaglin v. Eunice Police Department*, 2017-1875 (La. 6/27/18), 319 So. 3d 225, governs the general issue of accrual. In *Eaglin*, the court found that state-law claims for false arrest and imprisonment accrued from the date of arrest, *not* from the date the arrestee was released from custody. *Id.* at 230. There, plaintiff was arrested on May 4, 2015, released on August 21, 2015, and filed his suit on May 9, 2016. *Id.* at 229–30. Because plaintiff filed his complaint more than one year after his arrest, the court concluded his false arrest and imprisonment claims had prescribed. *Id.* The *Eaglin* court relied on the "well-settled concept that prescription commences to run from the day injury or damage is sustained." *Id.* at 229. Applying this principle, the court explained that it was "undisputed that that [plaintiff's] injury or damages based on the alleged false arrest and false imprisonment was first sustained on May 4, 2015, the date he was arrested." *Id.* It thus follows that prescription commenced that day. *Id.* at 230.

Here, Parria was arrested on July 11, 2018. A strict application of *Eaglin* compels the conclusion that Parria's state-law claims sounding in false arrest and negligence accrued on that date.[97] But that does not end the inquiry. Mindful that this matter is at the pleadings stage, the Court considers Parria's argument that she has sufficiently alleged facts implicating *contra non valentem* such that her state-law claims premised on false arrest, negligence, negligent supervision, and Louisiana

---

[97] The JPSO Defendants do not advance arguments specific to each of the state law claims it seeks to dismiss as prescribed. Instead, the JPSO Defendants focus only on the wrongful arrest claim. Regardless of whether the same accrual analysis applies to all four state law claims or the JPSO abandoned any specific arguments pertaining to negligence, negligent supervision, and Louisiana constitutional claims, at this stage of proceedings, the result is the same: none of the challenged claims are facially prescribed.

29

constitutional violations are not facially prescribed because the one-year prescriptive period was suspended.

"A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." *Doe 1 v. City View Independent Sch. Dist.*, --- F.4th ---, 2025 WL 2537001, at *3 (5th Cir. Sept. 4, 2025) (*per curiam*). The doctrine of *contra non valentem* applies to suspend accrual of prescription but is "strictly construed" and "applies only in exceptional circumstances." *Jackson v. Jefferson Par. Clerk of Ct.*, 07-963 (La. App. 5 Cir. 4/15/08), 981 So. 2d 156, 160, *writ denied*, 2008-1150 (La. 10/31/08), 993 So. 2d 219. Parria alleges that the first and third categories of this doctrine apply: "where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action" and "where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action." *See Bradley v. Sheriff's Dep't St. Landry Par.*, 958 F.3d 387, 394 (5th Cir. 2020) (citation omitted). To be sure, "[c]*ontra non valentem* does not suspend prescription when a litigant is perfectly able to bring [her] claim but fails or refuses to do so." *Terrebonne Par. Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 885 (5th Cir. 2002).

Though *Eaglin* expressly rejected *Wallace*'s accrual rule for Louisiana-law false imprisonment claims, the state high court indicated that the concerns underlying deferment of accrual in certain circumstances are adequately addressed in the civil law tradition, where courts may ameliorate the harshness from strict

application of prescription through the jurisprudential doctrine of *contra non valentem*. 319 So. 3d at 229. To be sure, the doctrine of *contra non valentem* did not apply to *Eaglin*'s plaintiff, who did not assert that he was prevented from filing suit due to incarceration and who was incarcerated for three months but was released from custody with eight months remaining in the prescriptive period. *Id.* at 229-30. But the court did not rule out its application where the facts called for it. *Id.* Such is the nature of an equitable doctrine.

Parria contends the facts she alleges call for application of the *contra non valentem* doctrine. Parria contends that the allegations in her Complaint amply demonstrate that she was not able to bring—and indeed was prevented by the JPSO Defendants from bringing—her claims until her unlawful detention ended. Parria distinguishes *Eaglin*, where the Court found that *contra non valentem* did *not* apply because plaintiff "ha[d] *not* asserted that he was prevented from filing suit due to his incarceration." *Id.* at 225, 229 (emphasis added).[98] Parria contends that she is differently situated from the plaintiff in *Eaglin* in material ways. Unlike the plaintiff in *Eaglin*, Parria contends that the allegations in her Complaint indicate that "she was prevented from bringing suit due to her incarceration—incarceration which continued for [three plus] years after the asserted expiration of the prescriptive period."[99] She points to the JPSO Defendants' alleged misconduct—their opposition to her bail reduction, Defendant Meunier's testimony at her preliminary hearing, Defendants' witness tampering, and Defendants' efforts to deprive her of counsel—as

---

[98] ECF No. 52 at 19.
[99] *Id.*

to why she was unable to pursue her civil rights claims during the four years she was incarcerated pending her criminal trial.[100]

Mindful of the Court's limited inquiry at this—the pleadings—stage, and viewing Parria's extensive factual allegations in the light most favorable to her, the Court finds that Parria has adequately alleged facts that plausibly implicate *contra non valentem* tolling. Unlike the plaintiff in *Eaglin*, who did not even assert that he was prevented from filing suit due to his incarceration and who was released from custody with time to spare on the prescriptive period but still failed to file suit before the period expired, Parria alleges facts indicating that the JPSO Defendants prevented her from filing any civil suit during the pendency of her yearslong detention at their behest and she was not released before the prescriptive period ended. According to Parria's Complaint, she did not fail or refuse to bring her state-law claims against the JPSO Defendants; rather, actively defending trumped-up murder charges, she was prevented from filing suit due to her detention for more than three years pending trial.

On the alleged facts, Parria has carried her burden to allege facts plausibly indicating that the one-year prescriptive period was suspended during her pretrial detention and her state-law claims based on this unlawful pretrial detention accrued upon her release from custody. Accordingly, the JPSO Defendants' motion to dismiss her state-law claims for wrongful imprisonment, negligence, negligent supervision, and Louisiana constitutional violations must be denied.

---

[100] *Id.* at 20.

## IV.   CONCLUSION

**IT IS ORDERED** that the motion[101] for partial judgment on the pleadings is **DENIED**.

New Orleans, Louisiana, this 29th day of September, 2025.

BRANDON S. LONG
UNITED STATES DISTRICT JUDGE

---

[101] ECF No. 51.